# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 25, 2011          Decided July 8, 2011

No. 09-7125

JOHN DOE VIII, ET AL.,
APPELLANTS

v.

EXXON MOBIL CORPORATION, ET AL.,
APPELLEES

Consolidated with 09-7127, 09-7134, 09-7135

Appeals from the United States District Court
for the District of Columbia
(No. 1:07-cv-01022)
(No. 1:01-cv-01357)

*Agnieszka Fryszman* argued the cause for appellants on State Claims. *Paul Hoffman* argued the cause for appellants on Federal Claims. With them on the briefs were *Kathleen M. Konopka, Maureen E. McOwen, Terrence P. Collingsworth*, and *Piper M. Hendricks*. *Charles J. Ogletree Jr.* and *Joseph M. Sellers* entered appearances.

*Marco B. Simons* was on the brief for *amicus curiae* EarthRights International (ERI) in support of appellants.

2

*Jennifer M. Green* was on the brief for *amici curiae* University of Minnesota Law School, et al. in support of appellants.

*William J. Aceves* was on the brief for *amici curiae* International Law Scholars in support of appellants.

*Muneer I. Ahmad* was on the brief for *amici curiae* Arthur Miller, Erwin Chemerinsky, and Professors of Federal Jurisdiction and Legal History in support of appellants.

*Sri Srinivasan* argued the cause for appellees/cross-appellants. With him on the brief were *Walter Dellinger*, *Anton Metlitsky*, *Theodore V. Wells Jr.*, *Alex Young K. Oh*, *Nikhil Singhvi*, *Martin J. Weinstein*, and *Patrick J. Conlon*.

*Robin S. Conrad, Alan E. Untereiner*, and *Mark T. Stancil* were on the brief for *amicus curiae* The Chamber of Commerce of the United States of America in support of appellees.

*Jeffrey A. Lamken* and *Robert K. Kry* were on the brief for *amici curiae* National Foreign Trade Council, Inc. et al. in support of appellees.

*Daniel J. Popeo* and *Richard A. Samp* were on the brief for *amici curiae* Washington Legal Foundation, et al. in support of appellees.

Before: ROGERS, TATEL, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Opinion dissenting in part by *Circuit Judge* KAVANAUGH.

ROGERS, *Circuit Judge*: Pursuant to a contract with the Indonesian government, Exxon Mobil Corporation, a United States corporation, and several of its wholly owned subsidiaries (hereinafter "Exxon") operated a large natural gas extraction and processing facility in the Aceh province of Indonesia in 2000–2001. Plaintiffs-appellants are fifteen Indonesian villagers from the Aceh territory. Eleven villagers filed a complaint in 2001 alleging that Exxon's security forces committed murder, torture, sexual assault, battery, and false imprisonment in violation of the Alien Tort Statute ("ATS") and the Torture Victim Protection Act ("TVPA"), and various common law torts. (The *Doe I* complaint.) Four other Aceh villagers alleged in 2007 that Exxon committed various common law torts. (The *Doe VIII* complaint.) All plaintiffs-appellants allege that Exxon took actions both in the United States and at its facility in the Aceh province that resulted in their injuries. The district court dismissed the statutory claims, *see Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005), and discovery proceeded on the tort claims.[1] Those claims, however, were subsequently dismissed for lack of prudential standing. *See Doe VIII v. Exxon Mobil Corp.*, 658 F. Supp. 2d 131 (D.D.C. 2009). Plaintiffs-appellants challenge the dismissals of their complaints and Exxon filed a cross-appeal, *inter alia* raising for the first time that as a corporation it was immune from liability under the ATS.[2]

---

[1] In an interlocutory appeal filed in 2005, this court held that it lacked jurisdiction to address Exxon's contention that the complaint should be dismissed pursuant to the political question doctrine and that Exxon had failed to meet the standard for issuance of a writ of mandamus. *See Doe I v. Exxon Mobil Corp.*, 473 F.3d 345 (D.C. Cir. 2007).

[2] For purposes of these appeals it is unnecessary to distinguish between the two complaints. Plaintiffs-appellants appeal the dismissal of the statutory claims in 2005 by Judge Oberdorfer and

4

For the reasons that follow, we conclude that aiding and abetting liability is well established under the ATS. We further conclude under our precedent that this court should address Exxon's contention on appeal of corporate immunity and, contrary to its view and that of the Second Circuit, we join the Eleventh Circuit in holding that neither the text, history, nor purpose of the ATS supports corporate immunity for torts based on heinous conduct allegedly committed by its agents in violation of the law of nations. We affirm the dismissal of the TVPA claims in view of recent precedent of this court. We conclude, however, that Exxon's objections to justiciability are unpersuasive and that the district court erred in ruling that appellants lack prudential standing to bring their non-federal tort claims and in the choice of law determination. Finally, we conclude that Exxon's challenge to the diversity of parties in the *Doe VIII* complaint is to be resolved initially by the district court. Therefore, we affirm the dismissal of plaintiffs-appellants' TVPA claims, reverse the dismissal of the ATS claims at issue in this appeal, along with plaintiffs-appellants' non-federal tort claims, and remand the cases to the district court.

## I.

Accepting the allegations of the complaints as true, and construing the complaints in favor of plaintiffs-appellants, as we must, *see Warth v. Seldin*, 422 U.S. 490, 501 (1975), the plaintiffs claim that Exxon's security forces were comprised of members of the Indonesian military and that Exxon and its subsidiaries, which were incorporated at the time of the filing of the first complaint in New Jersey and Delaware, *Doe I* Compl. ¶¶ 17, 20, 23, retained these soldiers as guards for its natural

the dismissal of the common law torts in 2009 on prudential standing grounds by Chief Judge Lamberth.

gas facility even though Exxon was aware that the Indonesian army had committed human rights abuses in the past, *id.* ¶¶ 39–47; *Doe I* Am. Compl. ¶¶ 55–66; *Doe VIII* Compl. ¶¶ 39–59, and knew that performance of the security contract would lead to human rights violations by Indonesian soldiers against the residents of Aceh. *Doe I* Compl. ¶¶ 64, 71; *Doe I* Am. Compl. ¶¶ 60, 66, 125; *Doe VIII* Compl. ¶¶ 51–53, 79. The human rights abuses alleged included genocide, extrajudicial killing, torture, crimes against humanity, sexual violence, and kidnaping. *Doe I* Compl. ¶ 64. In addition to extrajudicial killings of some of the plaintiffs-appellants' husbands as part of a "systematic campaign of extermination of the people of Aceh by [d]efendants' [Indonesian] security forces," *id.* ¶ 65, the plaintiffs-appellants were "beaten, burned, shocked with cattle prods, kicked and subjected to other forms of brutality and cruelty" amounting to torture, *id.* ¶ 66, as well as forcibly removed and detained for lengthy periods of time, *id.* ¶ 67. Plaintiffs-appellants claim that Exxon or its agents, by decisions made in the United States, *id.* ¶¶ 30, 32–33, and at its Aceh plant, *id.* ¶¶ 55–57, "committed acts that had the intent and the effect of grossly humiliating and debasing" either them or their deceased husbands by "forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance" by actions that constitute "inhuman or degrading treatment in violation of the law of nations." *Id.* ¶ 68.

According to the complaints, these actions of the Indonesian military could be attributed to Exxon because they were committed by a unit dedicated only to Exxon's Aceh facility and Exxon had the authority "to control and direct[]" the soldiers' actions. *Id.* ¶ 40. Plaintiffs-appellants claim Exxon was aware of the atrocities committed by the Indonesian military in Aceh, as confirmed by public reports including reports of atrocities committed by Exxon's dedicated unit, and that Exxon

nonetheless provided logistical and material support to the military by hiring mercenaries to provide advice, training, intelligence, and equipment to the unit while Exxon profited from the operation of its Aceh facility. *Id.* ¶¶ 39–41, 46. By acting together with Indonesian security forces, the plaintiffs-appellants claim that Exxon acted under color of Indonesian law. *Id.*

On October 1, 2001, Exxon moved to dismiss the complaint, and after a hearing on the motion the district court requested the Office of Legal Adviser of the Department of State to inform the court whether the Department deemed adjudication of the case to affect adversely the interests of the United States. On July 29, 2002, the Office of Legal Adviser filed a statement of interest and attached a statement of the Indonesian Ambassador to the United States. Thereafter, the district court dismissed the statutory claims. It ruled that aiding and abetting was not actionable under the ATS, *Doe I*, 393 F. Supp. 2d at 24, that "sexual violence" is not sufficiently recognized as a violation of the law of nations to be actionable under the ATS, and that Exxon could not be liable for genocide and crimes against humanity because adjudication of such claims would "be an impermissible intrusion in Indonesia's internal affairs." *Id.* at 25. Although concluding that "resolving claims of complicity in arbitrary detention, torture, and extrajudicial killing pose[d] less of a threat of infringing Indonesia's sovereignty," *id.*, the district court ruled that the plaintiffs could not assert such claims against Exxon because color-of-law jurisprudence developed in lawsuits under 42 U.S.C. § 1983 was inapplicable in view of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). *Doe I*, 393 F. Supp. 2d at 25–26. The district court also ruled that joint action with the Indonesian military was not sufficiently alleged, but even if it were the required inquiry would raise justiciability concerns, and to the extent state action could be alleged under a proximate cause theory, that theory was not sufficiently

alleged in the complaint. *Id.* at 26–27. The district court declined to hold, as Exxon urged, that the ATS claims must be dismissed due to plaintiffs-appellants' failure to exhaust remedies in Indonesia because it was apparent that such efforts would be futile. *Id.* at 24–25.

On appeal, plaintiffs-appellants challenge the dismissal of their ATS and TVPA claims based on prohibitions of extrajudicial killing, torture, and prolonged arbitrary detention, but do not appeal the dismissal of their claims of genocide, crimes against humanity, or sexual violence. They contend, and Exxon does not dispute, that extrajudicial killing, torture, and prolonged arbitrary detention are clearly established norms of international law.[3] They also contend, but Exxon disputes, that the district court erred in ruling that aiding and abetting liability is unavailable under the ATS, in view of subsequent case law in the circuit courts of appeals, and in ruling that color-of-law jurisprudence may not be applied in ATS cases. Responding to Exxon's new contention on appeal that it is entitled to corporate immunity because customary international law does not recognize corporate liability for human rights violations, appellants contend that Exxon has conflated *Sosa*'s analysis for norms in a manner that is inconsistent with a well-established distinction in international law, and alternatively it has inaccurately recounted customary international law. Appellants maintain that corporations may be liable directly and also for aiding and abetting under the ATS and the TVPA.

Finally, appellants challenge the dismissal of their non-federal tort claims, contending that history demonstrates that

---

[3] This relieves the court from the task, in which our dissenting colleague unnecessarily engages, *see* Dis. Op. at 4 n.2, of identifying the universe of international norms capable of giving rise to causes of action in ATS lawsuits. *See* Oral Arg. Tr. at 64:9–12.

there is no *per se* bar on non-resident alien standing and that they meet the traditional zone-of-interests test for prudential standing. Exxon maintains that appellants cannot meet the zone-of-interests test because the alleged torts occurred on foreign soil and that any state law claims would be subject to foreign affairs preemption, and even if those claims survive, Indonesian law ought to apply. Exxon also raises three justiciability objections: the complaint should be dismissed in deference to the foreign policy views of the Executive Branch; the claims interfere with a peace agreement supported by the United States; and the claims threaten international comity with Indonesia. Exxon further maintains the *Doe VIII* complaint must be dismissed for lack of diversity jurisdiction.

In Part II, we address aiding and abetting liability under the ATS, concluding that it is well established. In Part III, we examine Exxon's claim of corporate immunity, concluding that corporations can be held liable under the ATS. In Part IV, we affirm the dismissal of appellants' claims under the TVPA in view of precedent issued by this court after oral argument in these cases. In Part V, we consider Exxon's contentions that the complaints should be dismissed on justiciability grounds and find them unpersuasive. In Part VI, we resolve appellants' challenge to the dismissal of their common law claims for lack of prudential standing, concluding that they have such standing; we agree, however, with Exxon that the district court erred in its choice of law determination and that Indonesian law applies under the District of Columbia choice of law rule to appellants' non-federal tort claims. In Part VII, we remand to the district court questions raised by Exxon with regard to the existence of diversity jurisdiction in *Doe VIII*.

We conclude that none of the four reasons offered by our dissenting colleague for reaching a different conclusion about the reach of the ATS withstand analysis. The dissent's first

objection relates to extraterritoriality when that issue is not presented and, as the historical context makes clear, the ATS reaches harm occurring outside of the United States. The dissent's objection to corporate liability is based on a misstatement of the definition of customary international law and of Supreme Court precedent, and disregards both a fundamental distinction between causes of action based on conduct that violates the law of nations or treaties and the remedy under domestic law, and a source of international law. The dissent's third objection that the TVPA precludes the court's conclusions regarding the ATS is contrary to the Supreme Court's conclusion about the effect of the TVPA on the ATS and inappropriately addresses an argument forfeited by Exxon. Finally, the dissent's justiciability objection selectively characterizes not only the complaints but also the State Department's expression of interest in this litigation.

## II.

The ATS stood largely dormant for nearly two centuries after its enactment in 1789. Two district courts invoked jurisdiction under the ATS. *See Adra v. Clift*, 195 F. Supp. 857 (D. Md. 1961)); *Bolchos v. Darrel*, 3 F. Cas. 810 (D.S.C. 1795) (No. 1,607). The first appellate court to uphold a claim under the ATS did so in 1980 when the Second Circuit held in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), that deliberate torture perpetrated under color of official authority violated universally accepted norms of international law on human rights and that the ATS provided federal jurisdiction over a claim by a resident alien against a Paraguayan official for the death of his son in Paraguay. The Supreme Court in *Sosa* described *Filartiga* as "the birth of the modern line of [ATS] cases." 542 U.S. at 724–25. Even after *Filartiga*, however, courts and commentators continued to disagree as to the proper interpretation of the ATS, resulting in the exchange between

Judge Edwards and Judge Bork in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984). The Supreme Court in *Sosa* settled this disagreement, adopting an approach consistent with both *Filartiga* and Judge Edwards' separate opinion in *Tel-Oren*.

The issue in *Sosa* was whether a Mexican citizen (Alvarez-Machain) could bring a claim under the ATS against Mexican nationals hired by the U.S. Drug Enforcement Administration ("DEA") for an alleged violation of the law of nations arising from his "arbitrary arrest." DEA agents had obtained an arrest warrant from a U.S. district court and hired Mexican nationals (including Sosa) to abduct Alvarez-Machain and bring him to the United States to be arrested. 542 U.S. at 698. The Supreme Court, although concluding the ATS was "intended as jurisdictional," *id.* at 714, and "creat[ed] no new causes of action," *id.* at 724, held that "[t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time," *id.* Further, the Court concluded that "Congress has not in any relevant way amended § 1350 or limited civil common law power by another statute." *Id.* at 725. The Court went on to observe, as we discuss in Part V, that "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind." *Id.*

Upon considering the history and purpose of the ATS, the Supreme Court instructed that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized," *id.*, referencing violation of safe conducts, infringement of the rights of

ambassadors, and piracy, *id.* at 724.  The Court recognized that "a judge deciding in reliance on an international norm will find a substantial element of discretionary judgment in the decision," *id.* at 726, but admonished that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted," *id.* at 732.  Appellants' aiding and abetting contention meets this test.

In dismissing appellants' statutory claims, the district court relied principally on *In re South African Apartheid Litigation*, 346 F. Supp. 2d 538, 549–51 (S.D.N.Y. 2004), which held that private actors who did not engage in state action committed no violation remediable under the ATS.  That authority was overruled in *Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007), *aff'd for lack of en banc quorum sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 256 (2d Cir. 2009), *cert. denied*, 131 S. Ct. 79 (2010).  The district court also ruled that there was no liability for aiding and abetting under the ATS, applying the rule of statutory construction in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 181–82 (1994), *superseded in part by statute*, 15 U.S.C. § 78t(e), that there is no general presumption in favor of aiding and abetting liability. *Doe I*, 393 F. Supp. 2d at 24.

Appellants persuasively contend that aiding and abetting liability exists under the ATS.  Virtually every court to address the issue, before and after *Sosa*, has so held, recognizing secondary liability for violations of international law since the founding of the Republic.  Appellants cite as examples *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133, 167–68 (1795) (Iredell, J.), *The Amiable Nancy*, 1 F. Cas. 765, 768 (C.C.D.N.Y. 1817) (No.

331), and *Henfield's Case*, 11 F. Cas. 1099 (C.C.D. Pa. 1793) (No. 6,360). Further, they note that aiding and abetting liability was a common feature of Founding-era statutes addressing international law offenses, *see* Crimes Act of 1790, ch. 9, § 10, 1 Stat. 112, 114 (1790) (deeming "an accessary [sic] to . . . piracies" anyone who "knowingly and willingly aided" piracy). Exxon maintains, however, that there is no aiding and abetting liability under the ATS because of the presumption against extraterritorial application established at the time of the ATS's enactment, and the Supreme Court's instruction in *Central Bank*, 511 U.S. at 181–82, that although "aiding and abetting is an ancient criminal law doctrine," *id.* at 181, "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors," *id.* at 182. For the following reasons, we hold that there is no extraterritoriality bar as Exxon suggests, that the principle of aiding and abetting liability is well established in customary international law, and that the *mens rea* and *actus reus* requirements are those set out by the Nuremberg Tribunals and the international courts created by the United Nations, which reflect the standard under federal common law.

### A.

The issue of extraterritoriality, although briefed,[4] was not decided in *Sosa*, and it has yet to be decided by a circuit court of appeals. One judge of this court discussed the issue in *Tel-Oren*, looking to the then-tentative draft Restatement of the Foreign Relations Law of the United States, 726 F.2d at 781 n.7, 788 (Edwards, J., concurring), which in its final version states

---

[4] Brief for the United States as Respondent Supporting Petitioner 47–50, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (No. 03-339), 2004 WL 182581.

that a nation has universal jurisdiction to define and prescribe punishment for certain egregious crimes regardless of any territorial considerations, RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 404, and otherwise a nation may prescribe law as to conduct occurring or having an effect in its territory and "the activities, interests, status, or relations of its nationals outside as well as within its territory," *id.* § 402(1)–(2); *see also Sosa*, 542 U.S. at 761 (Breyer, J., concurring) (citing RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 401(1)–(2)). The two other judges in *Tel-Oren* and our recent decision in *Ali Shafi v. Palestinian Authority*, ___ F.3d ___. 2011 WL 2315028 (D.C. Cir. June 14, 2011), relied on other grounds for dismissing the ATS claims, notwithstanding that both involved claims of harms occurring outside of the United States, as did the claims in *Sosa* and *Filartiga*.

The Supreme Court, however, recently reaffirmed the "presumption against extraterritoriality" in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), holding that "[r]ather than guess anew in each case, we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Id.* at 2881. "This principle represents a canon of construction, or a presumption about a statute's meaning." *Id.* at 2877. "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 2878.

The ATS provides in full:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

14

28 U.S.C. § 1350. The ATS was enacted as part of the Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77 (1789), and its content has not been materially amended since its enactment.[5] Its terms are "jurisdictional," the Supreme Court held in *Sosa*, "enabl[ing] federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." 542 U.S. at 712. At the time of enactment of the ATS, the Court observed, "torts in violation of the law of nations were understood to be within the common law." *Id.* And although the Supreme Court has fundamentally altered the breadth and understanding of federal common law since the ATS's enactment, *see id.* at 729 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 604 (1938)), the Court noted in *Sosa* that in

---

[5] The ATS has been amended three times. In 1874, as part of the first official codification of the Acts of Congress when the grants of jurisdiction were listed, the ATS was amended to read: "The district courts shall have jurisdiction . . . [o]f all suits brought by any alien for a tort only in violation of the law of nations, or of a treaty of the United States." Rev. Stat. § 563 (1st ed. 1875). In the 1911 codification of the Judiciary Act, a comma was added after the phrase "tort only" and a comma was removed after the phrase "law of nations"; neither change appears to have had any practical effect. Act of Mar. 3, 1911, ch. 231, § 24, 36 Stat. 1087, 1093 (1911). In the 1948 revision of the Judicial Code, the term "civil action" was substituted for "suits" to conform with Rule 2 of the Federal Rules of Civil Procedure, which provided that "there shall be one form of action to be known as a 'civil action.'" Act of June 25, 1948, ch. 646, § 1350, 62 Stat. 869, 934 (1948) (codified at 28 U.S.C. § 1350). The word "committed" was added, but no party has cited a case or scholarly work suggesting the addition has any significance or that Congress had any particular intent in adding it. *See Tel-Oren*, 726 F.2d at 779 n.3 (Edwards, J., concurring). Also in the 1948 Act, the term "any alien" reverted to "an alien," consistent with the original 1789 language, and the word "original" was inserted before "jurisdiction." 62 Stat. at 934.

certain areas federal common law will prevail either because of express congressional authorization to devise a body of law, *see id.* at 726 (citing *Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448 (1957)), or by way of judicial decision "to create federal common law rules in interstitial areas of particular federal interest," *id.* (citing *United States v. Kimbell Foods, Inc*., 440 U.S. 715, 726–27 (1979)). The Court concluded that the ATS was enacted on the basis of a "congressional assumption" that courts would develop common law claims "derived from the law of nations," thus ensuring that any common lawmaking authority as to actionable conduct would, at least, be cabined by the law of nations. *Id.* at 731 n.19.

Citing *Morrison*, Exxon contends that a "strong presumption . . . against extending [federal statutes] to encompass conduct in foreign territory" militates against recognizing a common law aiding and abetting claim based on human rights violations committed in a foreign country. Appellees' Br. 37. Exxon posits a novel form of the canon, for it appears beyond debate that piracy is contemplated by the ATS, *see Sosa,* 542 U.S. at 719; *Tel-Oren*, 726 F.2d at 779 (Edwards, J., concurring) (citing 4 BLACKSTONE'S COMMENTARIES *67); *id.* at 813–14 (Bork, J., concurring), and piracy can occur outside of the territorial bounds of the United States, *see generally United States v. Hasan*, 747 F. Supp. 2d 599 (E.D. Va. 2010), and, the Supreme Court has held, also within the territorial waters of another nation, *see United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 200–01 (1820). *Morrison* and other Supreme Court cases hold, in contrast to Exxon's canon, "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." 130 S. Ct. at 2877 (quoting *EEOC v. Arabian Am. Oil Co.* ("*ARAMCO*"), 499 U.S. 244, 248 (1991)); *see also Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949); *Blackmer v. United States*, 284 U.S. 421, 437 (1932); *United*

*States v. Bowman*, 260 U.S. 94, 98–99 (1922). It is at least arguable that none of the modern cases cited by Exxon (and our dissenting colleague, Dis. Op. at 7–10) interpret statutes having obvious extraterritorial reach, as the dissent concedes is true of the ATS, *see* Dis. Op. at 14–15.

"This principle [of a presumption against extraterritorial reach of a statute] represents a canon of construction . . . rather than a limit upon Congress's power to legislate." *Morrison*, 130 S. Ct. at 2877. Exxon's characterization of the presumption against extraterritoriality is incomplete at best, stating the presumption is "against extending [federal statutes] to encompass conduct in foreign territory." Appellees' Br. 37. Exxon has cited no authority supporting the existence of a presumption that a statute applies to the high seas (e.g., piracy) but not to foreign territory; indeed, Exxon cites two Supreme Court cases supporting the contrary: *The Apollon*, 22 U.S. (9 Wheat.) 362, 370 (1824), and *Rose v. Himely*, 8 U.S. (4 Cranch) 241, 279 (1808). In *The Apollon* the Court held that "[t]he laws of no nation can justly extend beyond its own territories, *except so far as regards its own citizens*," 22 U.S. at 370 (emphasis added), and in *Rose v. Himely* "that the legislation of every country is territorial; that beyond its own territory, *it can only affect its own subjects or citizens*," 8 U.S. at 279 (emphasis added).[6] To the extent Exxon maintains that the ATS is only

---

[6] In *Rose v. Himely* the Court went on to hold that "a seizure of a person not a subject, or of a vessel not belonging to a subject, made on the high seas, for the breach of a municipal regulation, is an act which the sovereign cannot authorize," 8 U.S. at 279, indicating that the background principle at work at the time was one where extraterritoriality was based on a national sovereignty principle rather than a special high-seas exception. Such a principle remains a part of international law today. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 402(2); *Sosa*, 542 U.S. at

partially extraterritorial, it advocates a novel canon of statutory construction, and not one of the settled "background canons of interpretation of which Congress is presumptively aware" when it legislates. *Lockhart v. United States*, 546 U.S. 142, 148 (2005).

Our dissenting colleague would bifurcate the canon by requiring a separate query with respect to the high seas and foreign countries. The dissent posits that because piracy by definition occurs on the high seas, application of the canon against extraterritoriality — as that canon has been consistently defined by the Supreme Court for over two hundred years — creates a statutory outcome that is at odds with congressional intent that the ATS grant federal courts jurisdiction over aliens' piracy-related torts. Dis. Op. at 14–16. Finding the existing canon of no avail, the dissent mutates both the canon and the precedent into a new canon that produces the desired result. To the extent that a canon of construction draws its persuasiveness in large measure from the fact that Congress is "presumptively aware," *Lockhart*, 546 U.S. at 148, of such canons of outstanding vintage when it legislates and thus "preserv[es] a stable background against which Congress can legislate with predictable effects," *Morrison*, 130 S. Ct. at 2878, a newly minted canon fashioned in a dissenting opinion more than two hundred years after the First Congress provides no such benefit.[7]

761 (Breyer, J., concurring).

[7] To the extent a presumption existed at the time of the First Congress, it differed materially from that suggested by Exxon and the dissent. Appellees' Br. 37; Dis. Op. at 7–9. In *Furlong*, the Supreme Court interpreted the reach of the piracy and other provisions in the Crimes Act of 1790. 18 U.S. at 200. Stating that a court ought to consider the statute by "reference to the punishing powers" of

Further, a technical but nonetheless important point sheds light on Exxon's contentions: appellants are not asking this court to apply the ATS itself extraterritorially. In *Sosa*, the Supreme Court held that the ATS is a jurisdictional statute that provides U.S. district courts with jurisdiction over civil actions brought by aliens seeking relief for torts committed in violation of the law of nations, and does not itself create causes of action. 542 U.S. at 713–14; 28 U.S.C. § 1350. As a jurisdictional statute, it would apply extraterritorially only if Congress were to establish U.S. district courts in foreign countries. To say that a court is applying the ATS extraterritorially when it hears an action such as appellants have brought makes no more sense

Congress and then apply a "reasonable presumption" that Congress did not intend to exceed those powers, and conversely that "general words . . . ought not . . . be restricted so as to exclude any cases within their natural meaning," the Court held that "it was reasonable to conclude[] that Congress intended to legislate, unless [the] express language shall preclude that conclusion." *Id.* at 196. The powers of Congress applied in *Furlong* were those identified in *The Apollon*, 22 U.S. at 370, and *Rose v. Himely*, 8 U.S. at 279, namely that Congress may legislate with respect to acts within U.S. territory and with respect to its own citizens. Thus, in *Furlong*, the Court affirmed the convictions for piracy of two U.S. citizens under the 1790 Act where the crimes had been committed in the territorial waters of Portugal, i.e., in a roadstead near the islands of Boa Vista and Maio, off the western coast of Africa. 18 U.S. at 200–01; *see also* U.S. DEP'T OF STATE, BACKGROUND NOTE: CAPE VERDE, *available at* http://www.state.gov/r/pa/ei/bgn/2835.htm (last visited June 21, 2011); John H. Knox, *A Presumption Against Extrajurisdictionality*, 104 AM. J. INT'L L. 351, 364 (2010). The dissent argues that "[c]haracteristically [piracy] has been regarded as an offense of the open seas," Dis. Op. at 16 n.8 (quoting Edwin D. Dickinson, *Is the Crime of Piracy Obsolete?*, 38 HARV. L. REV. 334, 336–37 (1925)), but in *Furlong* the Supreme Court has made patently clear that the First Congress intended the term "high seas" to include at least some territory of foreign states, *see* 18 U.S. at 200–01.

than saying that a court is applying 28 U.S.C. § 1331, the federal question statute, extraterritorially when it hears a TVPA claim brought by a U.S. citizen based on torture in a foreign country.

Thus, the question here is not whether the ATS applies extraterritorially but is instead whether the common law causes of action that federal courts recognize in ATS lawsuits may extend to harm to aliens occurring in foreign countries. One might hope to resolve this question by considering whether the First Congress would have understood federal courts to have the authority to recognize such causes of action. Unfortunately, the historical record with respect to this question is sparse and has been characterized as ambiguous. The authority most on point is a 1795 legal opinion by U.S. Attorney General William Bradford. *See* Breach of Neutrality, 1 Op. Att'y Gen. 57 (1795). In the midst of the war between Britain and France that followed the French Revolution, U.S. citizens participated in a French privateer fleet's attack and plunder of the British colony of Sierra Leone in 1794. *See id.* at 58.[8] Responding to a protest from the British Ambassador, Attorney General Bradford expressed "some doubt" as to whether the U.S. citizens could be prosecuted in U.S. courts. *See id.* at 58–59. But Bradford had "no doubt that the company or individuals who ha[d] been injured by the[] acts of hostility ha[d] a remedy by a *civil* suit in the courts of the United States" since Congress in the ATS had granted federal courts "jurisdiction . . . in all cases where an

---

[8] *See also* William R. Casto, *The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations*, 18 CONN. L. REV. 467, 502–03 (1986) (hereinafter "Casto, *Law of Nations*") (citing CHRISTOPHER FYFE, A HISTORY OF SIERRA LEONE, 59–61 (1962)), cited by the Supreme Court in *Sosa*, 542 U.S. at 713, 717, 718, 719 n.13, 721.

alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States." *Id.* at 59 (emphasis in original).

Bradford's opinion, however, is not a model of clarity. The paragraph containing Bradford's discussion of the ATS opens by stating, "So far . . . as the transactions complained of originated or took place in a foreign country, they are not within the cognizance of our courts . . . ." *Id.* at 58. In context, this statement might be best read as applying only to the scope of the U.S. courts' *criminal* jurisdiction. The majority in the Second Circuit, however, interpreted the statement more broadly, citing it as support for the proposition that at the time of its enactment, the ATS was not understood to grant federal courts jurisdiction over international law violations committed within the territorial jurisdiction of foreign nations but "only for the actions taken by Americans on the high seas." *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 142 n.44 (2d Cir. 2010).[9] In *Sosa* the Supreme Court viewed the Attorney

---

[9] The cases on which Exxon relies, which seek to invoke early piracy cases for the proposition of non-extraterritoriality, are inapposite. For instance, in *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818), the Supreme Court interpreted the Crimes Act of 1790 not to extend to situations where a non-citizen attacked a vessel under foreign flag bearing citizens of a foreign state. Exxon fails, however, to account for *United States v. Klintock*, 18 U.S. (5 Wheat.) 144 (1820), where the Supreme Court backed away from *Palmer*, stating that although *Palmer* could be "understood to indicate the opinion that the whole act must be limited in its operation to offences committed by, or upon, the citizens of the United States," that issue was not before the Court in *Palmer*. *Id.* at 152. The Court held that so long as the piracy was committed by persons on board a vessel not "belonging to the subjects of any foreign power . . . in possession of a crew acting in defiance of all law, and acknowledging obedience to no government whatever," *id.*, or in other words, a vessel having no nationality, the piracy provisions of the Crimes Act of 1790 would

General's opinion as "clear that a federal court was open for the prosecution of a tort action growing out of the episode," 542 U.S. at 721, but noted uncertainty about whether Bradford assumed there had been a violation of a treaty and concluded that "it appears likely Bradford understood the ATS to provide jurisdiction over what must have amounted to common law causes of action," *id*.

Extraterritorial application of the ATS would reflect the contemporaneous understanding that, by the time of the Judiciary Act of 1789, a transitory tort action arising out of activities beyond the forum state's territorial limits could be tried in the forum state. *See Stoddard v. Bird*, 1 Kirby 65, 68

---

reach the conduct. This "description happens to fit pirates to a tee." Eugene Kontorovich, *The "Define and Punish" Clause and the Limits of Universal Jurisdiction*, 103 Nw. U. L. Rev. 149, 189 (2009) (citing 4 Blackstone's Commentaries *71). Further, Exxon fails to address developments in response to *Palmer*, namely that in 1819 Congress amended the Crimes Act of 1790 to provide:

> That if *any* person or persons *whatsoever*, shall, on the high seas, commit the crime of piracy, as defined by the law of nations, . . . every such offender or offenders shall . . . be punished with death.

Act of March 3, 1819, ch. 77, § 5, 3 Stat. 510 (1819) (emphasis added). The 1819 Act was indefinitely extended, Act of May 15, 1820, ch. 113, § 2, 3 Stat. 600 (1820), and the crime of piracy today is "nearly identical," *Hasan*, 747 F. Supp. 2d at 614 (citing 18 U.S.C. § 1651 and, *inter alia*, *United States v. Corrie*, 25 F. Cas. 658, 663 (C.C.D.S.C. 1860) (No. 14,869)). Other cases, such as *The Apollon*, 22 U.S. at 370, and *Rose v. Himely*, 8 U.S. at 279, on which Exxon (a U.S. citizen) relies, and the prize court cases on which *amici* Washington Legal Foundation and Allied Educational Foundation rely, do not advance their extraterritorial objection.

(Conn. Super. Ct. 1786) (Ellsworth, J.); *Mostyn v. Fabrigas*, (1774) 98 Eng. Rep. 1021 (K.B.) 1025–26; Casto, *Law of Nations*, *supra* note 8, at 503–04 & n.205. It also would reflect an understanding that a violation of the law of nations could occur within the territorial jurisdiction of a foreign country and be civilly remediable in the United States courts. As early as 1781, Lord Mansfield held in *Lindo v. Rodney,* 2 Doug. 614 (K.B.), *reprinted in Le Caux v. Eden*, (1781) 99 Eng. Rep. 375 (K.B.), that "[b]y the law of nations, and treaties, every nation is answerable to the other for all injuries done, by sea or land, or in fresh waters, or in port," *id.* at 389 n.1, and that "every reason which created a Prize Court as to things taken upon the high seas, holds equally when they are thus taken at land," *id.*, citing treaties as old as 1498, *id.* at 389, and parliamentary acts from the reign of King George II, *id.* at 392. Congress adopted this definition of "piracy" in the Act of May 15, 1820, ch. 3, § 3, 3 Stat. 600 (1820).

Chancellor Kent, "the great commentator on American law," *Holy Trinity Church v. United States*, 143 U.S. 457, 470 (1892), and then "the country's foremost legal scholar," *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 278 n.13 (1977), in "his landmark work," *Sun Oil Co. v. Wortman*, 486 U.S. 717, 726 (1988), described both *Lindo* and the piracy statute as "only declaratory of the law of nations." 1 JAMES KENT, COMMENTARIES ON AMERICAN LAW 189 (New York 8th ed. 1854) (hereinafter "KENT'S COMMENTARIES"). The Crimes Act of 1790 had similarly contemplated violations of the law against piracy committed on land.[10] *Id.* at 187–89. The dissent,

---

[10] The Crimes Act of 1790 provided punishment for

every person who shall, either upon the land or the seas, knowingly and wittingly aid and assist, procure, command, counsel, or advise any person or persons, to do or commit . . .

in maintaining that the ATS ought to apply wherever piracy can occur, *see* Dis. Op. at 14–16, makes no attempt to reconcile its view with early definitions of piracy that are not limited to the high seas.

True, the 1790 Act did not provide for primary liability for actions taken on the land of another nation, instead providing punishment as a principal only for crimes of piracy committed "upon the high seas, or in any river, basin or bay, out of the jurisdiction of any particular [U.S.] state," ch. 9, § 8, 1 Stat. at 113–14; *Furlong*, 18 U.S. at 200–01. Moreover, *amici* suggest that the provisions were never invoked by prosecutors in cases involving actions taken within the territory of another nation, Brief of Washington Legal Foundation and Allied Educational Foundation as *Amici Curiae* in Support of Defendants-Appellees ("Wash. Legal Found. Br.") 11 n.8, although the facts of *Furlong*, *see supra* note 7, weaken this point. Consequently, the historical record, clear on the notion that U.S. courts at the nation's founding could exercise jurisdiction over at least some international law violations committed beyond our domestic shores and in the territorial waters of another nation, *Furlong*, 18 U.S. at 200–01, is nonetheless ambiguous regarding whether

---

piracy . . . on the seas, [and that] all and every such person so as aforesaid, aiding, assisting, procuring, commanding, counselling [sic] or advising the same, *either upon the land or the sea*, shall be, and they are hereby declared, deemed and adjudged to be accessary [sic] to such piracies before the fact, and every such person being thereof convicted shall suffer death."

§ 10, 1 Stat. at 114 (emphasis added).

jurisdiction could be exercised over law of nations violations occurring on the land of another nation.[11]

To the extent the historical record is inconclusive, two modern developments convince us that it is entirely appropriate to permit appellants to proceed with their aiding and abetting claims even though much of the conduct relating to the international law violations alleged in their complaint occurred in Indonesia. First, modern ATS litigation has primarily focused on atrocities committed in foreign countries, and Congress in enacting the TVPA expressly endorsed federal courts' exercise of jurisdiction over such lawsuits. The Report of the Senate Committee on the Judiciary states that the "TVPA would establish an unambiguous basis for a cause of action that has been successfully maintained" in ATS lawsuits such as *Filartiga*, explaining that in that case "two citizens of Paraguay alleged that a former Paraguayan inspector general of police had tortured and killed a member of their family in Paraguay." S. REP. NO. 102-249, at 4 (1991).[12] The TVPA thus "enhance[d]

---

[11] The complaints at issue concern aiding and abetting liability where at least some of the conduct causing harm to the plaintiffs in Indonesia occurred in the United States. The district court, in denying in part Exxon's motion for summary judgment on the non-federal tort claims, found that the plaintiffs had presented sufficient evidence of corporate control within the United States to go to trial. *Doe I v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 31–32 (D.D.C. 2008).

[12] The Legal Advisor of the State Department supported adjudication of the claims in *Filartiga*, participating as *amicus curiae* and stating that:

> The . . . international law of human rights . . . endows individuals with the right to invoke international law, in a competent forum and under appropriate circumstances. . . . As

the remedy already available under" the ATS by extending that civil remedy also to U.S. citizens who may have been tortured abroad. *Id.* at 5. Expressing approval for the ATS, the Senate Committee report thus noted that "[c]onsequently, that statute should remain intact." *Id.* The Report of the House Committee on the Judiciary is to the same effect. *See* H.R. REP. NO. 102-367, at 3 (1991). Second, although the United States argued in *Sosa* that the ATS in no way "applies to alleged torts, such as the one [at issue in *Sosa* – arbitrary detention], that occur outside of the United States," Brief for United States at 8, *Sosa*, 542 U.S. 692 (2004) (No. 03-339); *see also id.* at 46–50; Reply Brief for United States at 19–20, *Sosa*, 542 U.S. 692 (2004) (No. 03-339), no Justice indicated agreement with the United States' position, *cf. Sosa*, 542 U.S. at 762–63 (Breyer, J., concurring). Given Congress's ratification of ATS lawsuits involving foreign conduct and the Supreme Court's failure to disapprove of such lawsuits in *Sosa*, we conclude that the extraterritoriality canon does not bar appellants from seeking relief based on Exxon's alleged aiding and abetting of international law violations committed in Indonesia.

The arguments of our dissenting colleague offer no basis for a contrary conclusion. First, the dissent notes that injuries of the sort alleged here, by aliens occurring abroad, could be remedied "by foreign sovereigns under their countries' laws." Dis. Op. at 12. Perhaps so, but the unchallenged finding by the

a result, in nations such as the United States where international law is part of the law of the land, an individual's human rights are in certain cases directly enforceable in domestic courts.

Memorandum for the United States as *Amicus Curiae* at 20, *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) (No. 79-6090), *reprinted in* 19 I.L.M. 585, 602–03 (1980).

district court is that the plaintiffs could not litigate their claims in Indonesia, even assuming, as Exxon argued before the district court, that international law required exhaustion of local remedies, because they had demonstrated such efforts would be futile, an exception to prudential exhaustion. *Doe I*, 393 F. Supp. 2d at 25 (citing *Hammontree v. NLRB*, 925 F.2d 1486, 1517 (D.C. Cir. 1991); *Rasoulzadeh v. Assoc. Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983), *aff'd without op.* 767 F.2d 908 (2d Cir. 1985)). In *Sosa,* the Supreme Court referenced the exhaustion argument by *amicus* European Commission but noted that it need not reach the question although stating it "would certainly consider this requirement in an appropriate case." 542 U.S. at 733 n.21. Since then the only circuit to address the question concluded that "certain ATS claims are appropriately considered for exhaustion under both domestic prudential standards and core principles of international law," *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 824 (9th Cir. 2008) (en banc), noting that "[u]nder international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies, unless such remedies are clearly sham or inadequate, or their application is unreasonably prolonged," *id.* at 829 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 713 cmt. f, and citing *id.* § 703 cmt. d, and *Interhandel* (*Switz. v. U.S.*), 1959 I.C.J. 6, 26 (Mar. 29)); the Ninth Circuit also recognized the futility exception applied by the district court here, *id.* at 830. Because Exxon has not challenged the district court's finding of futility, this court has no occasion to decide the question. To the extent Exxon suggests subsequent events in Indonesia may have rendered the finding outdated, that issue may be addressed on remand, *see infra* Part V.C.[13]

---

[13] The dissent's satisfaction with foreign domestic remedies and use of extradition, Dis. Op. at 12 n.5, 14 n.7, undoes the First

Second, in deeming "very odd" that the First Congress would be interested in protecting "a Frenchman injured in London," Dis. Op. at 12, the dissent ignores that the calculus can change where a U.S. citizen is a cause of the harm.[14] *E.g.*, *The Apollon*, 22 U.S. 362; *Furlong*, 18 U.S. at 200–01; *Rose*, 8 U.S. 241. "Congress in prescribing standards of conduct for American citizens may project the impact of its laws beyond the territorial boundaries of the United States," *Steele v. Bulova Watch Co.*, 344 U.S. 280, 282–83 (1952), especially where a defendant engaged in acts here that "were essential steps in the course of business consummated abroad," *id.* at 287. The Supreme Court has not found an extraterritorial bar when a federal statute provided for criminal or civil liability for a

---

Congress's decision that federal courts should be empowered to provide a remedy for aliens suffering torts in violation of the law of nations. Relying on foreign domestic remedies, the dissent assumes such harms occur in the territory of the offended country and not in the territory of a third disinterested country. Furthermore, neither party nor *amici* describe the status of extradition treaties prior to the passage of the Judiciary Act of 1789. By way of example, the Jay Treaty with the United Kingdom permitted extradition only in cases of murder and forgery, *see* Treaty of Amity, Commerce, and Navigation, U.S.-Gr. Brit., art. XXVII, Nov. 19, 1794, 8 Stat. 116, 129, and appeared to exclude violations of the law of nations such as piracy, *see id.* art. XX, 8 Stat. at 126–27.

[14] The objections in some respects echo the minority views in the Senate Committee report accompanying the TVPA, which expressed concerns about "over-extendind[ing] Congress's constitutional authority" in that statute. S. REP. NO. 102-249, at 13. But the dissent ignores the fact that both the minority and the majority views agreed no such concern existed in a case where the "connection to the United States . . . is clear," *id.* at 14, as in *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983), where a foreign defendant used a U.S. corporation as an instrumentality of a breach of contract, *id.*

scheme devised and executed in the United States intended to inflict harm abroad, e.g., to a Frenchman in London.[15] *See Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 921–22 (D.C. Cir. 1984); *cf. Pasquantino v. United States*, 544 U.S. 349, 371–72 (2005). Here, appellants claim that Exxon engaged in acts in the United States that were part and parcel of the harm they suffered. Considering the identity of the person causing harm to the Frenchman in London further illuminates the First Congress's intent. After all,

> where the individuals of any state violate this general law [of nations], it is then the interest as well as duty of the government, under which they live, to animadvert upon them with a becoming severity, that the peace of the world may be maintained. For in vain would nations, in their collective capacity, observe these universal rules, if private subjects were at liberty to break them at their own discretion, and involve the two states in a war. It is therefore incumbent upon the nation injured, first, to demand satisfaction and justice to be done on the offender, by the state to which he belongs; and, if that be refused or neglected, the

---

[15] The dissent finds fault with this citation of *Steele* and *Pasquantino,* misinterpreting their citation. The court is not, as the dissent suggests, reading *Steele* "to permit application of a nonextraterritorial statute *whenever* conduct in the United States contributes to a violation abroad," *Morrison*, 130 S. Ct. at 2886 n.11 (emphasis supplied). Dis. Op. at 8 n.4. Rather, the court starts with the ATS text and history and concludes that the ATS, like the statute at issue in *Steele*, grants federal courts jurisdiction over at least some forms of extraterritorial conduct. The court cites *Pasquantino* only as support for the proposition that where, as here, plaintiffs may ultimately prove that Exxon provided substantial practical assistance, *see infra* Part II.C, from its offices in the United States, jurisdiction over extraterritorial harm is all the more appropriate.

> sovereign then avows himself an accomplice or abettor of his subject's crime, and draws upon his community the calamities of foreign war.

4 BLACKSTONE'S COMMENTARIES *67–68. Blackstone's representation that a foreign country could deem the United States an "accomplice or abettor," *id.* at *68, of a violation of the law of nations if it does not censure a U.S. citizen who has violated that law makes the First Congress's judgment hardly "odd" at all.

**B.**

The rule of statutory construction set forth in *Central Bank* does not preclude recognition of aiding and abetting liability for claims under the ATS. In *Central Bank*, the Supreme Court held that although § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j, did not prohibit aiding and abetting liability, "the private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)," 511 U.S. at 173. The Court declined to create a presumption against aiding and abetting liability, but instructed that when Congress enacts a statute, there is no presumption in *favor* of aiding and abetting liability. *Id.* at 182. Our conclusion that there is aiding and abetting liability under the ATS is not based on a presumption in favor of aiding and abetting liability.

The ATS provides jurisdiction for the federal courts to hear lawsuits regarding torts "committed in violation of the law of nations." 28 U.S.C. § 1350. Congress thus directed that the courts derive the rule of law from the law of nations, and that law extends responsibility for conduct violating its norms to aiders and abettors. The "Supreme Court's instruction in *Central Bank* that 'when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no

general presumption that the plaintiff may also sue aiders and abettors,' is thus inapposite." *Khulumani*, 504 F.3d at 282 (Katzmann, J., concurring) (quoting *Central Bank*, 511 U.S. at 182) (internal citation omitted); *see also id.* at 288 n.5 (Hall, J., concurring); William R. Casto, *The New Federal Common Law of Tort Remedies for Violations of International Law*, 37 RUTGERS L.J. 635, 650 (2006) (hereinafter "Casto, *Federal Common Law*").

Ample authority supports the conclusion that the First Congress considered aiding and abetting itself to be a violation of the law of nations. All three branches of government had addressed the subject and were in accord. Congress in 1790 enacted a piracy law providing for aiding and abetting liability. Crimes Act of 1790, § 10, 1 Stat. at 114. President George Washington, in response to the state of hostilities in Europe following the French Revolution, issued the Proclamation of Neutrality in 1793, warning "the citizens of the United States carefully to avoid all acts and proceedings" that would contravene that neutrality and "mak[ing] known that" citizens would render themselves "liable to punishment or forfeiture under the law of nations by committing, *aiding, or abetting* hostilities against any" power involved in the general conflict "or by carrying to any of them those articles which are deemed contraband by the modern usage of nations." Proclamation No. 3 (1793), *reprinted in* 11 Stat. 753 (1859) (emphasis added). So too, the 1795 opinion of Attorney General Bradford stated that civil recovery could be had in federal court against U.S. citizens who "aided and abetted" the French privateer fleet in its plunder of Sierra Leone. 1 U.S. Op. Att'y Gen. at 58; *see also Sosa*, 542 U.S. at 721. An early decision of the Supreme Court upheld aiding and abetting liability for the unlawful capture of a neutral

ship. *See Talbot*, 3 U.S. at 167–68; *see also Henfield's Case*, 11 F. Cas. 1099.[16]

Because aiding and abetting liability implicates the character of the "specific conduct allegedly committed by the defendants sued," *Khulumani*, 504 F.3d at 269 (Katzmann, J. concurring), *adopted in Presbyterian Church of Sudan*, 582 F.3d at 258, the conduct must represent a violation of an international

---

[16] *Henfield's Case* involved a U.S. citizen accused of illegally enlisting with a French privateer. Chief Justice John Jay, sitting on circuit, instructed the grand jury that: (1) "the laws of the United States" consisted of treaties, the law of nations, and the Constitution and statutes of the United States, 11 F. Cas. at 1100–01; (2) "circumstances and considerations now unite in urging the people of the United States to be particularly exact and circumspect in observing the obligation of treaties, and the laws of nations, which . . . form a very important part of the laws of our nation," *id.* at 1102; (3) President Washington's proclamation had been "exactly consistent with and declaratory of . . . the law of nations," *id.*; (4) if a nation "let[s] loose the reins of [its] subjects against foreign nations, these will behave in the same manner to [it]," *id.* at 1103; and (5) those "who commit, *aid, or abet* hostilities against" the European nations in violation of neutrality must be punished, *id.* at 1104 (emphasis added), and "[w]hat acts amount to committing, or *aiding, or abetting* hostilities, must be determined by the laws and approved practice of nations, and by the treaties and other laws of the United States relative to such cases," *id.* (emphasis added). The grand jury charge was apparently published to explain the effect of the 1793 Proclamation at home and abroad. *See* Casto, *Law of Nations*, *supra* note 8, at 502 & n.193 (citing Ralph Lerner, *The Supreme Court as Republican Schoolmaster*, 1967 SUP. CT. REV. 127; FRANCIS WHARTON, STATE TRIALS OF THE UNITED STATES DURING THE ADMINISTRATIONS OF WASHINGTON AND ADAMS (hereinafter "WHARTON'S STATE TRIALS") 49 n.* (1849); JULIUS GOEBEL, JR., HISTORY OF THE SUPREME COURT OF THE UNITED STATES, ANTECEDENTS AND BEGINNINGS TO 1801, at 623–24 (1971)).

law norm with at least as "definite content and acceptance among civilized nations [as] the historical paradigms familiar" in 1789, *Sosa*, 542 U.S. at 732. To the extent the district court in *Doe I*, 393 F. Supp. 2d at 24, concluded that aiding and abetting liability would be an "'innovative interpretation[ ]' of the Alien Tort Statute" that could result in "collateral consequences and possible foreign relations repercussions," the Second Circuit has since held that there can be aiding and abetting liability under the ATS, *see Presbyterian Church of Sudan*, 582 F.3d at 258–59; *Khulumani*, 504 F.3d at 260 (per curiam). The Eleventh Circuit has also held that aiding and abetting liability is available under the ATS. *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1258 n.5 (11th Cir. 2009); *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008); *Aldana v. Del Monte Fresh Produce N.A.*, 416 F.3d 1242, 1248 (11th Cir. 2005). Both courts reached this conclusion upon looking to customary international law, *see Presbyterian Church of Sudan*, 582 F.3d at 258; *Aldana*, 416 F.3d at 1247–48, to which we now turn.

Decisions of the courts established by the U.N. Security Council, the International Military Tribunal at Nuremberg established in the Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, U.N.T.S. 280 (hereinafter "London Charter"), and the several Nuremberg tribunals are recognized as an authoritative source of customary international law. *See, e.g.*, *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 244 n.18 (2d Cir. 2003); *United States v. Yousef*, 327 F.3d 56, 105 nn.39–40 (2d Cir. 2003); *cf. Hamdan v. Rumsfeld*, 548 U.S. 557, 610 & n.40 (2006); *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1121 (1995). *See generally* Theodor Meron, *Reflections on the Prosecution of War Crimes by International Tribunals*, 100 AM. J. INT'L L. 551, 559 (2006). The General Assembly of the United Nations has

unanimously affirmed the principles of international law recognized by the London Charter and the Nuremberg tribunals. *See* Affirmation of the Principles of International Law Recognized by the Charter of the Nürnberg Tribunal, G.A. Res. 95(I), U.N. Doc. A/236 (Dec. 11, 1946) ("Nuremberg Principles Resolution I"). Exxon does not dispute that the London Charter and the cases prosecuted thereunder constitute sources of customary international law.

"[C]riminal responsibility of those who aid and abet violations of international law" has been "accepted as one of the core principles of the post-World War II war crimes trials." *Khulumani*, 504 F.3d at 273 (Katzmann, J., concurring). The London Charter extended responsibility for crimes to "accomplices participating in the formulation or execution of a common plan or conspiracy to commit" any of the crimes triable by the Tribunal. London Charter art. 6, 82 U.N.T.S. 282. At the direction of the U.N. General Assembly, the International Law Commission ("ILC") in 1950 formulated "principles recognized in the Charter . . . and in the judgment of the Tribunal," as a codification of certain legal principles applied by the Nuremberg tribunals. *See* Nuremberg Principles Resolution I; *see also Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Trial Chamber Judgement, ¶ 526 (Sept. 2, 1998); *Prosecutor v. Milosevic*, Case No. IT-02-54, Trial Chamber Decision on Preliminary Motions, ¶¶ 29–30 (Nov. 8, 2001). Principle VII provided that "[c]omplicity in the commission of a crime against peace, a war crime, or a crime against humanity . . . is a crime under international law." ILC, Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal, G.A.O.R., 5th session, Supp. No. 12, U.N. Doc. A/1316, Principle VII (1950) ("ILC Principles"). Implementing the London Charter, the joint Allied body coordinating the governance of postwar Germany promulgated Control Council Law No. 10 to impose criminal liability on

whomever was "an accessory to the commission of any such crime or ordered or abetted the same." Allied Control Council Law No. 10, art. II, § 2 (Dec. 20, 1945) ("Control Council Law No. 10")*, in* 1 ENACTMENTS AND APPROVED PAPERS OF THE CONTROL COUNCIL AND COORDINATING COMMITTEE 306 (1945) ("ENACTMENTS"); *see Khulumani*, 504 F.3d at 272 (Katzmann, J., concurring); *Flick v. Johnson*, 174 F.2d 983, 985–86 (D.C. Cir. 1949).

The U.N. Security Council resolutions establishing the International Criminal Tribunal for the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR") likewise imposed liability on any "person who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution" of a crime. Statute of the International Criminal Tribunal for the Former Yugoslavia, art. 7, U.N. Doc. S/25704 annex (May 3, 1993) ("ICTY Statute"), *adopted in* S.C. Res. 827, U.N. Doc. S/RES/827 (May 25, 1993); Statute of the International Criminal Tribunal for Rwanda, art. 6, S.C. Res. 955, U.N. Doc. S/RES/955 annex (Nov. 8, 1994) ("ICTR Statute"). The Secretary General of the United Nations explained that "in assigning to the International Tribunal the task of prosecuting persons responsible for serious violations of international humanitarian law, the Security Council would not be creating or purporting to 'legislate' that law. Rather, the International Tribunal would have the task of applying existing international humanitarian law." Report of the Secretary-General Pursuant to Paragraph 2 of Security Council Resolution 808, ¶ 29, U.N. Doc. S/25704 (May 3, 1993) ("Sec'y General ICTY Report"). The ICTY's jurisdiction was limited to "rules of international humanitarian law which are beyond any doubt part of customary [international] law." *Id.* ¶ 34; *see Khulumani*, 504 F.3d at 275 (Katzmann, J., concurring) (citing *Prosecutor v. Furundzija*, Case No. IT-95-17/1 Trial Chamber Judgement, ¶¶ 249, 275

(Dec. 10, 1998); *Prosecutor v. Tadic*, Case No. IT-94-1-T, Trial Chamber Opinion and Judgement, ¶¶ 689–92, 730, 735, 738 (May 7, 1997)).  The ICTY emphasized that it was required to determine "the objective basis for such individual responsibility as a matter of customary international law . . . since the International Tribunal is only empowered to apply international humanitarian law that is 'beyond any doubt customary law.'" *Tadic*, Trial Chamber Opinion and Judgement, ¶ 662 (quoting Sec'y General ICTY Report ¶ 34).  The ICTR has a similar mandate to that of the ICTY but also encompasses several treaties.  *See* Report of the Secretary-General Pursuant to Paragraph 5 of the Security Council Resolution 955, ¶ 12, U.N. Doc. S/1995/134 (Feb. 13, 1995).

Federal courts have, in turn, relied on international criminal law norms in establishing the content of the law of nations.  *See, e.g.*, *Khulumani*, 504 F.3d at 270 (Katzmann, J., concurring); *Kadic*, 70 F.3d at 241–43; *see also Sosa*, 542 U.S. at 762–63 (Breyer, J., concurring).[17]  These authorities and sources confirm that aiding and abetting liability is clearly established in the law of nations and consequently such liability is available under the ATS.

---

[17]  As the Seventh Circuit has pointed out:

> Crimes and torts frequently overlap.  In particular, most crimes that cause definite losses to ascertainable victims are also torts: the crime of theft is the tort of conversion; the crime of assault is the tort of battery . . . . [In] a much earlier era of Anglo-American law, . . . criminal and tort proceedings were not clearly distinguished.

*United States v. Bach*, 172 F.3d 520, 523 (7th Cir. 1999) (citing, *inter alia*, David J. Seipp, *The Distinction Between Crime and Tort in the Early Common Law*, 76 B.U. L. REV. 59, 81 (1996)).

**C.**

The question remains what intent must be proved for aiding and abetting liability under the ATS. Appellants suggest that the federal common law standard for aiding and abetting — knowing assistance that has a substantial effect on the commission of the human rights violation — is well established and that the standard under customary international law is essentially the same. Exxon urges the court to follow the Second Circuit in *Presbyterian Church of Sudan*, 582 F.3d at 259, by requiring proof that the defendant acted with the purpose of committing the alleged human rights violation, maintaining that "[i]f a federal common law aiding and abetting cause of action is to be recognized under the ATS, then *Sosa* requires that the scope of the federal common law rule derive from international law." Appellees' Br. 40.

In *Sosa*, the Supreme Court stated that the ATS's "jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action." 542 U.S. at 724. From this statement appellants draw the conclusion that federal common law provides the standard for aiding and abetting liability. Judge Edwards similarly observed in *Tel-Oren*, 726 F.2d at 777–78, that "the law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations; by consensus, the states leave that determination to their respective municipal laws." Appellants also cite the United States' *amicus* brief in the Second Circuit urging that the "validity of a federal-common-law claim under *Sosa* should generally be treated as a merits question, with the ATS conferring subject-matter jurisdiction so long as the allegations of a violation of customary international law are not plainly insubstantial." Brief for the United States as Amicus Curiae at 20, *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009) (Nos. 05-48630-cv & 05-6768-cv). Appellants suggest that "[t]he

application of domestic common law standards is essential because international law does not ordinarily provide for the means of its own enforcement in domestic courts," Appellants' Br. 33, and in their view, the Supreme Court in *Sosa*, 542 U.S. at 731, "endorsed Judge Edwards' view that domestic rules govern the litigation of ATS claims in U.S. courts," Appellants' Br. 33–34.

The history of the ATS examined by the Supreme Court in *Sosa*, 542 U.S. at 731, indicated the First Congress's understanding that federal common law would supply the rules in ATS cases. *Amici* law professors in *Sosa* noted that when the ATS was enacted there was no clear distinction between common law and customary international law. *See* Brief of Professors of Federal Jurisdiction and Legal History as Amici Curiae in Support of Respondents, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (No. 03-339), *reprinted in* 28 HASTINGS INT'L & COMP. L. REV. 99, 109 (2004) ("*Sosa* Legal History Amicus Br."). Courts routinely treated causes of action arising under international law as they did other common law torts – by applying general common law principles. *See, e.g.*, *Talbot*, 3 U.S. (3 Dall.) at 155–58 (Paterson, J.); *id.* at 161 (Iredell, J.); *id.* at 169 (Rutledge, C.J.); *United States v. Benner*, 24 F. Cas. 1084, 1087 (C.C.E.D. Pa. 1830) (No. 14,568). Appellants maintain that the application of common law rules to ATS cases is consistent with the way in which federal courts implement other federal statutes. *See, e.g.*, *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727 (1979); *see also Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). The Eleventh Circuit has adopted this approach, holding that a knowledge standard applies because that is the standard under federal common law. *See Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157–60 (11th Cir. 2005); *cf. Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 120 n.12 (D.D.C. 2003).

That a particular cause of action cognizable under the ATS is to be recognized as a federal common law claim, however, does not identify the source of law to which the court must look for a standard. The Supreme Court in *Sosa* mandated that courts recognize only "a narrow set of common law actions derived from the law of nations." 542 U.S. at 721. In so doing, a court must identify a norm for conduct of no less "definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted," *id.* at 732, to which the international community expresses approbation or disapprobation.[18] Aiding and abetting liability, while supplemental to some other alleged tort liability, is based on conduct distinct from the conduct of the principal actor. Consistent with *Sosa*, the question is whether the international community would express definite disapprobation toward aiding and abetting conduct only when based on a particular standard. The court therefore looks to customary international law to determine the standard for assessing aiding and abetting liability, much as we did in addressing availability of aiding and abetting liability itself. Important sources are the international tribunals

---

[18] "A norm prescribes or permits a certain human behavior," HANS KELSEN, PRINCIPLES OF INTERNATIONAL LAW 6 (1966); it determines what "ought" to happen or, the meaning of conduct, that is, whether one ought or ought not engage in particular behavior, HANS KELSEN, GENERAL THEORY OF NORMS 2 (1991). International law embraces the concept of a peremptory norm, one that is "accepted and recognized by the international community of states as a whole and from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." Art. 53, Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331; *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 102 cmt. k; 1 OPPENHEIM'S INTERNATIONAL LAW § 2 (Sir Robert Jennings & Sir Arthur Watts, eds., 9th ed. 1996); Prosper Weil, *Towards Relative Normativity in International Law*, 77 AM. J. INT'L L. 413, 421 (1983).

mandated by their charter to apply only customary international law. Two such tribunals, the International Criminal Tribunals for the Former Yugoslavia and Rwanda, are considered authoritative sources of customary international law. *See, e.g.*, *Hamdan*, 548 U.S. at 611 n.40; *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 739 (9th Cir. 2008); *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1293 (11th Cir. 2002). They have declared the knowledge standard suffices under customary international law.[19]

The ICTY, in addressing whether the accomplice[20] must "share the *mens rea* of the principal or whether mere knowledge" will suffice, concluded that "the latter will suffice." *Furundzija*, Trial Chamber Judgement, ¶ 236. It is not necessary that the aider and abettor "shares the *mens rea* of the perpetrator, in the sense of positive intention to commit the crime," provided he "ha[s] knowledge that his actions will assist the perpetrator

---

[19] The knowledge standard appears to conform with the standard for aiding and abetting liability in many other countries, including France, Germany, England, Canada, Australia, and Switzerland. *See Krstic*, Appeals Judgement, ¶¶ 140–41; Brief of *Amici Curiae* International Law Scholars in Support of Plaintiffs-Appellants Seeking Reversal ("Int'l Law Scholars Amicus Br.") 16–17.

[20] The ICTY and the ICTR opinions refer to "accomplice" and "aiding and abetting" liability interchangeably, *e.g.*, *Furundzija*, Trial Chamber Judgement, ¶¶ 190–249, and that understanding is reflected in the London Charter and the opinions of the Nuremberg tribunals, *see Khulumani*, 504 F.3d at 272 (Katzmann, J., concurring).

in the commission of the crime." *Id.* ¶ 245.[21] The Trial Chamber's judgment states:

> [T]he *actus reus* [of aiding and abetting] consists of practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime. The *mens rea* required is the knowledge that these acts assist the commission of the offense.

*Id.* ¶ 249; *see also id.* ¶¶ 238–40, 245–46 (citing *inter alia*, *In re Tesch*, 1 LAW REPORTS OF TRIALS OF WAR CRIMINALS 93); *Prosecutor v. Krstic*, Case No. IT-98-33-A, Appeals Judgement, ¶¶ 139–41 (Apr. 19, 2004); *Prosecutor v. Delalic*, Case No. IT-96-21-I, Trial Chamber Judgement, ¶¶ 325–29 (Nov. 16, 1998); *Tadic*, Trial Chamber Judgement, ¶¶ 674, 692. The ICTR is in agreement. *See Prosecutor v. Ntakirutimana*, Case No. ICTR-96-13-I, Appeals Judgement, ¶ 501 (Dec. 13, 2004); *Prosecutor v. Musema*, Case No. ICTR-96-13-I, Trial Chamber Judgement, ¶¶ 180–82 (Jan. 27, 2000). The parties do not suggest that the

---

[21] The Trial Chamber in *Furundzija* further emphasized that the knowledge standard:

> is particularly apparent from all the cases in which persons were convicted for having driven victims and perpetrators to the site of an execution. In those cases the prosecution did not prove that the driver drove for the purpose of assisting in the killing, that is, with an intention to kill. It was the knowledge of the criminal purpose of the executioners that rendered the driver liable as an aider and abettor. Consequently, if it were not proven that a driver would reasonably have known that the purpose of the trip was an unlawful execution, he would be acquitted.

*Id.*

approach of the ICTY and the ICTR is inconsistent with the federal standard for aiding and abetting liability.

In *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which the Supreme Court described as "a comprehensive opinion on the subject [of aiding and abetting]," *Central Bank*, 511 U.S. at 181, this court defined the scope of aiding and abetting for tort liability in the civil context as follows:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

705 F.2d at 477 (citing, *inter alia*, RESTATEMENT (SECOND) OF TORTS § 876 (1979), which provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."). In *Halberstam*, the court cited five factors relevant in determining whether the defendant's assistance was sufficiently substantial: "'the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind.'" *Id*. at 478 (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 876 cmt. d). The Eleventh Circuit has adopted the *Halberstam* standard in ATS and TVPA litigation. *See Cabello*, 402 F.3d at 1158–59 (citing *Halberstam*, 705 F.2d at 481, 487). To the extent that the federal common law and the customary international law standards do not differ, a court may, for purposes of applying the *actus reus* and *mens*

*rea* standards, turn to the federal common law knowledge standard in addressing claims under the ATS.

The Second Circuit, in *Presbyterian Church of Sudan*, 582 F.3d at 259, nonetheless held that the aider and abettor must share the same purpose as the principal actor, relying on the Rome Statute of the International Criminal Court ("Rome Statute"), July 17, 1998, 2187 U.N.T.S. 90, and *United States v. von Weizsaecker* ("*The Ministries Case*"), *in* 14 TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10, at 308, 622 (1997) ("TRIALS OF WAR CRIMINALS"); *see also Khulumani*, 504 F.3d at 276 (Katzmann, J., concurring). Under that standard, "the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring). The Second Circuit reasoned that whether to recognize "aiding and abetting liability is no less significant a decision than whether to recognize a whole new tort in the first place," *Presbyterian Church of Sudan*, 582 F.3d at 259, and consistent with *Sosa*'s command about the definiteness of new norms, it concluded from those two sources that "no such [international] consensus exists for imposing liability on individuals who knowingly (but not purposefully) aid and abet a violation of international law," *id*.

Although we agree with the Second Circuit's premise that aiding and abetting must be embodied in a norm of customary international law, *amici* international law scholars point out why its conclusion was flawed. The Rome Statute, which created the International Criminal Court ("ICC"), is properly viewed in the nature of a treaty and not as customary international law. *See* Int'l Law Scholars Amicus Br. 19–20 (citing Rome Statute, art. 10; Leila Nadya Sadat, *Custom, Codification and Some*

*Thoughts About the Relationship Between the Two: Article 10 of the ICC Statute*, 49 DEPAUL L. REV. 909, 911 & n.11, 917 (2000); Otto Triffterer, *Article 10*, *in* COMMENTARY ON THE ROME STATUTE OF THE INTERNATIONAL CRIMINAL COURT 317 (Otto Triffterer ed., 1999)).  It specifically provides in Article 10 that it is not to "be interpreted as limiting or prejudicing in any way existing or developing rules of international law."  This acknowledges that the Rome Statute was not meant to affect or amend existing customary international law.  *See* Int'l Law Scholars Amicus Br. 19.  As a treaty, the Rome Statute binds only those countries that have ratified it, *see Military and Paramilitary Activities* (*Nicar. v. U.S.*), 1986 I.C.J. 14, ¶ 175 (June 27), and the United States has not,[22] *see* U.S. CONST. art. II, § 2, cl. 2; *Haver v. Yaker*, 76 U.S. (9 Wall.) 32, 35 (1869); *Abagninin*, 545 F.3d at 738; *see also* Statute of the International Court of Justice ("ICJ Statute"), June 26, 1945, art. 38(1)(a), 59 Stat. 1055, 1060, 832 U.S.T.S. 993.[23]    The

---

[22]  President Clinton signed the Rome Statute stating: "I will not, and do not recommend that my successor submit the Treaty to the Senate for advice and consent."    White House Office of Communications, Statement by President on Signature of the ICC Treaty (Jan. 2, 2001), *available at* 2001 WL 6008.  On May 6, 2002, President Bush withdrew the signature of the United States from the Statute.  *See* Letter of John R. Bolton, Under Sec'y of State for Arms Control and Int'l Sec., to Kofi Annan, Sec'y Gen. of the United Nations (May 6, 2002).  By contrast, the United States Representative to the United Nations voted in the U.N. Security Council to create both the ICTY and the ICTR; the votes were unanimous, except for the vote of the representative from Rwanda against creation of the ICTR.    Laura Bingham, *Strategy or Process? Closing the International Criminal Tribunals for the Former Yugoslavia and Rwanda*, 24 BERKELEY J. INT'L L. 687, 695 (2006).

[23]    Article 38 of the ICJ Statute, which "embodies the understanding of States as to what sources offer competent proof of

the content of customary international law," *Flores*, 414 F.3d at 251, provides:

> The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:
>> a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
>> b. international custom, as evidence of a general practice accepted as law;
>> c. the general principles of law recognized by civilized nations;
>> d. . . . judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.

ICJ Statute, art. 38; *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES §§ 102(1), 103(2).

Our dissenting colleague incorrectly implies that the definition of customary international law is synonymous with the law of nations. Dis. Op. at 1, 26 n.10. Rather, as the ICJ Statute indicates, customary international law is one of the sources for the law of nations. The misconception appears also in *Kiobel*, 621 F.3d at 116, and *Flores*, 414 F.3d at 237 & n.2, where the cited authorities for treating the "law of nations" as a synonym for "customary international law" do not support the proposition. Nor did the Supreme Court in *Sosa* treat as equivalent customary international law and the law of nations generally. In *Sosa* the notion of customary international law is not discussed until Part IV.C, where the Court addresses whether Alvarez-Machain's abduction and arrest could be considered a violation of an international norm of a sufficiently specific character to be cognizable under the ATS. 542 U.S. at 735–37. By contrast, where the Supreme Court reaches a general conclusion it refers to "international law" or the "law of nations" without modification. *See, e.g.*, *id.* at 712, 714,

ICC has recognized that the Rome Statute does not necessarily represent customary international law. *Prosecutor v. Germain Katanga and Mathieu Ngudjolo Chui*, Case No. ICC-01/14/01/07, Decision on the Confirmation of Charges, ¶¶ 507–08 (Sept. 30, 2008).[24]

---

715 (quoting *The Paquette Habana*, 175 U.S. 677, 686 (1900)). The Court's rejection of Alvarez-Machain's claim because the defendant's conduct "violate[d] no norm of customary international law so well defined as to support the creation of a federal remedy," *id.* at 738, necessarily requires for liability to exist under the ATS, a finding that the defendant either violated a norm of customary international law or a treaty to which the United States is a party. This follows not from the fact that the "law of nations" is synonymous with "customary international law." Countless sources of international law conclusively demonstrate otherwise, *see generally* LOUIS HENKIN, RICHARD CRAWFORD PUGH & OSCAR SCHACHTER, INTERNATIONAL LAW 51–149 (3d ed. 1993), and this court ought not assume that the Court misstated international law, *cf. Murray v. The Schooner Charming Betsy*, 8 U.S. (4 Cranch) 241, 279 (1808). Rather, in stating that courts must engage in some form of common lawmaking subject to "vigilant doorkeeping," *Sosa*, 542 U.S. at 729, the Court emphasized that the violation of a norm of customary international law is a necessary condition to the recognition under federal common law of a plaintiff's claim. This by no means indicates that customary international law constitutes the entire corpus of international law or that this court, in exercising its common law authority to decide interstitial and technical questions appurtenant to the substantive norm of primary conduct, which is governed by customary international law, may not look to guidance from other sources of international law.

[24] Appellants direct the court to the *amicus* brief filed by David J. Scheffer, former U.S. Ambassador-at-Large for War Crimes Issues and head of the U.S. delegation involved in negotiating the Rome Statute. Brief of David J. Scheffer, Director of the Center for International Human Rights, as Amicus Curiae in Support of the Issuance of a Writ of Certiorari, *Presbyterian Church of Sudan v.*

Even were we to agree that the Rome Statute reflects customary international law, the Second Circuit's interpretation in *Khulumani*, 504 F.3d at 276 (Katzmann, J., concurring), and *Presbyterian Church of Sudan*, 582 F.3d at 259, appears inconsistent with its provisions. Article 25(3)(c) of the Rome Statute provides for liability if an individual, "[f]or the purpose of facilitating the commission of such a crime, aids, abets or *otherwise assists* in its commission or its attempted commission, including providing the means for its commission." Rome Statute, art. 25(3)(c) (emphasis added). Article 25(3)(d) provides liability for an individual who "contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose" where such contribution is "intentional" and either "made with the aim of furthering the criminal activity or criminal purpose of the group" *or* "made in the *knowledge* of the intention of the group to commit the crime." *Id.* art. 25(3)(d) (emphasis added). Article 30 provides that "a person has intent where . . . [i]n relation to a consequence, that person means to cause that consequence *or* is aware that it will occur in the ordinary course of events." *Id.* art. 30(2)(b) (emphasis added). Although the text of Article 25(3)(c) appears to require proof of "purpose," the text of Article 25(3)(d) requires no more than "knowledge." Given that Exxon is alleged to have aided and abetted the Indonesian military forces, which in turn are alleged to have committed

---

*Talisman Energy, Inc*. (May 20, 2010) (No. 09-1262), *cert. denied*, 131 S. Ct. 79 (2010). Ambassador Scheffer states that the provisions on accessorial liability were a "negotiated compromise among mostly common law and civil law governments after years of talks leading to the Rome Statute and [were] not finalized to express a rule of customary law." *Id.* at 3; *see also id.* at 7, 9–13; David J. Scheffer & Caroline Kaeb, *The Five Levels of CSR Compliance: The Resiliency of Corporate Liability Under the Alien Tort Statute and the Case for a Counterattack Strategy in Compliance Theory*, 29 BERKELEY J. INT'L L. 334, 348–51 (2011) (hereinafter "Scheffer & Kaeb").

violations of the law of nations against appellants, were the Rome Statute to apply it appears that Article 25(3)(d) and its *mens rea* of "knowledge" would apply. *Cf. Prosecutor v. Thomas Lubanga Dyilo*, Case No. ICC/01/04-01/06, Pre-Trial Chamber Decision on the Confirmation of Charges (Jan. 29, 2007) (applying a "knowledge" standard under Article 25(3)(a) to international law violations by co-perpetrator). To the same effect are decisions applying Article 30, which defines the *mens rea* requirement of intent to include "knowledge," such as *Prosecutor v. Germain Katanga and Mathieu Ngudjolo Chui*, Case No. ICC-01/14-01/07, Decision on the Confirmation of Charges, ¶¶ 528, 530 (Sept. 30, 2008), *Prosecutor v. Jean-Pierre Bemba Gombo*, ICC-01/05-01/08, Decision on the Confirmation of Charges, ¶ 359 (June 15, 2009), and *Prosecutor v. Abdallah Banda Abakaer Nourain and Saleh Mohammed Jerbo Jamus*, ICC-02/05-03/09, Decision on the Confirmation of Charges, ¶¶ 156–57 (Mar. 7, 2011). The ICTY has also observed that the Rome Statute embraces a knowledge standard of *mens rea* for aiding and abetting. *See Furundzija*, Trial Chamber Judgement, ¶ 243–44 & n.266.[25]

Finally, focusing only on *The Ministries Case* overlooks the fact that in numerous decisions of the Nuremberg tribunals defendants were convicted as aiders and abettors based on a *mens rea* of knowledge and not purpose. *See* Int'l Law Scholars Amicus Br. 21. *Amici* cite as examples *United States v. Ohlendorf*, *in* 4 TRIALS OF WAR CRIMINALS 568–70 (defendant "was aware that the people listed would be executed when found"); *United States v. Flick*, 6 TRIALS OF WAR CRIMINALS 1217, 1222 (defendant knowingly contributed money to an organization even though it was "unthinkable" he would "willingly be a party" to atrocities); *In re Tesch*, 13 INT'L L. REP. 250 (1947) (defendant acted "with knowledge" that gas would

---

[25] *See* Scheffer & Kaeb, *supra* note 24, at 251–57.

be used to kill prisoners). *See* Int'l Law Scholars Amicus Br. 21. These cases are not addressed by the Second Circuit in either *Presbyterian Church of Sudan* or Judge Katzmann's concurring opinion in *Khulumani. But see Khulumani*, 504 F.3d at 290 (Hall, J., concurring).

Instead, the Second Circuit considered only one of the decisions rendered in the multi-defendant prosecution in *The Ministries Case*. In *Presbyterian Church of Sudan*, 582 F.3d at 251, and *Khulumani*, 504 F.3d at 276 (Katzmann, J., concurring), that court examined the case of Karl Rasche, the Chairman of Dresdner Bank, who was acquitted of war crimes and crimes against humanity on an aiding and abetting theory, 14 TRIALS OF WAR CRIMINALS 622, although convicted on other charges, *id.* at 784. Yet in the same proceeding the Tribunal convicted Emil Puhl, deputy to the president of the German Reichsbank, based on the same charge and theory, where he knowingly took part in disposing of gold, including gold teeth and crowns and other valuables looted from Holocaust victims, even though he did not share the intent of the Holocaust perpetrators and did not "originate[ ] the matter [that] was probably repugnant to him." *Id.* at 621. The Tribunal concluded that Puhl had no part in the actual extermination of concentration camp inmates, and that it had "no doubt that he would not, even under orders, have participated in that part of the program." *Id.* at 620–21. The distinction for the Tribunal appears to have been not that Rasche had mere knowledge of the activities of the German Nazis whereas Puhl had purpose; both had knowledge only. Instead the *actus reus* was the critical distinction relied on by the Tribunal.[26] Rasche's activities never went beyond his

---

[26] The Tribunal stated, with respect to Rasche,

[t]he real question is, is it a crime to make a loan, knowing or having good reason to believe that the borrower will us[e] the

49

routine duties as a banker and, thus, he had not committed an *actus reus* sufficient to convict. By contrast, Puhl had engaged in activities beyond his routine banking duties in order to assist the primary perpetrators. The Second Circuit never considered the implications of Puhl's conviction for the scope of aiding and

> funds in financing enterprises which are employed in using labor in violation of either national or international law? Does he stand in any different position than one who sells supplies or raw materials to a builder building a house, knowing that the structure will be used for an unlawful purpose? A bank sells money or credit in the same manner as the merchandiser of any other commodity. It does not become a partner in enterprise, and the interest charged is merely the gross profit which the bank realizes from the transaction, out of which it must deduct its business costs, and from which it hopes to realize a net profit. Loans or sale of commodities to be used in an unlawful enterprise may well be condemned from a moral standpoint and reflect no credit on the part of the lender or seller in either case, but the transaction can hardly be said to be a crime. Our duty is to try and punish those guilty of violating international law, and we are not prepared to state that such loans constitute a violation of that law, nor has our attention been drawn to any ruling to the contrary.

*Id.* at 622. By contrast, with respect to Puhl, the Tribunal concluded:

> His part in this transaction was not that of a mere messenger or businessman. He went beyond the ordinary range of his duties to give directions that the matter be handled secretly by the appropriate departments of the bank. . . . [W]ithout doubt he was a consenting participant in part of the execution of the entire plan, although his participation was not a major one.

*Id.* at 620–21.

abetting liability in reaching a conclusion about the proper standard.

Accordingly, we hold that aiding and abetting liability is available under the ATS because it involves a norm established by customary international law and that the *mens rea* and *actus reus* requirements are those established by the ICTY, the ICTR, and the Nuremberg tribunals, whose opinions constitute expressions of customary international law. The Rome Statute does not constitute customary international law. Its *mens rea* requirements contemplate, in any event, a "knowledge" standard. The discussion of the aiding and abetting charge against Rasche in *The Ministries Case* does not support a "purpose" standard when considered in conjunction with the charges against Puhl, also part of *The Ministries Case*, and other cases heard at Nuremberg that establish that "knowledge" suffices to meet the *mens rea* requirement for aiding and abetting liability. The decisions of the ICTY and ICTR adopt a "knowledge" *mens rea* and a showing for *actus reus* of acts that have a substantial effect in bringing about the violation. For all practical purposes, we agree with appellants that the standard under federal common law applies inasmuch as the parties suggest no differences between it and the standard under customary international law.[27]

## III.

Exxon contends, for the first time on appeal, that the ATS does not recognize corporate liability. The district court

---

[27] Because Exxon is subject to ATS liability on an aiding and abetting theory, the court need not address appellants' alternative contention, which Exxon challenges, that Exxon is subject to ATS liability as a state actor acting under color of Indonesian law.

dismissed appellants' ATS claims for failing adequately to plead joint action or causation under a color of law theory of liability, having ruled that aiding and abetting liability was unavailable. *See Doe I*, 393 F. Supp. 2d at 24–27. Appellants contend that, therefore, this court should not address Exxon's new argument, but they have responded to the argument on the merits and an addendum to their reply brief contains *amicus* briefs on corporate liability under the ATS that were lodged with the Second Circuit in *Kiobel v. Royal Dutch Petroleum*, No. 06-4800-cv (Oct. 14 & 15, 2010) (en banc).

### A.

In urging the court to address the question of corporate liability although it is raised for the first time on appeal, Exxon suggests the question is "jurisdictional." *See Sosa*, 542 U.S. at 712–14. Exxon's jurisdictional theory may, however, run afoul of *Herero People's Reparations Corp. v. Deutsche Bank, A.G.*, 370 F.3d 1192 (D.C. Cir. 2004). In that case, this court held that subject matter jurisdiction under the ATS existed where a corporate defendant was alleged to have violated international law, stating the question as whether the "federal common law . . . provide[s] a private cause of action for violations of customary international law," *id.* at 1195, which mimics what the Supreme Court concluded in *Sosa*, 542 U.S. at 711, 721, 731 n.19; *see also Saleh v. Titan Corp.*, 580 F.3d 1, 14 (D.C. Cir. 2009), *cert. denied*, __ S. Ct. __, 2011 WL 2518834 (June 27, 2011).

It is unnecessary to decide whether *Herero* settles the jurisdictional question after *Sosa* because, as Exxon alternatively maintains, "[c]ourts of appeals are not rigidly limited to issues raised in the tribunal of first instance; they have a fair measure of discretion to determine what questions to consider and resolve for the first time on appeal." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992) (citing,

*inter alia*, *Hormel v. Helvering*, 312 U.S. 552, 555–59 (1941)). Although such review is usually confined to "exceptional circumstances," *id.*, the court in *Roosevelt* gave as examples of such circumstances "uncertainty in the state of the law," *id.* (citing *Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 325–26 (D.C. Cir.), *cert. denied*, 459 U.S. 839 (1982)), and a "novel, important, and recurring question of federal law," *id.* (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 255–57 (1981)). The issue of corporate liability under the ATS is all of the above, and it "does not depend on any additional facts not considered by the district court." *Id.*; *see also Time Warner Entm't Co., L.P. v. FCC*, 93 F.3d 957, 974–75 (D.C. Cir. 1996). Because appellants do not suggest they are prejudiced by not having had an opportunity to present their position on the merits in the district court and they have fully addressed the issue on appeal, including attaching amici briefs, and because the question is one of law, we conclude that addressing whether there is corporate liability under the ATS is both a fair and efficient way to proceed inasmuch as the *Doe I* complaint was filed more than a decade ago.

**B.**

Appellants contend that there is no basis for corporate immunity in either the text or the history of the ATS or international law, and that the question of corporate liability is to be decided either pursuant to federal common law or general principles of international law. They observe, as the Eleventh Circuit held in *Romero*, 552 F.3d at 1315, that the text of the ATS places no limit on who can be a defendant, by contrast with who can be a plaintiff, and the phrase "any civil action" undermines any implied limitations not contained in the text. They also observe that the codified statute's use of "any civil action," *see supra* note 5, does not alter its meaning, citing the Brief of *Amici Curiae* Professors of Federal Jurisdiction and Legal History in Support of Plaintiffs-Appellants Seeking

Petition for Rehearing En Banc at 2 n.3, *Kiobel v. Royal Dutch Petroleum Co.*, __F.3d __, 2011 WL 338048 (2d Cir. Feb. 4, 2011) (No. 06-4800-cv) ("*Kiobel* Legal History Amicus Br."). Consistent with *Sosa*'s emphasis on history, 542 U.S. at 712–24, appellants maintain that the textual and historical evidence indicates that the First Congress would have considered juridical entities such as corporations to be proper defendants under the ATS.

Our analysis begins by recognizing that corporate liability differs fundamentally from the conduct-governing norms at issue in *Sosa*, and consequently customary international law does not provide the rule of decision. Then we establish that corporate liability is consistent with the purpose of the ATS, with the understanding of agency law in 1789 and the present, and with sources of international law. Our conclusion differs from that of the Second Circuit in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), *reh'g en banc denied*, __ F.3d __, 2011 WL 338048 (Feb. 4, 2011), because its analysis conflates the norms of conduct at issue in *Sosa* and the rules for any remedy to be found in federal common law at issue here; even on its own terms, its analysis misinterprets the import of footnote 20 in *Sosa* and is unduly circumscribed in examining the sources of customary international law. Finally, we conclude that Exxon's other arguments for corporate immunity are unpersuasive.

**1**. In *Sosa*, the Supreme Court set forth the standard by which federal courts derive common law causes of action for violations of international law norms, 542 U.S. at 728–29, and that standard is to be applied where a norm relating to the conduct of an actor is at issue. *Sosa* addressed whether federal courts should recognize under federal common law "new cause[s] of action," 542 U.S. at 713, 724, 725, 727, 732, or a new common law "claim," *id.* at 712, 714, 720, 725, 731 n.19,

731–32, 733. The Court instructed that when "accepting a cause of action subject to jurisdiction under § 1350," a court "should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* at 732. The Court also counseled a "restrained conception of the discretion a federal court should exercise in considering a new cause of action" of the kind urged by the plaintiff in *Sosa*. *Id.* at 725. Because the question presented in *Sosa* was whether the alleged illegal arrest and brief detention (of less than 24 hours) could support a cause of action — i.e., whether a substantive norm of conduct existed to support the claim — the Court looked to customary international law.

Corporate liability presents a conceptually different question. By way of example, in legal parlance one does not refer to the tort of "corporate battery" as a cause of action. The cause of action is battery; agency law determines whether a principal will pay damages for the battery committed by the principal's agent. Here the court may assume that individuals acting as agents of a corporation violated substantive international law norms. The question is whether a corporation can be made to pay damages for the conduct of its agents in violation of the law of nations. *Sosa* did not address this question and "at best lends Delphian guidance," *Khulumani*, 504 F.3d at 286 (Hall, J., concurring), on what law supplies the rules governing "the technical accoutrements to [a cause of] action," *Tel-Oren*, 726 F.2d at 778 (Edwards, J., concurring).

*Sosa* instructs that the substantive content of the common law causes of action that courts recognize in ATS cases must have its source in customary international law. It is clear from the fact that the law of nations, outside of certain treaties, *see Dreyfus v. Von Finck*, 534 F.2d 24, 31 (2d Cir. 1976), creates no

civil remedies and no private right of action that federal courts must determine the nature of any remedy in lawsuits alleging violations of the law of nations by reference to federal common law rather than customary international law. Professor Louis Henkin, a leading authority on international law, explained the distinction:

> [T]hough international law is part of the law of United States . . . , except as otherwise provided by treaty or by special doctrine . . . , international law establishes rights, duties, and remedies for states against states . . . . International law itself . . . does not require any particular reaction to violations of law . . . . Whether and how the United States should react to such violations are domestic, political questions: the court will not assume any particular reaction, remedy, or consequence.

LOUIS HENKIN, FOREIGN AFFAIRS AND THE UNITED STATES CONSTITUTION 245–46 (2d ed. 1996). Judge Edwards elaborated in *Tel Oren*, specifically addressing ATS claims:

> The law of nations . . . permits countries to meet their international duties as they will. In some cases states have undertaken to carry out their obligations in agreed-upon ways, as in a United Nations Genocide Convention, which commits states to make genocide a crime, or in bilateral or multilateral treaties. Otherwise, states may make available their municipal laws in the manner they consider appropriate. As a result, the law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations; by consensus, the states leave that determination to their respective municipal laws. Indeed, given the existing

array of legal systems within the world, a consensus would be virtually impossible to reach — particularly on the technical accoutrements to an action — and it is hard even to imagine that harmony ever would characterize this issue.

726 F.2d at 778 (Edwards, J., concurring) (citations omitted); *accord Dreyfus*, 534 F.2d at 31; RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 906 & cmt. b; 1 OPPENHEIM'S INTERNATIONAL LAW § 19. That the ATS provides federal jurisdiction where the conduct at issue fits a norm qualifying under *Sosa* implies that for purposes of affording a remedy, if any, the law of the United States and not the law of nations must provide the rule of decision in an ATS lawsuit.

Consequently, the fact that the law of nations provides no private right of action to sue corporations addresses the wrong question and does not demonstrate that corporations are immune from liability under the ATS. There is no right to sue under the law of nations; no right to sue natural persons, juridical entities, or states. Customary international law — defined as the "[p]ractice of states," RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 102(2) & cmt. b, i.e., that law "made over time by widespread practice of governments acting from a sense of legal obligation," LOUIS HENKIN, HOW NATIONS BEHAVE: LAW AND FOREIGN POLICY 33 (2d ed. 1979), 1 OPPENHEIM'S INTERNATIONAL LAW § 10, and "gradually ripening into a rule of international law," *The Paquette Habana*, 175 U.S. 677, 686 (1900); *see also North Sea Continental Shelf* (*Ger. v. Den.*), 1969 I.C.J. 3, ¶ 77 (Feb. 20); *Asylum* (*Colom. v. Peru*), 1950 I.C.J. 266, 276 (Nov. 20); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES, § 102(2) & cmts. b, c, k; 1 OPPENHEIM'S INTERNATIONAL LAW §§ 16–17; 1 CHARLES CHENEY HYDE,

INTERNATIONAL LAW § 6 (1922) — does not "partake of the prolixity of a legal code," *cf. M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819). Although customary international law provides rules for determining whether international disapprobation attaches to certain types of conduct, such as torture, extrajudicial killing, prolonged arbitrary detention, or aiding and abetting the same, one could not expect, as Judge Edwards has written, the widespread practice of states out of "a sense of legal obligation," to produce detailed rules of procedure and evidence on matters like *res judicata*, burdens of proof, and *respondeat superior*.

**2.** Ordinarily our statutory analysis would begin with the text of the ATS, and end with the text if it is clear. *See, e.g., Hawaii v. Office of Hawaiian Affairs*, __ U.S. __, 129 S. Ct. 1436, 1443 (2009). Appellants have made such points as can be made about the plain text: the phrase "any civil action" is inclusive and unrestricted. The Supreme Court has observed that the ATS "by its terms does not distinguish among classes of defendants." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 438 (1989). Given the brevity of the text of the ATS and the absence of a formal legislative history,[28] *see Sosa*, 542 U.S. at 718–19, the court, as in *Sosa*, looks to the historical context, and it suggests that the purpose of the ATS supports the availability of corporate liability.

---

[28] Little is known of the origins of the ATS. *See Sosa*, 542 U.S. at 718. The debates in the House of Representatives "contain no reference to the" ATS, *In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 978 F.2d 493, 498 (9th Cir. 1992), and the debates in the Senate were not recorded, *Tel-Oren*, 726 F.2d at 812 (Bork, J., concurring); *see also Sosa*, 542 U.S. at 718–19; *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 104 n.10 (2d Cir. 2000).

As the Supreme Court observed in *Sosa*, under the Articles of Confederation, the federal government lacked authority to remedy or prevent violations of the law of nations.[29] *Id.* at 716. The need to address and enforce the law of nations at the federal level was among the concerns that motivated abandoning the Articles and convening the Constitutional Convention. James Madison complained:

> The[ ] articles [of confederation] contain no provision for the case of offenses against the law of nations; and consequently leave it in the power of any indiscreet member to embroil the Confederacy with foreign nations.

THE FEDERALIST NO. 42, at 258, 260 (James Madison) (Henry Cabot Lodge ed., 1888). The Continental Congress struggled to respond to violations of the law of nations. In 1779 it wrote to the French Minister Plenipotentiary to assure that the courts "will cause the law of nations to be most strictly observed: that if it shall be found, after due trial, that the owners of [ ] captured vessels have suffered damage from the misapprehension or violation of the rights of war and neutrality, Congress will cause reparation to be made . . . ." 14 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 635 (Worthington Chauncey Ford ed., 1909). The promise rang hollow; although the Articles gave the federal courts authority over "the trial of piracies and felonies committed on the high seas," ARTICLES OF CONFEDERATION, art. 9, § 1, 1 Stat. 4, 6 (1778), the courts lacked authority over violations of the law of nations on land. In 1781, the Continental Congress adopted a resolution that "implored the States to vindicate rights under the law of nations," *Sosa,* 542 U.S. at 716, specifically to "provide expeditious, exemplary and adequate punishment" for violations. 21 JOURNALS OF THE

---

[29] *See Sosa* Legal History Amicus Br. 102–03.

CONTINENTAL CONGRESS 1774–1789, at 1136–37 (Gaillard Hunt ed., 1912).

The 1781 resolution is acknowledged to be "the direct precursor of the alien tort provision in the First Judiciary Act." Anne-Marie Burley, *The Alien Tort Statute and the Judiciary Act of 1789: A Badge of Honor*, 83 AM. J. INT'L L. 461, 477 (1989); *see also* William S. Dodge, *The Historical Origins of the Alien Tort Statute: A Response to the "Originalists,"* 19 HASTINGS INT'L & COMP. L REV. 221, 226–29 (1996); Casto, *Law of Nations*, *supra* note 8, at 490–91. The resolution requested that each state, "in words that echo Blackstone," *Sosa*, 542 U.S. at 716, establish remedies for the "violation of safe conducts or passports," for "the commission of acts of hostility against such as are in amity, league or truce with the United States, or who are within the same, under a general implied safe conduct," for "the infractions of the immunities of ambassadors and other public ministers," for "infractions of treaties and conventions to which the United States are a party," and for "offences against the law of nations, not contained in the foregoing enumeration." 21 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 1136–37. In letters to the states, the Continental Congress pointed out that "a prince, to whom it may be hereafter necessary to disavow any transgression of that law by a citizen of the United States, will receive such disavowal with reluctance and suspicion, if regular and adequate punishment shall not have been provided against the transgressor." *Id.* at 1136.[30]

---

[30] In response, for example, Connecticut in 1782 enacted a law criminalizing violations of the law of nations, as well as "any other Infractions or Violations of, or Offenses against the known, received and established Laws of civilized Nations, agreeable to the Laws of this State, or the Laws of Nations," and creating a tort remedy for injuries caused by violation of the law of nations. ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 82, 83 (1784).

Two examples illustrate concerns underlying the 1781 Resolution and enactment of the ATS. *Sosa,* 542 U.S. at 716–17. In May 1784, the Chevalier De Longchamps, a French citizen, assaulted Francis Barbe Marbois, the French Consul General, on a street in Philadelphia, Pennsylvania. *See Respublica v. De Longchamps*, 1 U.S. (1 Dall.) 111, 111 (O.T. Phila. 1784). The French Ambassador complained to the Continental Congress and the Dutch Ambassador threatened to leave the State if action was not taken. *Id.* (citing Casto, *Law of Nations*, *supra* note 8, at 491–92 & n.138). Although the Pennsylvania state court tried and convicted De Longchamps for an offense against the law of nations, which the Court of Oyer and Terminer termed "in its full extent, . . . part of the law of" Pennsylvania, *De Longchamps*, 1 U.S. (1 Dall.) at 116, the events laid bare the impotence of the young nation. The Continental Congress and the Secretary of Foreign Affairs struggled to respond to an international incident over which the federal government had no authority.[31]

---

[31] "The Marbois Affair was a national sensation that attracted the concern of virtually every public figure in America." *Sosa* Legal History Amicus Br. 105 (quoting Casto, *Law of Nations*, *supra* note 8, at 492). The Continental Congress could only require the Secretary for Foreign Affairs John Jay to express the Congress's "regret" and "lament" over the incident and explain

> the difficulties that may arise on this head from the nature of a federal union in which each State retains a distinct and absolute sovereignity [sic] in all matters not expressly delegated to Congress leaving to them only that of advising in many of those cases in which other governments decree.

33 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 314 (John C. Fitzpatrick ed., 1933). The Secretary explained that

> many allowances are to be made for a nation whose whole

In "a reprise of the Marbois affair," *Sosa*, 542 U.S. at 717, in December 1787, during the Constitutional Convention, a New York constable entered the house of the Dutch Ambassador and arrested one of his domestic servants. *Sosa* Legal History Amicus Br. 105; Curtis A. Bradley, *The Alien Tort Statute and Article III*, 42 VA. J. INT'L L. 587, 641 (2002). The Mayor of New York City arrested the constable, as Secretary of Foreign Affairs John Jay requested, but he cautioned that "neither Congress nor our internal Legislature have yet passed any act respecting a breach of the privileges of Ambassadors" and so the nature and degree of punishment would depend on whether the common law would recognize the breach. Bradley, *The Alien Tort Statute and Article III*, *supra* at 641–42 (quoting 3 DEP'T OF STATE, THE DIPLOMATIC CORRESPONDENCE OF THE UNITED STATES OF AMERICA 447 (1837)). Secretary Jay reported to the Continental Congress that "the federal Government does not appear . . . to be vested with any judicial Powers competent to the Cognizance and Judgment of such Cases." 34 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 111 (Roscoe R. Hill ed., 1937).

James Madison lamented at the Constitutional Convention that "[t]he files of Cong[ress] contain complaints already, from almost every nation with which treaties have been formed. Hitherto indulgence has been shewn to us. This cannot be the permanent disposition of foreign nations." 1 THE RECORDS OF

---

attention till the present period has been engaged in the pursuit of measures which were to determine their existence as such, even tho they should be found deficient in those wise provisions which experience has established among older Nations.

*Id.*

THE FEDERAL CONVENTION OF 1787, at 316 (Max Farrand ed., 1937) ("FARRAND'S RECORDS") (statement of James Madison). Opposing the New Jersey Plan to enhance the power of small states, Madison asked: "Will it prevent those violations of the law of nations & of Treaties which if not prevented must involve us in the calamities of foreign wars?  The tendency of the States to [sic] these violations has been manifested in sundry instances."  *Id.*[32]  Alexander Hamilton noted that "[t]he Union will undoubtedly be answerable to foreign powers for the conduct of its members," THE FEDERALIST NO. 80, at 494, 495 (Alexander Hamilton) (Henry Cabot Lodge ed., 1888), and that "[a]s the denial or perversion of justice by the sentences of courts, as well as in any other manner, is with reason classed among the just causes of war, it will follow that the federal judiciary ought to have cognizance of all causes in which the citizens of other countries are concerned," *id.*  Hamilton emphasized that such jurisdiction was "not less essential to the preservation of the public faith, than to the security of the public tranquility."  *Id.* at 495–96.

The Judiciary Act of 1789 ensured that there would be no gap in federal subject matter jurisdiction with regard to torts in violation of treaties or the law of nations.  It provided federal jurisdiction for lawsuits brought by aliens for torts in violation of the law of nations without textual limitation.  By contrast, it contained no grant of federal question jurisdiction in civil cases, *see Tel-Oren*, 726 F.2d at 779 n.3 (Edwards, J., concurring), and established diversity jurisdiction in the federal circuit courts

---

[32] *See also* James Madison, *Vices of the Political System of the United States*, *reprinted in* SELECTED WRITINGS OF JAMES MADISON 36 (Ralph Ketcham ed., 2006); 2 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 520 (Merrill Jensen ed., 1976) (statement of James Wilson); 1 FARRAND'S RECORDS 24–25 (statement of Edmund Randolph), 164 (statement of James Madison).

subject to a $500 amount-in-controversy requirement, ch. 20, § 11, 1 Stat. at 78–79. As a consequence, aliens alleging domestic common law or international non-tort claims, including foreign creditors seeking to collect on debts owed by U.S. citizens, were forced into state courts unless their suit was for $500 or more, which had the practical effect of excluding virtually all domestic tort lawsuits from the federal courts. *See* Casto, *Law of Nations*, *supra* note 8, at 497–98 & n.168, 507–08. Clearly the Judiciary Act evidences that the First Congress knew how to limit, or deny altogether, subject matter jurisdiction over a class of claims and declined to do so with respect to torts in violations of the law of nations and treaties when brought by aliens.

Exemplary of a purpose of the ATS is the case of *Bolchos v. Darrel*, 3 F. Cas. 810.[33] A French privateer, Bolchos, had sailed a Spanish prize into the harbor at Charleston, South Carolina. France was then at war with Spain and Great Britain. The vessel had a cargo of slaves, which were the property of a Spanish subject who had mortgaged them to a British subject, Savage. Savage's agent, Darrel (a person of unknown citizenship who was in Charleston at or after the time the vessel made landfall), seized the slaves on behalf of Savage and sold them. Bolchos filed suit in the U.S. District Court for the District of South Carolina demanding recompense for the slaves "as lawful prize," invoking the Treaty of Amity and Commerce between France and the United States, U.S.-Fr., Feb. 6, 1778, 8 Stat. 12, which provided that "[i]t shall be lawful for the ships of war of either party, and privateers, freely to carry whithersoever they please, the ships and goods taken from their enemies . . . ; nor shall such prizes be arrested or seized, when they come to and enter the ports of either party." *Id.* art. XVII. Ownership of

---

[33] *See* Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 COLUM. L. REV. 830, 893 (2006).

the slaves turned on the validity of the seizure of the Spanish prize by the French privateer on the high seas. The district court's "doubt about admiralty jurisdiction over a suit for damages . . . was assuaged by assuming that the ATS was a jurisdictional basis for the court's action," *Sosa*, 542 U.S. at 720, and the district court in 1795 ruled that the treaty with France required judgment in favor of the French privateer.

Thus prior to the Constitutional Convention, when the new nation was at risk of losing respect abroad because it could not respond to violations of the law of nations, the Founders and the First Congress recognized that the inability to respond to such violations could lead to the United States' entanglement in foreign conflicts when a single citizen abroad offended a foreign power by violating the law of nations. The Bradford and *Bolchos* opinions are evidence of the realities of this concern. Attorney General Bradford could abide by the 1793 Proclamation of Neutrality by favoring neither France nor Great Britain and prevent a U.S. citizen from entangling the United States in the general conflict in Europe as a result of his activities abroad, in Sierra Leone. Similarly, in *Bolchos* the executive and legislative branches avoided expressing opinions on the civil dispute between British and Spanish subjects because the district court and the Supreme Court could adjudicate such disputes by applying the law of nations.

The historical context, in clarifying the text and purpose of the ATS, suggests no reason to conclude that the First Congress was supremely concerned with the risk that natural persons would cause the United States to be drawn into foreign entanglements, but was content to allow formal legal associations of individuals, i.e., corporations, to do so.[34]

---

[34] "A CORPORATION [] . . . is a collection of many individuals, united into one body, . . . and vested, by the policy of the law, with

Considering as an example the facts of the Sierra Leone affair involving a U.S. citizen abroad and Attorney General Bradford's 1795 opinion, nothing would suggest that the First Congress would have sought to prevent natural persons from causing entanglements to which the United States was a party by ransacking and plundering the holdings of the Sierra Leone Company but been content to fight a war where the privateering mission was funded or otherwise supported by a U.S. corporation. Attorney General Bradford did not shy away from the notion that the Sierra Leone Company could sue under the ATS, never intimating that a corporation could not be a defendant or would have to prove its capacity to sue under the law of nations rather than the common law. 1 U.S. Op. Att'y Gen. at 58–59. Neither did Congress shy from imposing punishment for piracy in the early crime acts, referring to the conduct of defendant "persons," Crimes Act of 1790, § 10, 1 Stat. at 114; *see also* Act of May 15, 1820, ch. 3, § 3, 3 Stat. 600 (1820), a term referring both to individual and to corporate entities, *see* 1 U.S.C. § 1 (defining "person" to include corporations); *cf. Beaston v. Farmers' Bank of Del.*, 37 U.S. (12 Pet.) 102, 134 (1838). Nor did the district court in the *Bolchos* case shy from applying the common law of agency (allowing Bolchos to sue Darrel, an agent of a British citizen, Savage, who held a mortgage from the actual owner, a Spanish subject). Thus, the historical context offers no reason to conclude that the First Congress sought to prevent drawing the United States into a dispute between Great Britain and France because the defendant who had taken ownership and sold the ship's cargo was a natural person and not a corporation. In the words of *amici* professors of federal jurisdiction and legal history:

---

the capacity of acting, in several respects, as an *individual*, particularly . . . of suing and being sued." 1 STEWART KYD, A TREATISE ON THE LAW OF CORPORATIONS 13 (1793) (emphasis in original).

> To remedy the problems identified in the preceding years, the ATS provided federal courts with jurisdiction over "all causes" in violation of the law of nations. The text demonstrates that the ATS was not limited to criminal conduct and did not exclude corporate defendants. Congress was focused not on whether the acts were criminal or the defendant's identity but rather on the right that had been violated (a right under "the law of nations or a treaty of the United States") and the plaintiff's identity ("an alien"). Together, these two factors defined a class of cases sufficiently important for Congress to grant jurisdiction over "*all causes* where an alien sues for a tort only in violation of the law of nations or a treaty of the United States."

*Kiobel* Legal History Amicus Br. 6–7 (citations omitted) (emphasis in original).

**3.** Corporate immunity also would be inconsistent with the ATS because by 1789 corporate liability in tort was an accepted principle of tort law in the United States. As early as 1774, Lord Mansfield held that a corporation could be liable where it failed to keep in repair a stream in consequence of which a person was injured. *Mayor of Lynn v. Turner*, (1774) 98 Eng. Rep. 980 (K.B.). Early decisions of the several states support this proposition. In *Chesnut Hill & Springhouse Turnpike Co v. Rutter*, 4 Serg. & Rawle 6 (Pa. 1818), the Pennsylvania Supreme Court considered the question of corporate liability in detail, citing to *Mayor of Lynn* as well as the Year Books from the reigns of Henry VI, Henry VII, and Henry VIII, *id.* at 17–18, and concluding that it was "beyond doubt," *id.* at 18, that a corporation could be liable for the torts of its agents. The Supreme Judicial Court of Massachusetts similarly considered "ancient law," including the English Year Books relied on in

*Chesnut Hill*, and concluded that tort actions could be maintained against corporations. *Riddle v. Proprietors of Merrimack River Locks & Canals*, 7 Mass. 169, 186 (1810); *see also Townsend v. Susquehanna Turnpike Road Co.*, 6 Johns. 90 (N.Y. Sup. Ct. 1810). An 1832 treatise cites *Chesnut Hill* in noting that "much learning will be found [in that case] on the subject" of corporate torts and stating that "from the earliest times to the present day, corporations have been liable for torts." JOSEPH KINNICUT ANGELL & SAMUEL AMES, TREATISE ON THE LAW OF PRIVATE CORPORATIONS AGGREGATE 222–23 & n.1 (1832).

The notion that corporations could be held liable for their torts, therefore, would not have been surprising to the First Congress that enacted the ATS. In *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819) (Story, J.), the Supreme Court held that an "aggregate corporation, at common law, is a collection of individuals, united into one collective body, under a special name . . . possess[ing] the capacity . . . of suing and being sued." *Id.* at 667. A corporation

> is, in short, an artificial person, existing in contemplation of law, and endowed with certain powers and franchises which, though they must be exercised through the medium of its natural members, are yet considered as subsisting in the corporation itself, as distinctly as if it were a real personage.

*Id.* The Court observed, moreover, that "a great variety of these corporations exist, in every country governed by the common law." *Id*. at 668; *see also* 1 BLACKSTONE'S COMMENTARIES \*469. In *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119 (2003), the Court assembled sources, including a 1793 treatise on the law of corporations, *see supra* note 34, demonstrating the common law understanding that a corporation

is a juridical person with the capacity to sue and be sued. *See* 538 U.S. at 125–26. Thus it appears that the law in 1789 on corporate liability was the same as it is today: "The general rule of substantive law is that corporations, like individuals, are liable for their torts." *White v. Cent. Dispensary & Emergency Hosp.*, 99 F.2d 355, 358 (D.C. Cir. 1938); *see also Daniels v. Tearney*, 102 U.S. 415, 420 (1880); *Lyon v. Carey*, 533 F.2d 649, 652–53 (D.C. Cir. 1976).

**4.** Neither does the law of the nations support corporate immunity under the ATS where, for example, a corporation operates as a front for piracy, engages in human trafficking, or mass-produces poisons for purposes of genocide. The ICTY has held that a crime against humanity, for example, requires acts "instigated or directed . . . by any organization or group," noting the post-World War II development of customary international law. *Prosecutor v. Tadic,* Case No. IT-94-1-T, Trial Chamber Opinion and Judgement, ¶¶ 654–55 (May 7, 1997). *Amici* international law scholars point to numerous international treaties that explicitly state that juridical entities should be liable for violations of the law of nations,[35] while others do not

---

[35]   *See, e.g.*, European Convention on the Prevention of Terrorism, May 16, 2005, art. 10(1), C.E.T.S. No. 196 (2005); Convention Against Transnational Organized Crime, Nov. 15, 2000, art. 10(1), 2225 U.N.T.S. 209; Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, Dec. 17, 1997, art. 2, S. Treaty Doc. No. 105-43; Basel Convention on the Control of Transboundary Movements of Hazardous Wasters and Their Disposal, Mar. 22, 1989, art. 2(14), 1673 U.N.T.S. 57; International Convention on the Suppression and Punishment of the Crime of Apartheid, Nov. 3, 1973, art. I(2), 1015 U.N.T.S. 243; *see also* Scheffer & Kaeb, *supra* note 24, at 359.

distinguish between natural and juridical individuals.[36] *See* Brief of *Amici Curiae* International Law Scholars in Support of Plaintiffs-Appellants-Cross-Appellees at 7–10, *Kiobel v. Royal Dutch Petroleum Co.*, __F.3d__ , 2011 WL 338048 (2d Cir. Feb. 4, 2011) (No. 06-4800-cv) ("*Kiobel* Int'l Law Scholars Br."). *Amici* also point to many authoritative actors and entities in the United Nations' human rights establishment concluding that corporations are responsible for violations of the law of nations. *Id.* at 10–11 (citing, for example, the U.N. Human Rights Committee and the U.N. Committee on the Elimination of All Forms of Racial Discrimination).

Exxon's reliance on the Report of the Special Representative of the Secretary-General on the Issue of Human Rights and Transnational Corporations and Other Business Enterprises, U.N. Doc. A/HRC/4/35 (Feb. 19, 2007), is misplaced. Its selective quotation from the report overlooks the salient point. *See* Dis. Op. at 25. The report refers to many states' unwillingness to adopt domestic laws providing human rights standards for corporations. *Id.* ¶ 44. But elsewhere the report points to the "extension of responsibility for international crimes to corporations under domestic law," *id.* ¶ 22, and specifically recognizes that the ATS provides such jurisdiction against corporations, *id.* ¶¶ 23, 27.

**5.** Exxon nonetheless maintains that the question of corporate liability is to be answered by looking to customary international law and because, it asserts, that law does not recognize corporate liability the ATS does not provide a cause of action against it. It relies principally on the Second Circuit's decision in *Kiobel*, which concluded that corporate liability "has

---

[36] *See, e.g.*, Convention Relative to the Treatment of Prisoners of War, Feb. 2, 1956, art. 3, 6 U.S.T. 3316, T.I.A.S. 3364, 75 U.N.T.S. 135.

not attained a discernible, much less universal, acceptance among nations of the world in their relations *inter se*." 621 F.3d at 145. Essentially, Exxon adopts the view of the majority in *Kiobel* that (1) the moral responsibility for human rights violations so heinous as to rise to the level of an "'international crime' rest[s] solely with the individual men and women who have perpetrated it," *id*. at 119, and that (2) the absence of corporate liability has been settled since Nuremberg when Article 6 of the London Charter limited the military tribunal's jurisdiction to "individuals" and "members of organizations." Appellees' Br. 28; *see Kiobel*, 621 F.3d at 133–34. Exxon also suggests that the *ad hoc* international tribunals – the ICTY and the ICTR – and the ICC have jurisdiction over only natural persons and that human rights treaties codifying international human rights norms apply only to natural persons, citing, for example, the Genocide and Torture Conventions.[37]

There are a number of problems with the analysis in *Kiobel*. Perhaps foremost, the Second Circuit looked to international law to define who may be a defendant, *but see Argentine Republic*,

---

[37] Exxon has waived any argument that enactment of the TVPA preempted torture and extrajudicial killing claims under the ATS by raising the argument only in a conclusory footnote. *See* Appellees' Br. 32 n.4. *But see* Dis. Op. at 28 n.11. "We need not consider cursory arguments made only in a footnote," *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc). "'It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.'" *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)); *see also* FED. R. APP. P. 28(a)(9). Arguing as a policy matter that corporate liability is "improper," Appellees' Br. 31–32, is not the same as addressing whether the TVPA "occup[ies] the field," *Sosa*, 542 U.S. at 731, *see also* Appellees' Br. 32 n.4; Dis. Op. at 29–30, to which Exxon devotes a single, conclusory sentence.

488 U.S. at 438, in concluding that "[b]ecause corporate liability is not recognized as a 'specific, universal, and obligatory' norm, it is not a rule of customary international law that we may apply under the ATS." *Kiobel*, 621 F.3d at 145 (quoting *Sosa*, 542 U.S. at 732) (citation omitted). *Sosa* neither addressed the question presented by Exxon's claim of corporate immunity, nor provided precise guidance on which body of law a court must draw to answer questions ancillary to the cause of action itself, such as corporate liability. *See supra* Part III.B.1. The Second Circuit's approach overlooks the key distinction between norms of conduct and remedies discussed by Professor Henkin and Judge Edwards and instead conflates the norms and the rules (the technical accoutrements) for any remedy found in federal common law. And in so doing, the majority in *Kiobel*, *id.* at 128–29 & n.31, like Exxon, misreads footnote 20 in *Sosa*, on which it primarily relies, to state that "whether a particular defendant can be sued is . . . necessarily a question about the 'scope of liability for a violation.'" Appellees' Br. 31 (quoting *Sosa*, 542 U.S. at 732 n.20).[38]

In footnote 20, *Sosa* noted a consideration raised by a comparison of *Tel-Oren* and *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995).[39] Each case addressed whether certain forms of

---

[38] *See* Scheffer & Kaeb, *supra* note 24, at 364–65.

[39] Footnote 20 states in full:

A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. Compare *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 791–795 (C.A.D.C. 1984) (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), with *Kadic v. Karadzíc*, 70 F.3d 232, 239–241 (C.A.2 1995)

conduct were violations of international law only when done by a state actor, or at least under color of state law or jointly with a state, and not when done by a private actor.[40] Nothing in either opinion suggests that either court considered a dichotomy between a natural and a juridical person, even though *Tel-Oren* involved a juridical defendant, the Palestinian Liberation Organization. The distinction between private and state actors exists in international law, and *amici* international law scholars point out the distinction has been recognized for centuries. *See Kiobel* Int'l Law Scholars Br. 7. For instance, Section 404 of the Restatement of Foreign Relations Law defines a limited set of international crimes that are of "universal concern" that can be committed by an individual, such as piracy, slave-trading, and hijacking, whereas Section 702 defines those acts that violate international law where a state as a matter of policy engaged in them. *Compare* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 404, *with id.* § 702. Footnote 20 appears to reference this dichotomy, which was briefed before

---

(sufficient consensus in 1995 that genocide by private actors violates international law).

*Sosa*, 542 U.S. at 732 n.20.

[40] In *Tel-Oren*, Judge Edwards concluded in 1984 that although torture practiced by a state violated the law of nations, there was no then-prevailing norm of customary international law that torture practiced by a private actor with no imprimatur of the state constituted a violation of the law of nations. *Tel-Oren*, 726 F.2d at 794–95 (Edwards, J., concurring). In *Kadic*, the Second Circuit concluded in 1995 that a sufficient consensus existed that genocide violated the law of nations regardless of whether it was conducted by a state actor or a private individual. 70 F.3d at 241–42.

the Supreme Court,[41] as opposed to an argument about corporate liability, which was not.  As Judge Leval pointed out in *Kiobel*:

> Far from implying that natural persons and corporations are treated differently for purposes of civil liability under [the] ATS, the intended inference of the footnote is that they are treated identically.  If the violated norm is one that international law applies only against States, then "*a private actor* [ ] *such as a corporation or an individual*," who acts independently of a State, can have no liability for violation of the law of nations because there has been no violation of the law of nations.  On the other hand, if the conduct is of the type classified as a violation of the norms of international law regardless of whether done by a State or a private actor, then *"a private actor* [ ] *such as a corporation or an individual*," has violated the law of nations and is subject to liability in a suit under the ATS.  The majority's partial quotation out of context, interpreting the Supreme Court as distinguishing between individuals and corporations, misunderstands the meaning of this passage.

621 F.3d at 166 (Leval, J., concurring) (emphasis in original).

Corporate liability governs the legal consequences of a relationship between a principal and an agent, *see* RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006), and for the reasons explained by Professor Henkin and Judge Edwards, and endorsed in *Sosa*, 542 U.S. at 724, the technical accoutrements to the ATS cause of action, such as corporate liability and agency law, are to be

---

[41] *See* Brief of *Amicus Curiae* the European Commission in Support of Neither Party at 10, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (No. 03-339), 2004 WL 177036.

drawn from federal common law, mindful that "in most cases where a court is asked to state or formulate a common law principle in a new context, there is a general understanding that the law is not so much found or discovered as it is either made or created." *Sosa*, 542 U.S. at 725; *see also id.* at 726 (citing *Textile Workers*, 353 U.S. at 456). Although *Sosa* may not provide guidance on which particular body of law is to provide answers to questions ancillary to the conduct underlying the norm, it recognized that the tort cause of action under the ATS is derived from federal common law, 542 U.S. at 720–21. In other words, "[t]he position of international law on whether civil liability should be imposed for violation of its norms is that international law takes no position and leaves that question to each nation to resolve." *Kiobel*, 621 F.3d at 152 (Leval, J., concurring); *see Sosa*, 542 U.S. at 724.

But taking the analysis of the majority in *Kiobel* on its own terms regarding the proper source of law, it overlooks a source of international law that would tend to confirm that liability under the ATS is properly extended to corporate defendants. Preliminarily it is to be noted that both Exxon and the majority in *Kiobel*, 621 F.3d at 133–36, emphasize that German corporations were not put on trial before the Nuremberg tribunals following World War II. Asserting that "[t]he absence of corporate liability for international human rights violations has been settled since Nuremberg," Appellees' Br. 28, Exxon maintains that although the Nuremberg tribunals charged executives of I.G. Farbenindustrie A.G. ("I.G. Farben") with international crimes, German corporations were not put on trial. This, however, overlooks an important part of Nuremberg history.

*Amici* Nuremberg scholars point out that the history of Nuremberg is more nuanced than Exxon suggests. Brief of *Amici Curiae* Nuremberg Scholars in Support of Plaintiffs-

Appellants-Cross-Appellees' Petition for Rehearing and for Rehearing En Banc at 3, *Kiobel v. Royal Dutch Petroleum Co.*, __ F.3d __, 2011 WL 338048 (2d Cir. Oct. 15, 2010) (No. 06-4800-cv) ("*Kiobel* Nuremberg Amicus Br."). The Allies' program for defeated Germany at the end of the war, *amici* note, "had three components: what to do with the German state upon defeat of the Third Reich, what to do with natural persons who committed crimes, and what to do with the German economy and its industrial cartels." *Id.* The Allies (1) partitioned Germany into zones; (2) dismantled Nazi Germany's industrial assets, public and private, and created a system of reparations for injured individuals and states; and (3) prosecuted major war criminals under the London Charter before an international military tribunal constituted at Nuremberg, indicting among others six Nazi organizations, designating three as criminal. *Kiobel* Nuremberg Amicus Br. 4–9. Control Council Law No. 9, ignored by Exxon and the majority in *Kiobel*, 621 F.3d at 134–35, directed the dissolution of I.G. Farben, and the disposal of the assets "of what was regarded as the Allies' principal economic enemy." *Kiobel* Nuremberg Amicus Br. 11. The preamble to Law No. 9 proclaimed that "I.G. Farben[ ] knowingly and prominently engaged in building up and maintaining the German war potential." Control Council Law No. 9, *Providing for the Seizure of Property Owned by I.G. Farbenindustrie and the Control Thereof* (Nov. 30, 1945), *reprinted in* 1 ENACTMENTS 225. Thus, *amici* Nuremberg scholars observe, the corporate death penalty enforced against I.G. Farben was as much an application of customary international law, on which Control Council Law No. 9 was based, as the sentences imposed by the tribunals themselves: the Allies determined that I.G. Farben had committed violations of

the law of nations and therefore destroyed it. *Kiobel* Nuremberg Amicus Br. 11–12.[42]

Moreover, the failure to charge the defunct entity with crimes was not based on the tribunals' view that I.G. Farben had not committed violations of international law or that other corporations were immune from liability:

> Where private individuals, including juristic persons, proceed to exploit the military occupancy by acquiring private property against the will and consent of the former owner, such action, not being expressly justified . . . , is in violation of international law. . . . Similarly

---

[42] Exxon implicitly suggests that because the Nuremberg era did not produce tribunal decisions embodying disapprobation of corporate atrocities, corporate liability under the law of nations cannot exist or be ascertained. But the doctrine of sources of international law treats judicial decisions as *secondary* evidence of the law of nations, and the conduct of nations as *primary* evidence. *See* ICJ Statute, art. 38; 1 KENT'S COMMENTARIES 18; BIN CHENG, GENERAL PRINCIPLES OF LAW AS APPLIED BY INTERNATIONAL COURTS AND TRIBUNALS 23 (2006). Exxon flips this doctrine on its head, treating judicial decisions as primary evidence. *Amici* Nuremberg Scholars point out that the Allies also dissolved and liquidated a number of insurance companies pursuant to Control Council Law No. 57 and seized the assets of other German corporations, in some instance to dissolve and liquidate them, pursuant to Control Council Laws Nos. 39 and 47. *Kiobel* Nuremberg Amicus Br. 14 & n.23. In Control Council Law No. 2 the Allies abolished the Nazi Party, a non-corporate juridical entity, declared it illegal, and authorized confiscation of its assets. *Id.* at 9. Other evidence indicates that Nuremberg prosecutors concluded the prosecution of a corporation was legally permissible. *See generally* Jonathan A. Bush, *The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said*, 109 COLUM. L. REV. 1094 (2009).

> where a private individual or a juristic person becomes a party to unlawful confiscation of public or private property by planning and executing a well-defined design to acquire such property permanently, acquisition under such circumstances subsequent to the confiscation constitutes conduct in violation of [international law].

*The Farben Case*, 8 TRIALS OF WAR CRIMINALS 1132–33. The Tribunal continued:

> [W]e find that the proof establishes beyond a reasonable doubt that offenses against property as defined in Control Council Law No. 10 were committed by [I.G.] Farben, and that these offenses were connected with, and an inextricable part of the German policy for occupied countries as above described. . . . The action of [I.G.] Farben and its representatives, under these circumstances, cannot be differentiated from acts of plunder or pillage committed by officers, soldiers, or public officials of the German Reich.

*Id.* at 1140.[43]

---

[43] Former Ambassador Scheffer observes, much as Judge Leval, that the majority in *Kiobel* not only misinterprets footnote 20 of *Sosa*, *see* Scheffer & Kaeb, *supra* note 24, at 364–65, but also "misinterprets the famous statement in the Nuremberg judgment that, 'Crimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced,'" *id.* at 362. He points out: "The Nuremberg judges were focusing on how to create a new precedent in international law for prosecuting individuals for violations of international law rather than rely only on the prior practice in international law of holding nations responsible for such

Additionally, the *Kiobel* majority overlooked general principles of international law as a proper source for the content of international law. *Amici* state that corporate liability is a universal feature of the world's legal systems and that no domestic jurisdiction exempts legal persons from liability. *Kiobel* Int'l Law Scholars Br. 12. Corporate personhood has been recognized by the ICJ upon considering the "wealth of practice already accumulated on the subject in municipal law," *Barcelona Traction, Light & Power Co.*, 1970 I.C.J. 3, 38–39 (Feb. 20). Legal systems throughout the world recognize that corporate legal responsibility is part and parcel of the privilege of corporate personhood. In *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 628–29 & nn.19–21 (1983) (citing, *inter alia*, *Barcelona Traction Light & Power Co.*, 1970 I.C.J. at 38–39), the Supreme Court upheld a counterclaim "aris[ing] under international law" against a Cuban corporation for illegal expropriation, *id.* at 623 (citing *The Paquete Habana*, 175 U.S. at 700), and observed that "the principles governing this case are common to both international law and federal common law, which in these circumstances is necessarily informed both by international law principles and by articulated congressional policies." *Id.*; *see* Brief of *Amici Curiae* Human Rights and Labor Organizations in Support of Plaintiffs-Appellants' Petition for Rehearing and for Rehearing

violations." *Id.* "There is nothing in the Nuremberg judgment to suggest that the Nuremberg judges made this statement to the exclusion of either nations or corporations for purposes of civil liability for such criminal conduct in violation of international law." *Id*. at 362–63. Additionally, he points out, "the only way that the Nuremberg prosecutors made their cases against the corporate executives of Farben and Krupps was to establish that these corporations had violated international law." *Id.* at 363. He concludes: "The *Kiobel* majority's contention that corporations cannot violate international law thus flies in the face of common sense, logic, and the reality of the evidence presented at Nuremberg." *Id*.

En Banc at 13–14, *Kiobel v. Royal Dutch Petroleum* __ F3d __, 2011 WL 338048 (2d Cir. Oct. 15, 2010) (No. 06-4800-cv) ("*Kiobel* Human Rights Amicus Br."). This understanding of corporate personhood is directly contrary to the conclusion of the majority in *Kiobel*.

Unlike the manner in which customary international law is recognized through common practice or usage out of a sense of legal obligation, a general principle becomes international law by its widespread application domestically by civilized nations.[44] *See* BIN CHENG, GENERAL PRINCIPLES OF LAW AS APPLIED BY INTERNATIONAL COURTS AND TRIBUNALS 24 (2006); H. LAUTERPACHT, PRIVATE LAW SOURCES AND ANALOGIES OF INTERNATIONAL LAW 33–35 (1927); OSCAR SCHACHTER, INTERNATIONAL LAW IN THEORY AND PRACTICE 50–55 (1991); F.A. Mann, *Reflections on a Commercial Law of Nations*, 33 BRIT. Y.B.I.L. 20, 34–39 (1957). It includes "the principles of

---

[44] General principles of international law, otherwise known as the *jus gentium*, were developed by Roman jurists to provide rules of law for the settlement of civil disputes between Roman citizens and aliens and between aliens and aliens, because the Roman civil law was applicable only in disputes between Roman citizens. 1 BLACKSTONE'S COMMENTARIES *44 n.8. Examples include principles of procedure, the principle of a good-faith defense, and the principle of *res judicata*, PERMANENT COURT OF INTERNATIONAL JUSTICE, ADVISORY COMMITTEE OF JURISTS, PROCÈS-VERBAUX OF THE PROCEEDINGS OF THE COMMITTEE JUNE 16TH-JULY 24TH, 1920, at 335, as well as statutes of limitations and laches, RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 102 cmt. *l*. *See also Souffront v. La Compagnie Des Sucreries de Porto Rico*, 217 U.S. 475, 483–84 & n.† (1910); *Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*, 822 F.2d 230, 237 (2d Cir. 1987); *Effect of Awards of Compensation Made by United Nations Administrative Tribunal*, 1954 I.C.J. 47, 53 (July 13).

private law administered in national courts where these are applicable to international relations," for

> [p]rivate [domestic] law, being in general more developed than international law, has always constituted a sort of reserve store of principles upon which the latter has been in the habit of drawing . . . for the good reason that a principle which is found to be generally accepted by civilized legal systems may fairly be assumed to be so reasonable as to be necessary to the maintenance of justice under any system.

J.L. BRIERLY, THE LAW OF NATIONS 62–63 (6th ed. 1963). International law "borrow[s] from" the principles of private law institutions for "an indication of legal policy or principle." *Id*. at 63. General principles of international law thus offer further support that corporate responsibility for the conduct of its agents under a principle of *respondeat superior* is recognized in the law of nations.

In sum, the majority in *Kiobel* not only ignores the plain text, history, and purpose of the ATS, it rests its conclusion of corporate immunity on a misreading of footnote 20 in *Sosa* while ignoring *Sosa*'s conclusion that federal common law would supply the rules regarding remedies, 542 U.S. at 721–22, inasmuch as all claims under the ATS are federal common law claims, *see Mohammed v. Rumsfeld*, __ F.3d __, 2011 WL 2462851, *7–10 (D.C. Cir. June 21, 2011), and also ignoring a source of international law providing for corporate liability in all legal systems. In joining this approach, the dissent's analysis suffers from the same flaws. *See* Dis. Op. at 22 n.9. As Judge Leval noted, there is an inconsistency in selectively reading international law:

> Because international law generally leaves all aspects of the issue of civil liability to individual nations, there is no rule or custom of international law to award civil damages in any form or context, either as to natural persons or as to juridical ones. If the absence of a universally accepted rule for the award of civil damages against corporations means that U.S. courts may not award damages against a corporation, then the same absence of a universally accepted rule for the award of civil damages against natural persons must mean that U.S. courts may not award damages against a natural person. But the majority opinion concedes (as it must) that U.S. courts may award damages against the corporation's employees when a corporation violates the rule of nations. Furthermore, our circuit and others have for decades awarded damages, and the Supreme Court in Sosa made clear that a damage remedy does lie under the ATS. The majority opinion [in *Kiobel*] is thus internally inconsistent and is logically incompatible with both Second Circuit and Supreme Court authority.

*Kiobel*, 621 F.3d at 152–53 (Leval, J., concurring).

**6.** Finally, Exxon's two other arguments for corporate immunity under the ATS are unpersuasive. First, Exxon maintains that because the Supreme Court has refused to recognize corporate liability in lawsuits brought under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), for violations of the U.S. Constitution, *see Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63 (2001), this court by analogy should similarly hold that corporations cannot be held liable for violations of international law in ATS lawsuits. The analogy is flawed, however, because it ignores crucial distinctions between *Bivens* suits and ATS suits. Although the private right of action

recognized in *Bivens* lacked any statutory basis, *see id.* at 66–67, the First Congress enacted the ATS with the understanding that "the district courts would recognize private causes of action for certain torts in violation of the law of nations," *Sosa*, 542 U.S. at 724. Because the judiciary's exercise of common law powers in ATS lawsuits has a firm statutory basis, unlike the *Bivens* line of cases, the Supreme Court's hesitancy "to extend *Bivens* liability to any new context or new category of defendants," including corporations, in no way forecloses recognition of corporate liability in ATS lawsuits. *Malesko*, 534 U.S. at 68. For example, in *Malesko*, the Court declined to extend *Bivens* to impose corporate liability because the rationale underlying *Bivens*, to deter individual government officials from committing constitutional violations, was inconsistent in that context with corporate liability. *Id.* at 63. By contrast, the deterrence rationale for the ATS extends to any actor, natural or juridical, who might entangle the United States in an international incident through violation of the law of nations.

Second, Exxon maintains that because Congress refrained from creating corporate liability in the TVPA, *see Mohamad v. Rajoub*, 634 F.3d 604, 606–09 (D.C. Cir. 2011), this court also should refrain from holding that there can be corporate liability under the ATS. In *Sosa*, the Supreme Court observed that "the general practice has been to look for legislative guidance before exercising innovative authority over substantive law." 542 U.S. at 726. The guidance to be gleaned from Congress's enactment of the TVPA is, however, slight. The legislative history of the TVPA shows only that: (1) A precursor to the TVPA would have imposed liability on any "person who, under actual or apparent authority of any foreign nation" subjected any other "person to torture or extrajudicial killing," H.R. 1417, 100th Cong. § 2 (as referred to the H. Comms. on Foreign Affairs and the Judiciary, Mar. 4, 1978); (2) the House Foreign Affairs Committee amended this predecessor bill in June 1988 to replace the word

"person" with "individual" and in so doing a single Member explained that the purpose was to make clear that the bill applies "to individuals and not to corporations," *The Torture Victim Protection Act: Hearing and Markup before the H. Comm. on Foreign Affairs on H.R. 1417*, 100th Cong. 87–88 (1988), *see also* Brief of Amici Curiae University of Minnesota Law School International Human Rights Clinic and Legal Scholars in Support of Plaintiffs-Appellants-Cross-Appellees Seeking Reversal ("U. Minn. Amicus Br.") 13 n.2; and (3) when a later Congress enacted the TVPA approximately four years later, the statute continued to use the word "individual" rather than "person," *see Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1127 (9th Cir. 2010). This legislative history provides little guidance on the subject of corporate liability. It does not indicate why the House Foreign Affairs Committee in 1988 decided against creating corporate liability in the TVPA. Neither does it indicate whether the concerns motivating the Committee's 1988 action were shared by the later Congress that enacted the TVPA in 1992. *See Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 204 (1980).

In *Sosa*, the Supreme Court characterized the TVPA as "supplementing" the ATS, not replacing it. 542 U.S. at 731.[45] The legislative history of the TVPA is to the same effect. The House and Senate Committee reports state that "[s]ection 1350 has other important uses and should not be replaced" by the TVPA. S. Rep. No. 102-249, at 4 (1991); H.R. Rep. No. 102-367, at 3 (1991), *reprinted in* 1992 U.S.C.C.A.N. 86. When operating in a common law fashion, courts are guided by reason and experience. *Cf*. FED. R. EVID. 501. Absent a clear indication in either the text or the legislative history of the

---

[45] Exxon has waived any argument that enactment of the TVPA preempted torture and extrajudicial killing claims. *See supra* note 37.

TVPA that Congress reached a considered judgment that corporations should never be held liable for violations of the law of nations, the court applies the rule suggested by both reason and experience — that under established principles of agency law, corporations can be held liable in ATS lawsuits for torts committed by their agents. To the extent our dissenting colleague concludes that allowing aliens to sue corporations in federal courts for aiding and abetting torture and extrajudicial killing while "U.S. citizens may not bring such suits" is a "rather bizarre outcome," Dis. Op. at 33, such an argument is better addressed to Congress inasmuch as the ATS was designed to afford greater jurisdictional protections to aliens.[46]

In sum, the court concludes, guided by *Sosa*, that under the ATS, domestic law, i.e., federal common law, supplies the source of law on the question of corporate liability. The law of the United States has been uniform since its founding that corporations can be held liable for the torts committed by their agents. This is confirmed in international practice, both in treaties and in legal systems throughout the world. Given that the law of every jurisdiction in the United States and of every civilized nation, and the law of numerous international treaties, provide that corporations are responsible for their torts, it would create a bizarre anomaly to immunize corporations from liability for the conduct of their agents in lawsuits brought for "shockingly egregious violations of universally recognized

---

[46] The dissent's suggested "principle in ATS cases," Dis. Op. at 30, and notion of "two filters," *id*., would require the court to address an issue (TVPA preemption) that Exxon has waived, *see supra* note 37. In any event, the Supreme Court observed thirteen years after enactment of the TVPA that "Congress has not *in any relevant way* amended § 1350 or limited civil common law power by another statute." *Sosa*, 542 U.S. at 725 (emphasis added).

principles of international law." *Zapata v. Quinn*, 707 F.2d 691 (2d Cir. 1983). The analysis of the majority in *Kiobel*, 621 F.3d at 130–35, by overlooking the distinction between norms and technical accoutrements in searching for an international law norm of corporate liability in customary international law, misinterpreting *Sosa* in several ways, and selectively ignoring relevant customary international law, is unpersuasive. The issue of corporate liability has remained in the background during the thirty years since the Second Circuit decided *Filartiga*, 630 F.2d 876, while numerous courts have considered cases against corporations or other juridical entities under the ATS without any indication that the issue was in controversy, whether in ruling that ATS cases could proceed[47] or that they could not on other grounds.[48] Exxon fails to show that a different approach is warranted now.

## IV.

The TVPA provides:

---

[47] *See, e.g.*, *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009); *Sarei v. Rio Tinto, PLC*, 550 F.3d 822 (9th Cir. 2008) (en banc); *Khulumani*, 504 F.3d 254 (2d Cir.); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000); *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1091–1100 (N.D. Cal. 2008); *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1004–24 (S.D. Ind. 2007).

[48] *See, e.g.*, *Ali Shafi*, 2011 WL 2315028, at *2–8; *Presbyterian Church,* 582 F.3d 244 (2d Cir.); *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104 (2d Cir. 2008); *Flores v. S. Peru Copper Corp*., 414 F.3d 233 (2d Cir); *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161 (5th Cir. 1999); *Carmichael v. United Techs. Corp*., 835 F.2d 109 (5th Cir. 1988); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999).

(a) Liability. – An individual who, under actual or apparent authority, or color of law, of any foreign nation –
(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note § 2(a). In *Mohamad*, 634 F.3d 604, this court held, after oral argument in the instant case, that Congress's use of the word "individual" indicated that it did not intend for the TVPA to apply to corporations or other organizations. *Id.* at 606–09; *see also Bowoto*, 621 F.3d at 1126–27. Accordingly, the district court did not err in dismissing appellants' TVPA claims. *See Doe I*, 393 F. Supp. 2d at 28.

As an alternative to their claim of Exxon's direct liability under the TVPA, appellants contend that they may sue Exxon under the TVPA on a theory of aiding and abetting liability. They cite *In re Nofziger*, 956 F.2d 287 (D.C. Cir. 1992), where the court stated the general proposition that in a criminal case "one may be found guilty of aiding and abetting another individual in his violation of a statute that the aider and abettor could not be charged personally with violating." *Id.* at 290 (citing *Coffin v. United States*, 156 U.S. 432, 447 (1895)). They also cite 18 U.S.C. § 2(a), which provides that any person who aids or abets a criminal offense is punishable as a principal. *See also Standefer v. United States*, 447 U.S. 10, 18 n.11 (1980). There is a circuit split. The Eleventh Circuit has held that private parties, including corporations, can be liable for aiding and abetting violations of the TVPA. *Aldana*, 416 F.3d at 1247–48. The Ninth Circuit has held that corporations may not

be held directly liable under the TVPA and that, "[e]ven assuming the TVPA permits some form of vicarious liability, the text limits such liability to individuals, meaning in this statute, natural persons." *Bowoto*, 621 F.3d at 1128; *see also Mohamad*, 634 F.3d at 608–09.

Given this court's holding in *Mohamad*, there is no basis in the statutory text for permitting vicarious corporate liability. The authorities that appellants cite, indicating that Congress can provide for aiding and abetting liability absent direct liability, do not support the inference that Congress so provided in the TVPA. Appellants point to no other provision in the TVPA that colorably provides for such liability. Even assuming *arguendo* that aiding and abetting liability is available under the TVPA, the court's precedent would limit such liability to natural persons. *See Mohamad*, 634 F.3d at 608–09.[49]

### V.

Exxon presents three additional arguments in contending that appellants' lawsuit is non-justiciable: First, the complaint should be dismissed in deference to the foreign-policy views of the Executive Branch. Second, adjudication of the complaint would interfere with an international agreement supported by the United States. Third, comity is owed to the legislative, executive, or judicial acts of Indonesia.

---

[49] To the extent the dissent unnecessarily addresses the issue and concludes that there is no vicarious aiding and abetting liability for natural persons under the TVPA, Dis. Op. at 31–32, this is inconsistent with the Senate Judiciary Committee report, which states that the statute permits "lawsuits against persons who ordered, abetted, or assisted in . . . torture." S. REP. NO. 102-249, at 8.

## A.

In *Sosa*, the Supreme Court referenced the "policy of case-specific deference to the political branches." 542 U.S. at 733 n.21. The Court did not elaborate, although such deference could implicate a number of the factors identified in *Baker v. Carr,* 369 U.S. 186, 217 (1962).[50] The Court, however, referred to then-pending multi-district litigation involving class action lawsuits for damages from corporations alleged to have participated in, or abetted, the apartheid regime that formerly controlled South Africa. 542 U.S. at 733 n.21 (citing *In re S. Afr. Apartheid Litig.*, 238 F. Supp. 2d 1379 (J.P.M.L. 2002)). South Africa objected that adjudication of the cases interfered with its Truth and Reconciliation Commission and the United States agreed. *Id. But see infra* note 56. "In such cases," the Court concluded, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the

---

[50] In *Baker v. Carr*, the Court identified six factors to guide a court's determination of whether a complaint presents a non-justiciable question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217.

case's impact on foreign policy." *Sosa*, 542 U.S. at 733 n.21. As the Court had elsewhere cautioned, "[m]atters relating to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Regan v. Wald*, 468 U.S. 222, 242 (1984) (internal citation and quotation marks omitted); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981); *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). Similarly, this court has stated that the "Executive's judgment that adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders [a] case non-justiciable under the political question doctrine." *Hwang Geum Joo v. Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005); *see also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (en banc); *Bancoult v. McNamara*, 445 F.3d 427, 435 (D.C. Cir. 2006).

By letter of July 29, 2002, the Legal Adviser of the State Department, in response to the district court's inquiry, filed a statement of interest that appellants' lawsuit "would in fact risk a potentially serious adverse impact on significant interests of the United States." The letter noted, however, that the assessment was "necessarily predictive and contingent on how the case might unfold in the course of litigation." The letter emphasized that the impact on U.S. foreign policy interests "cannot be determined with certainty." The State Department attached a letter of July 15, 2002 from the Indonesian Ambassador stating that Indonesia "cannot accept" a suit against an Indonesian government institution, and that U.S. courts should not be adjudicating "allegation[s] of abuses of human rights by the Indonesian military." In a supplemental statement of July 14, 2003, the Justice Department referenced the views expressed in the State Department's 2002 letter while arguing the legal point that the ATS is merely a jurisdictional statute and

that there is no private right of action under the ATS, a point rendered moot by *Sosa*. By letter of July 15, 2005, the State Department expressed "concerns" with the plaintiffs' proposed discovery plan of May 16, 2005 — not implemented by the district court — which would have involved relatively broad discovery that could extend to documents located in Indonesia. *Doe I*, 473 F.3d at 347. Upon dismissing the statutory claims on their merits, *see Doe I*, 393 F. Supp. 2d at 24–27, the district court explained:

> The issues and parties in this case have been tailored to a narrow[ ] question: did U.S. corporations in their effort to secure their pipeline in Indonesia violate U.S. state tort law? Litigation and discovery on this issue, if conducted with care, should alleviate the State Department's concerns about interfering with Indonesia's sovereign prerogatives while providing a means for plaintiffs to obtain relief through their garden-variety tort claims. It should be feasible, for instance, for plaintiffs to perpetuate testimony and satisfy document discovery requirements outside Indonesia.

*Id.* at 29–30.[51]

In the prior interlocutory appeal, this court rejected Exxon's justiciability contention inasmuch as the State Department's 2002 letter contained "several important qualifications." *Doe I*,

---

[51] The district court emphasized the general ambiguity of the State Department's 2002 letter, *see Doe I*, 393 F. Supp. 2d at 22–23, and observed that a few months later it had ordered discovery to commence on the common law claims, *id.* at 23. This suggests the district court did not view the 2002 letter as presenting a justiciability problem for either the federal statutory or the common law claims.

473 F.3d at 354. "[T]he State Department's letter [is] not [ ] an unqualified opinion that this suit must be dismissed, but rather [ ] a word of caution to the district court alerting it to the State Department's concerns." *Id.* The court further noted that the reference to "how the case might unfold in the course of litigation" leads to the inference that "the State Department did not necessarily expect the district court to immediately dismiss the case in its entirety." *Id.* Moreover, the court noted the possibility that it had misinterpreted the letter, and invited the State Department, if that were the case or if the Department had additional concerns about the litigation, "to file further letters or briefs with the district court expressing its views." *Id.* The court cited opinions from the Ninth and Eleventh Circuits rejecting non-justiciability objections for ATS or common law tort actions.[52]

The interlocutory appeal decided only that Exxon lacked a "clear and indisputable" right to a writ of mandamus ordering appellants' common law tort claims to be dismissed under the political question doctrine. *Doe I*, 473 F.3d at 357. Now this court reviews *de novo* the district court's decision to dismiss

---

[52] This court cited *Sarei v. Rio Tinto, PLC*, 456 F.3d 1069 (9th Cir. 2006), *vacated on other grounds*, 487 F.3d 1193 (9th Cir. 2007) (en banc), where the State Department had filed a letter, stating an ATS suit against non-state actors was, in the words of this court, "simply a tort suit — which is constitutionally committed to the judiciary." *Doe I*, 473 F.3d at 354 (citing *Sarei*, 456 F.3d at 1079–82). This court also cited *Linder v. Portocarrero*, 963 F.2d 332 (11th Cir. 1992), where the Eleventh Circuit concluded that the political question doctrine ought not prevent common law tort claims arising out of the Nicaraguan civil war from going forward, *id.* at 337, noting that "[t]he fact that the issues before us arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question," *id.* (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)).

those claims. *See Lin v. United States*, 561 F.3d 502, 505 (D.C. Cir. 2009). Subsequent events persuade us that the considered analysis by this court in *Doe I* is correct. The Supreme Court denied Exxon's petition for a writ of *certiorari*, 554 U.S. 909 (2008), which the United States opposed. The United States stated that "[t]he district court carefully considered concerns identified by the United States in its submissions to that court," noting dismissal of the federal law claims, "all claims against a defendant indirectly owned by the Indonesian government," and the "limit[] [on] discovery in a manner intended to avoid offending Indonesia's sovereign interests." Brief for the United States as Amicus Curiae, *Exxon Mobil Corp. v. Doe I*, 554 U.S. 909 (2008) (No. 07-81), 2008 WL 2095734, at *8.[53] Further, that "[i]n light of that procedural history and *the absence of a request by the United States that the case be dismissed in its entirety*, the court of appeals reasonably regarded petitioners' interlocutory appeal as one from the denial of a motion to dismiss state-law tort claims based on an assertion by private defendants, *not by the Executive*, that the litigation itself would have adverse consequences for the Nation's foreign policy interests and thus raised separation-of-powers concerns." *Id*., 2008 WL 2095734, at *8–9 (emphasis added). Appellants also cite an *amicus* brief filed by the United States before the Second Circuit, emphasizing that the "requirement of an *explicit* request for dismissal on foreign policy grounds by the Executive Branch

---

[53] The United States' *amicus* brief before the Supreme Court stated that district court had "carefully considered concerns identified by the United States" and "[l]argely on the basis of those concerns" had dismissed the federal claims. 2008 WL 2095734, at *8. Both the district court and this court concluded, however, that the State Department's 2002 letter was ambiguous and the text qualifying the State Department's position applied to all claims. *See Doe I*, 473 F.3d at 354. Since appellants noted their appeals in 2009, the State Department has not filed a statement of interest in this or the district court.

is, in our view, critical." Brief for the United States as Amicus Curiae at 11, *Balintulo v. Daimler AG*, No. 09-2778-cv (2d Cir. Nov. 30, 2009) (emphasis in original). The Executive Branch has made no such request in the instant cases.

This court "grant[s] substantial weight" to State Department statements regarding factual questions that are "at the heart of the Department's expertise." *In re Papandreou*, 139 F.3d 247, 252 & n.2 (D.C. Cir. 1998). Currently the court has no occasion to "decide what level of deference would be owed to a letter from the State Department that *unambiguously* requests that the district court dismiss a case as a non-justiciable political question." *Doe I*, 473 F.3d at 354 (emphasis in original). Before this court are only: (1) an ambiguous statement of interest by the State Department in 2002 regarding the plaintiffs' litigation, respecting both the federal statutory and non-federal tort claims; (2) an *amicus* brief filed by the Solicitor General and the State Department's Legal Advisor emphasizing that the statement of interest did not constitute an explicit request for dismissal and affirming that the district court had mitigated the concerns of the United States regarding discovery; (3) silence from the United States in the years since the United States' statement as *amicus* to the Supreme Court, notwithstanding this court's invitation in *Doe I* to file a further statement of interest; and (4) an *amicus* brief filed by the United States in another circuit emphasizing that the United States will make an explicit request for dismissal when appropriate. Also lodged but not filed in this court is a letter of January 24, 2011 from the Indonesian Embassy expressing continuing objection to plaintiffs' lawsuits. Given the United States' subsequent filings — and subsequent silence — the court concludes that it did not misinterpret the Legal Advisor's 2002 statement of interest.[54]

---

[54] The district court received expert testimony on the question of the definitiveness or ambiguity of the 2002 statement of interest

Nonetheless, insofar as the court is reviving appellants' ATS claims (minus the defendant owned in part by the Indonesian government and those dismissed claims not appealed), the court recognizes the United States had previously expressed concern. Although the court lacks a sufficiently unambiguous and recent statement from the United States expressing concern as would justify dismissal of the ATS claims on justiciability grounds, if the State Department were to reassert concerns, as it has been invited to do, this court or, upon remand, the district court in the first instance, must assess whether they provide grounds for dismissing the complaints or a part thereof, particularly with regard to the ATS claims. *See* Dis. Op. at 39.

## B.

In August 2005, a Memorandum of Understanding Between the Government of the Republic of Indonesia and the Free Aceh Movement was signed as part of the Helsinki Accord. Exxon characterizes the Memorandum as a peace treaty ending the Aceh conflict and appellants' claims as arising out of injuries allegedly sustained during the civil war. By letter of February 1, 2007 to the State Department, the Indonesian Embassy "reaffirm[ed] its position as contained in the previous correspondence," "highlight[ed]" the memorandum of

---

from Harold Hongju Koh, at the time a former Assistant Secretary of State for Democracy, Human Rights and Labor in the Clinton Administration and former attorney-adviser in the Office of Legal Counsel in the Justice Department in the Reagan Administration, who in both capacities participated in the drafting of statements of interest of the sort at issue here. Thereafter he was Dean of the Yale Law School and is currently the Legal Advisor of the State Department. Dean Koh's testimony supports the conclusion of this court in the prior interlocutory appeal and now. *See also* Harold Hongju Koh, *Separating Myth from Reality About Corporate Responsibility Litigation*, 7 J. INT'L. ECON. L. 263 (2004).

understanding, and concluded that adjudication of appellants' lawsuit "could be deemed as undermining the result of the democratic process." Exxon suggests continuation of this litigation would also "necessarily embody a 'lack of respect due' to the Executive Branch's support of the Helsinki Accord," Appellees' Br. 65 (citing *Baker v. Carr*, 369 U.S. at 217).

Exxon marshals paltry support for its asserted domestic doctrine of nonjusticiability based on interference with the peace process. It relies on the proposition that "war-related claims, including those not explicitly addressed, are extinguished by [a] peace settlement," *id.* at 64 (quoting *Burger-Fischer v. Degussa AG*, 65 F. Supp. 2d 248, 274 (D.N.J. 1999) (alteration in original), principally pointing to *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 230 (1796)). In *Ware v. Hylton*, a British subject sought to recover a debt confiscated by the Commonwealth of Virginia during the War of Independence, and Justice Chase wrote that inasmuch as "the treaty of peace abolishes the subject of the war, and that after peace is concluded, neither the matter in dispute, nor the conduct of either party, during the war, can ever be revived, or brought into contest again." *Id.* at 230. This principle was applied in *Hwang Geum Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005), involving claims by women who had been abducted and forced into sexual slavery by the Japanese Army before and during World War II; both Japan and the State Department filed statements that treaties between Japan and Taiwan, South Korea, the Philippines, and China, respectively, had resolved all civil claims. *Id.* at 52. This court relied on the statement of the State Department that the claims had been extinguished by treaty. *Id.* at 51–52. Exxon neither cites *Hwang Geum Joo* nor addresses the fact that the State Department has expressed no opinion regarding the 2005 Memorandum of Understanding. Instead, Exxon cites *Ware* and *Burger-Fischer*, which involved a class action lawsuit to recover compensation and damages in connection with forced labor under the Nazi

regime. The district court concluded the civil claims had been subsumed by remedies agreed to by the Allies and Germany without reference to any statement by the State Department. *Id.* at 279. Exxon also cites Section 902 comment *i* of the Restatement of Foreign Relations Law.[55]

Exxon's invocation of this doctrine founders on a fundamental level. As demonstrated by the noted sources, the basic principle is that a state has authority to bargain on behalf of its citizens and, consequently, to bargain away its citizens' civil claims. HENKIN, FOREIGN AFFAIRS AND THE CONSTITUTION 299–300. Once an international settlement agreement is finalized, the private claim becomes a "claim of the state and is under the state's control." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 902 cmt. *i*. The flaw in Exxon's reasoning is that the Free Aceh Movement is not, and never was, a state. Appellants consequently challenge the characterization of the Memorandum of Understanding as a "treaty of peace," and it is notable that there is no statement by the Executive Branch that supports the characterization. The principle articulated by Justice Chase and

---

[55] *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 902 cmt. *i*:

> Like other claims for violation of an international obligation, a state's claim for a violation that caused injury to rights or interests of private persons is a claim of the state and is under the state's control. The state may determine what individual remedies to pursue, may abandon the claim, or settle it. The state may merge the claim with other claims with a view to an en bloc settlement. The claimant state may set these claims off against claims against it by the respondent state. Any reparation is, in principle, for the violation of the obligation to the state, and any payment made is to the state.

the Restatement is that the citizens of once-warring countries may rely on their respective sovereigns to enforce their claims or not, if that proves a necessity of foreign relations. Following the conflict, citizens of each sovereign may petition their own governments to enforce their claims. Appellants have no such recourse because the Free Aceh Movement is not a sovereign; Aceh's rebellion did not result in its independence from Indonesia. Exxon cites no authority for the extension of the doctrine articulated in *Ware* to domestic agreements and the purpose underlying the doctrine would appear to have no applicability when the agreement is not bargained by two independent sovereigns.

So understood, Exxon's contention that the court must afford respect to "the Executive Branch's support" of the Memorandum of Understanding, Appellees' Br. 65, becomes no more than an alternative approach to the case-specific deference to the Executive Branch already discussed. The State Department filed its only statement of interest three years before the Memorandum of Understanding was signed, and the United States made no reference to it in its *amicus* brief filed before the Supreme Court. Thus, where Exxon's first contention regarding nonjusticiability was premised on ambiguity followed by silence, Exxon's second contention is premised on silence alone.

## C.

Exxon's invocation of the doctrine of comity, citing *Hilton v. Guyot*, 159 U.S. 113 (1895), fares no better. In *Hilton*, the Supreme Court instructed that:

> where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an

impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

*Id.* at 202–03. In other words, a foreign judgment ought to have preclusive effect and be granted full credit and effect under the principles of comity and international law. *Id.* at 206. Circuit courts of appeals applying *Hilton* require adjudication of the propriety of a foreign judicial decision, *Phila. Gear Corp. v. Phila. Gear de Mexico, S.A.*, 44 F.3d 187, 191 (3d Cir. 1994), and where no proceeding has been conducted abroad, emphasize the importance of an available foreign forum, *see, e.g.*, *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238–39 (11th Cir. 2004); *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 454 (2d Cir. 2001); *Jota v. Texaco Inc.*, 157 F.3d 153, 160 (2d Cir. 1998).

In effect, Exxon challenges the district court's conclusion that, assuming without deciding that the ATS has a prudential exhaustion requirement, *see Sosa*, 542 U.S. at 733 n.21, the plaintiffs were excused from meeting the requirement because "it is apparent here that efforts to pursue this case in Indonesia would be futile." *Doe I*, 393 F. Supp. 2d at 25. Specifically, the district court found that the plaintiffs, in response to an affidavit from an Indonesian Supreme Court Justice that their claims could be litigated in Indonesia, "effectively counter that they risk the very real possibility of reprisals, including death, if they pursue their claims there." *Id.* The only circuit court of appeals

to address the question held that a prudential exhaustion requirement does exist under international law and the ATS, but that where "the United States 'nexus' is weak, courts should carefully consider the question of exhaustion, particularly . . . with regard to claims that do not involve matters of 'universal concern,'" and in so doing apply the usual domestic exhaustion principles, including that "[t]he defendant bears the burden to plead and justify an exhaustion requirement, including the availability of local remedies." *Sarei*, 550 F.3d at 832. The "remedy must be available, effective, and not futile." *Id.*

Exxon's contention regarding international comity thus appears to be an attempt to reargue the issue of prudential exhaustion, which it has not appealed, *see supra* Part II.A, without challenging the district court's finding that efforts to pursue the case in Indonesia would be futile. In order to invoke this doctrine, Exxon must either point to a legal proceeding in Indonesia involving these particular plaintiffs to which the court must defer or at least the availability of effective and non-futile local remedies. *See Bigio*, 239 F.3d at 454. Exxon has done neither.[56]

---

[56] The dissent makes a related point, asserting that although enacted to avoid conflict with foreign nations the ATS has caused the opposite in recent years. Dis. Op. at 12–13. Yet the examples cited in support of this assertion do not withstand examination. As regards the South African apartheid, the dissent states that the ATS litigation hampered the Truth and Reconciliation Commission of South Africa. *Id.* Archbishop Desmond Tutu, Chairman of the Commission, disagreed and filed letters with the district court and the Second Circuit urging that the claims go forward. *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228, 276 (S.D.N.Y. 2009). Following a later ruling by the district court, the Justice Minister of South Africa wrote the district court that in light of the limitation to claims "based on aiding and abetting very serious crimes, such as torture, [and] extrajudicial killing committed in violation of international law by the

100

**VI.**

The district court dismissed the common law claims for lack of prudential standing. *Doe VIII*, 658 F. Supp. 2d 131. Appellants correctly contend that there is no *per se* rule against standing for non-resident aliens in federal courts and that under a case-by-case approach, upon applying the zone-of-interests test, they have prudential standing to bring their claims. Exxon disputes that appellants meet the zone-of-interests test, and alternatively maintains that the district court erred in its choice of law analysis and that principles of federal foreign affairs preemption dispose of appellants' claims.

---

apartheid regime," as contrasted with those corporations that "merely did business with the apartheid government," the court had addressed South Africa's concerns. Letter from J.T. Radebe, Minister of Justice and Constitutional Development, to Hon. Shira A. Scheindlin, U.S. Dist. Court, S. Dist. of N.Y. 1–2 (Sept. 1, 2009), *quoted in* Brief for the United States as Amicus Curiae Supporting Appellees at 6–7, *Balintulo v. Daimler AG*, No. 09-2778-cv (2d Cir. Nov. 30, 2009). As regards Papua New Guinea, the Chief Secretary of the government wrote to the district court on multiple occasions, reflecting the views expressed by the Prime Minister to parliament, urging that the litigation proceed. *Sarei*, 487 F.3d at 1199–1200. Indeed, in one letter the Chief Secretary indicated that the only way that relations between the United States and Papua New Guinea could be harmed would be "if the litigation is discontinued." *Id.* at 1207 n.15. The objections by Canada in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ. 9882 (DLC), 2005 WL 2082846 (S.D.N.Y. Aug. 30, 2005), and by the United Kingdom, Switzerland, and Germany — as appended to the Brief for the United States as Amicus Curiae in Support of Petitioners at apps. C–D, *Am. Isuzu Motors, Inc. v. Ntsbeza*, 128 S. Ct. 2424 (2008) (No. 07-919) — were not to the exercise of jurisdiction over events that took place in their countries but to exercise of jurisdiction over corporations that were citizens of those countries. *See, e.g.*, *id.* at 7a–8a, 10a.

**A**.

In dismissing the common law claims, the district court relied on *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.D.C. 1976), which relied on an asserted "general rule that non-resident aliens have no standing to sue in United States courts." *Id.* at 152. Appellants contend that neither that case nor any subsequent case has established such a general rule, which would be contrary to the rules of prudential standing and the Framers' intent. Neither Exxon nor *amici* supporting Exxon rely in this court on *Berlin Democratic Club* or any *per se* rule. Instead they maintain appellants fail to show that they fall within the zone of interests of D.C. common law because neither the District of Columbia nor any state of the United States has any interest in extending its law to reach the allegations of non-residents involving foreign individuals within the territory of a foreign sovereign, particularly when, they assert, the claims concern acts of that sovereign's military during a civil war. Our analysis begins with a review of the standard for prudential standing and then applies that standard to appellants' tort claims.

Exxon's decision not to rely on *Berlin Democratic Club* is well founded. The Framers intended to permit aliens, resident or otherwise, access to federal courts: Article III of the Constitution conferred jurisdiction in the federal courts over lawsuits "between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U.S. CONST. art. III, § 2; *see also JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 95 (2002).[57] The Judiciary Act of 1789

---

[57] *See also* THE FEDERALIST NO. 80, at 494, 495, 500 (Alexander Hamilton) (Henry Cabot Lodge ed., 1888); 4 DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 546, 554 (Jonathan Elliott, ed., 1836) (statement of James Madison); 2 *id.* at 492 (statement of James Wilson); Brief for the United States as Amicus Curiae Supporting

authorized the federal courts to hear cases involving an alien defendant. Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73, 78 (1789).[58] The court in *Berlin Democratic Club* misread *Johnson v. Eisentrager*, 339 U.S. 763 (1950), which concerned the constitutional rights of alien enemies, *id.* at 769, 774, 776, and took pains to distinguish alien friends, *id.* at 769 & n.2. The authorities cited in *Eisentrager* for the proposition that "alien enemies resident in the country of the enemy could not maintain an action in its courts during the period of hostilities," *id.* at 776, make clear that the Supreme Court intended only to address claims by enemy aliens. *See id.* at 774 n.6, 776–77. In *Rasul v. Bush*, 542 U.S. 466 (2004), the Supreme Court rejected the notion that its precedent "categorically excludes aliens detained in military custody outside the United States from the 'privilege of litigation' in U.S. courts," *id.* at 484 (quoting *Al Odah v. United States*, 321 F.3d 1134, 1139 (D.C. Cir. 2003)), and stated that "*Eisentrager* itself erects no bar to the exercise of federal-court jurisdiction over [ ] habeas corpus claims" brought under 28 U.S.C. § 2241, *id.* The Court quoted *Disconto Gesellschaft*, in which it had stated that "[a]lien citizens, by the policy and practice of the courts of this country, are ordinarily permitted to resort to the courts for the redress of wrongs and the protection of their rights," 208 U.S. at 578, and noted that "28

---

Petitioner at 2, *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88 (2002) (No. 01-651), 2001 WL 34092062, at *2.

[58] Every proposed version of the draft Judiciary Act provided for alienage jurisdiction. *See* Brief of Amici Curiae of Arthur Miller, Erwin Chemerinsky and Professors of Federal Jurisdiction and Legal History in Support of Plaintiffs-Appellants-Cross-Appellees and Reversal 13 ("Legal History Amicus Br.") (citing Kevin R. Johnson, *Why Alienage Jurisdiction? Historical Foundations and Modern Justification for Federal Jurisdiction over Disputes Involving Noncitizens*, 21 YALE. J. INT'L L. 1, 17 (1996)).

U.S.C. § 1350 explicitly confers the privilege of suing for an actionable 'tort . . . committed in violation of the law of nations or a treaty of the United States' on aliens alone." 542 U.S. at 484–85 (alteration in original).

To the extent the court in *Berlin Democratic Club* relied on this court's opinions, they have been qualified, if not overruled, by subsequent Supreme Court decisions.[59] In *Kukatush Mining Corp. v. SEC*, 309 F.2d 647 (D.C. Cir. 1962), this court held that a non-resident alien corporation, which transacted no business and had no assets in the United States, lacked standing because the court did not "ha[ve] jurisdiction of the subject res or with the preferred rights under immigration laws." *Id*. at 650. The court acknowledged, however, "a definite trend to relax the rigidities of the earlier cases." *Id*.[60] In *Constructores Civiles de*

---

[59] The district court also cited *Reyes v. Sec'y of Health, Educ. & Welfare*, 476 F.2d 910 (D.C. Cir. 1973), which addressed a substantive, not a procedural question, namely whether a non-resident alien was protected by the Due Process Clause and the applicability of the Constitution outside of the United States. *Id.* at 915 & n.8. The district court also cited Justice Douglas's dissent in *Kleindienst v. Mandel*, 408 U.S. 771 (1972), "assuming, arguendo" that persons outside the United States lacked standing to assert a First Amendment claim of being excluded from entry based on protected speech, *id.* at 772 (Douglas, J., dissenting); the dissenting opinion rested on a substantive question, namely whether the First Amendment applied extraterritorially, *id.*

[60] The court in *Kukatush Mining* read other opinions as limited to their facts. For instance, the court read *Disconto Gesellschaft v. Umbreit*, 208 U.S. 570, 578 (1908), and *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489 (1931), as concerning the present or prior existence of a *res* in the United States. *See Kukatush Mining*, 309 F.2d at 649–50. Similarly, this court read *Cia Mexicana De Gas S.A. v. Federal Power Commission*, 167 F.2d

*Centroamerica, S.A. v. Hannah*, 459 F.2d 1183, 1190 (D.C. Cir. 1972), this court found circuit case law muddled and, noting the Supreme Court's admonition that "'[a]lien citizens, by the policy and practice of the courts of this country, are ordinarily permitted to resort to the courts for the redress of wrongs and the protection of their rights,'" *id.* (quoting *Disconto Gesellschaft*, 208 U.S. at 578) (alteration in original), concluded that the question "depends upon the circumstances," *id*. The court did not suggest a test for judging the circumstances, *id.*, but held there was standing in view of the plaintiff's substantial contacts with a federal agency in Washington, D.C., the fact that the money at issue originated from the U.S. Treasury in Washington, D.C., and unlike in *Kukatush Mining*, the plaintiff was not an alleged wrongdoer but sued "under a statute at least arguably enacted for its own benefit [and] also for the American people as a private attorney general," *id*. at 1191. In *Berlin Democratic Club*, the district court refused to adopt an additional exception for a non-resident alien where the *res* was not within a domestic court's territorial jurisdiction or a non-resident alien had not applied for relief under a U.S. statute or was not brought from abroad to be subject to a domestic criminal prosecution. 410 F. Supp. at 152; *see also id.* at 153.

Before this court spoke again on the question of prudential standing for a non-resident alien, the Supreme Court rendered a series of decisions on prudential standing,[61] ultimately adopting the analysis in *Valley Forge Christian College v. Americans*

---

804 (5th Cir. 1948), and *Estrada v. Ahrens*, 296 F.2d 690 (5th Cir. 1961), as relying on idiosyncracies of administrative law. *See Kukatush Mining*, 309 F.2d at 649–50.

[61] *E.g.*, *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99–100 (1979); *Craig v. Boren*, 429 U.S. 190, 193–94 (1976); *Warth v. Seldin*, 422 U.S. 490, 499–500 (1975).

*United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982). In an effort to clarify the line between constitutional and prudential standing, the Court enumerated three "prudential principles that bear on the question of standing": (1) "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"; (2) courts ought to refrain from "adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches"; and (3) the "plaintiff's complaint [must] fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 474–75 (internal citations and quotation marks omitted).

Since *Valley Forge* this court has imposed no special disability on non-resident alien status in addressing standing to bring constitutional claims. In *Cardenas v. Smith*, 733 F.2d 909 (D.C. Cir. 1984), the court characterized *Kukatush Mining* as identifying a non-exhaustive list of situations in which a non-resident alien may bring suit, and *Constructores Civiles* as signaling a "relaxation of rigidities" in adopting a "case-by-case analytical approach." *Id.* at 916. Applying the zone-of-interests test of *Valley Forge*, the court inquired whether the interest asserted by the plaintiff "enjoys the protection of the Fourth and Fifth Amendments," the substantive basis for the plaintiff's suit, and acknowledged that "the inquiry tends to meld into the question of whether [the plaintiff] has a cause of action to enforce these Amendments." *Id.* at 915. "It is beyond peradventure," the court noted, "that a foreign nonresident, non-hostile alien may, under some circumstances, enjoy the benefits of certain constitutional limitations imposed on United States actions." *Id.* In *DKT Memorial Fund v. Agency for International Development*, 887 F.2d 275 (D.C. Cir. 1989), the court again decided the prudential standing question based on

the substantive question of the territorial reach of the constitutional protection: the court looked at the merits of the plaintiff's claim to determine whether the First Amendment protected the conduct of the non-resident aliens. *Id.* at 284–85.

Consequently, regardless of whether *Berlin Democratic Club* was correctly decided based on authority in this circuit at the time, this court now analyzes prudential standing on a case-by-case basis based on the zone of interests of the law providing the basis for the plaintiff's cause of action. The court has not identified any special rule governing the prudential standing of non-resident aliens. To the extent the zone-of-interests test is dependent on a "peek at the merits," *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 11 (D.C. Cir. 2008), the substantive question will be whether a constitutional, statutory, or common law protection has extraterritorial reach or reaches non-resident aliens.

**B.**

The test for prudential standing "is not meant to be especially demanding," and there "need be no indication of [legislative] purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). The question whether appellants would have prudential standing under the zone-of-interests test, assuming it applies,[62] turns on what law

---

[62] For purposes of this appeal the court assumes without deciding that the zone-of-interests test, developed as a matter of administrative law, *see Clarke*, 479 U.S. at 400 n.16, applies to a cause of action sounding in tort. The court has described the zone-of-interests test for administrative claims as "a gloss on the judicial review provision of the Administrative Procedure Act." *PDK Labs. Inc. v. DEA*, 362 F.3d 783, 791 (D.C. Cir. 2004). The First Circuit has held that prudential standing is demonstrated when a plaintiff either satisfies the zone-of-interests test or "show[s] that the harm of which he complains amounts to a 'common law' injury, such as a tort."

provides the basis for the cause of action under District of Columbia choice of law rules, which the parties agree apply. On cross-appeal Exxon challenges the district court's choice of law analysis, and our review is *de novo*, *Felch v. Air Florida, Inc.*, 866 F.2d 1521, 1523 (D.C. Cir. 1989).[63]

"To determine which jurisdiction's substantive law governs a dispute, District of Columbia courts blend a 'governmental interests analysis' with a 'most significant relationship' test." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009) (quoting *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40–41 & n.18 (D.C. 1989)). "Under the governmental interests analysis[,] . . . [a court] must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Id.* (quoting *Hercules*, 566 A.2d at 41) (alterations in original). "To determine which jurisdiction has the most significant relationship to a case, a court must consider . . . : (1) 'the place where the injury occurred'; (2) 'the place where the conduct

*Munoz-Mendoza v. Pierce*, 711 F.2d 421, 425 (1st Cir. 1983).

[63] Contrary to appellants' suggestion, the choice of law issue is properly before the court. In the Notice of Cross-Appeal, Exxon stated it appealed from "any . . . orders that have merged into the [district court's September 30, 2009] judgment." One such order is the district court's choice of law ruling, which Exxon also included in its list of rulings under review. *See* Exxon Mobil's Certificate as to Parties, Rulings, & Related Cases 3. Exxon's intent to seek review of the district court's choice of law ruling "can be fairly inferred" from its notice of appeal and its certificate of rulings under review. *LaRouche's Comm. for a New Bretton Woods v. FEC*, 439 F.3d 733, 739 (D.C. Cir. 2006). The court need not address appellants' motion to dismiss the cross-appeal because Exxon states it was filed only as a precautionary measure. Appellees' Br. 2.

causing the injury occurred'; (3) 'the domicil[e], residence, nationality, place of incorporation and place of business of the parties'; and (4) 'the place where the relationship, if any, between the parties is centered.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAW § 145(2) (1971)).

The District of Columbia courts follow section 145 of the Restatement, *see Rymer v. Pool*, 574 A.2d 283, 286 (D.C. 1990), a comment to which states: "When certain contacts involving a tort are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if those contacts were grouped in a single state." RESTATEMENT (SECOND) OF CONFLICT OF LAW § 145, cmt. *i*; *see also Simon v. United States*, 341 F.3d 193, 198 n.3 (3d Cir. 2003). The district court concluded that there was no conflict among the laws of the District of Columbia, Delaware, New Jersey, and Texas, except as to the wrongful death claim as to which the district court applied Delaware law.[64] These are the jurisdictions in which Exxon is a legal resident and where appellants allege some of the tortious conduct occurred. The district court, however, compared the interest of the United States in applying District of Columbia law to the interest of Indonesia. *See Doe I v. Exxon Mobil*

---

[64] Appellants suggest that the choice of law analysis cannot proceed because Exxon failed to demonstrate a "true conflict." "Where each state would have an interest in the application of its own law to the facts, a true conflict exists and the law of the jurisdiction with the stronger interest will apply." *In re Estate of Delaney*, 819 A.2d 968, 987 (D.C. 2003) (quoting *Biscoe v. Arlington Cnty.*, 738 F.2d 1352, 1360 (D.C. Cir. 1984)); *see also Herbert v. District of Columbia*, 808 A.2d 776, 779 (D.C. 2002); *Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985). Appellants do not suggest that Indonesia has no interest in the application of its laws to their cases.

*Corp.*, No. Civ.A.01-1357, 2006 WL 516744, at \*2 (D.D.C. Mar. 2, 2006).  But the foreign affairs interest of the United States identified by the district court — that "the leader of the free world[ ] has an overarching, vital interest in the safety, prosperity, and consequences of the behavior of its citizens, particularly its super-corporations conducting business in one or more foreign countries," *id.*, does not necessarily reflect the interests of the several states.  Rather the court must compare the interests of the three states, and the interest of the forum District of Columbia, with the interests of Indonesia.  The district court correctly observed that such a comparison "tilt[s] in favor of Indonesia." *Id.*

"[S]ubject only to rare exceptions, the local law of the state where conduct and injury occurred will be applied to determine whether the actor satisfied minimum standards of acceptable conduct and whether the interest affected by the actor's conduct was entitled to legal protection."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. d; *see also Drs. Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007).  The place of injury is accorded particular importance "in the case of personal injuries and of injuries to tangible things." *Washkoviak v. Student Loan Mkg. Ass'n*, 900 A.2d 168, 182 (D.C. 2006) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. f).  The district court concluded that "[s]ome (perhaps most) of the conduct occurred in Indonesia, although plaintiffs argue that ExxonMobil knew about and participated, indeed directed, from the United States the allegedly culpable conduct to the detriment of plaintiffs." *Doe I*, 2006 WL 516744, at \*1.  Other than decision-making, for purposes of the non-federal tort claims all conduct causing injury occurred in Indonesia according to the complaint.  The plaintiffs are citizens of and reside in Indonesia.  The defendants, at the time the *Doe I* complaint was filed in 2001, were incorporated in the United States: one corporate defendant had its principal place of

business in Indonesia and three in various U.S. states. The citizenship of the corporate defendant with its principal place of business in Indonesia at the time the *Doe VIII* complaint was filed in 2007 remains in dispute. The district court found that "[t]he relationship between [Exxon] and plaintiffs is likely centered in Indonesia." *Id.*

In view of the importance that the Restatement places on the place of injury, which District of Columbia choice of law rules follow, RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. d; *Rymer*, 574 A.2d at 286, and the fact that the remaining factors weigh in favor of a choice of Indonesian law, we hold that Indonesian law applies to appellants' non-federal claims. Exxon's objection that Indonesian law should not apply due to considerations of international comity concerns the content of Indonesian law, not its applicability under District of Columbia choice of law rules. Exxon relies on dictum in *Phillips v. Eyre*, (1870) 6 L.R.Q.B. 1 at 30–31 (Eng.), for the proposition that comity would support recognizing a general amnesty issued by the foreign jurisdiction upon whose law the court relies. It points to the objection of the Indonesian Embassy, which refers to an agreement to establish a human rights court and a commission for truth and reconciliation, but does not refer to either the implementation of that agreement, the exclusivity of that remedy, or amnesty for any party. None of the experts on Indonesian law presented to the district court referred to the remedies cited by the Embassy and their status and applicability are uncertain.

## C.

Because Indonesian law applies under District of Columbia choice of law rules, the court need not address Exxon's federal preemption argument regarding District of Columbia and Delaware law. To the extent Exxon suggested during oral argument that appellants' non-federal tort claims would be

preempted if Indonesian law applies, the authorities it cites in its brief are inapposite, relating to the "supremacy of the national power in the general field of foreign affairs" and to the need to prevent the legislatures of the states from conducting foreign policy, *Hines v. Davidowitz*, 312 U.S. 52, 62–63 (1941); *see also Zschernig v. Miller*, 389 U.S. 429, 440–41 (1968); *Saleh*, 580 F.3d at 12–13. Otherwise, the argument is forfeited because it is not presented in Exxon's briefs. *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)); *see also* FED. R. APP. P. 28(a)(9).

**VII.**

Exxon contends that the *Doe VIII* complaint, which is based on diversity jurisdiction, 28 U.S.C. § 1332, should be dismissed for lack of complete diversity between plaintiffs and defendants. Complete diversity requires that no two parties on opposite sides of an action can be citizens of the same state. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806). The diversity statute does not confer subject matter jurisdiction over a lawsuit between an alien on one side, and an alien and a U.S. citizen on the other side. *See Saadeh v. Farouki*, 107 F.3d 52, 61 (D.C. Cir. 1997). The *Doe VIII* complaint alleges that the plaintiffs are Indonesian citizens, *Doe VIII* Compl. ¶¶ 6–9, and that defendant Exxon Mobil of Indonesia ("EMOI"), is incorporated in the Cayman Islands with its principal place of business in Indonesia. *Id.* ¶ 16.

The district court did not reach Exxon's diversity objections. We agree with appellants that EMOI's non-diversity would not mandate dismissal because the district court, were it to find that EMOI is a non-diverse party, could dismiss EMOI, permitting appellants to proceed against Exxon Mobil

Corporation. Federal Rule of Civil Procedure 21 permits dismissal of "jurisdictional spoilers" and creates a "fiction that [the dismissal] relates back to the date of the complaint," *In re Lorazepam & Clorazepate Antitrust Litig.*, 631 F.3d 537, 542 (D.C. Cir. 2011). We therefore remand this issue to the district court.

Accordingly, we affirm the dismissal of appellants' TVPA claims, we reverse the dismissal of the ATS claims at issue in this appeal, along with the dismissal of appellants' non-federal tort claims, and we remand the cases to the district court.

KAVANAUGH, *Circuit Judge*, dissenting in part:

Plaintiffs are Indonesian citizens who allege that they (or their family members) were imprisoned, beaten, abused, and in some cases killed in Indonesia by Indonesian soldiers. Plaintiffs claim that the Indonesian soldiers violated customary international norms against torture, extrajudicial killing, and prolonged detention. The Indonesian soldiers provided security for an American corporation, Exxon. In this case, plaintiffs did not sue Indonesia or Indonesian officials. Rather, they sued Exxon under the Alien Tort Statute, or ATS, for aiding and abetting the Indonesian officials' tortious conduct.

The ATS grants federal district courts jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In cases such as this where no U.S. treaty is involved, the substantive content of an ATS claim is determined by reference to customary international law, also commonly called the law of nations. *See Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). Customary international law is a kind of international common law. It is a body of sometimes difficult-to-ascertain rules and principles that arise informally from the general and consistent practice of nations, and that have been recognized and enforced in international tribunals such as the post-World War II tribunal at Nuremberg.

In the District Court, Judge Oberdorfer dismissed plaintiffs' ATS claims. *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24-27 (D.D.C. 2005). I would affirm Judge Oberdorfer's decision for any of four independent reasons.[1]

---

[1] In addition to their ATS claims, plaintiffs have asserted claims under the federal Torture Victim Protection Act and state tort law. I agree with the majority opinion's decision to affirm

*First*, under the presumption against extraterritoriality, the ATS does not apply to conduct that occurred in foreign nations – such as this suit, which concerns conduct that occurred in Indonesia. A "longstanding principle of American law" dictates that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian American Oil Co. (ARAMCO)*, 499 U.S. 244, 248 (1991). The presumption helps the United States avoid conflicts with other nations, which of course have a strong interest in policing and regulating conduct in their own countries. The ATS contains no textual indication that it was meant to apply to conduct in foreign countries. Moreover, the ATS's historical purpose was to avoid conflicts with foreign governments. It did so by providing redress for foreign citizens who suffered injuries *within the United States* or on the high seas. As this case exemplifies – given Indonesia's strenuous and repeated objections to a U.S. court's entertaining plaintiffs' suit – extending the ATS to conduct that occurs *in foreign countries* creates rather than avoids conflicts with foreign nations and thus runs directly counter to

---

dismissal of the TVPA claims. I also agree with the majority opinion's decision to remand the state-law claims, including for a careful analysis of whether those claims are preempted under the foreign affairs preemption doctrine. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 422-23 (2003); *Zschernig v. Miller*, 389 U.S. 429 (1968); *Hines v. Davidowitz*, 312 U.S. 52 (1941); *Saleh v. Titan Corp.*, 580 F.3d 1, 11-12 & 12 n.8 (D.C. Cir. 2009); *see also Chamber of Commerce of the United States v. Whiting*, 131 S. Ct. 1968, 1983 (2011) (describing "uniquely federal areas of regulation" and citing *Garamendi* and *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373-74 (2000), as examples of federal authority over foreign affairs).

both the presumption against extraterritoriality and the ATS's design and purpose.

*Second*, as the Second Circuit recently held, the ATS does not apply to claims against corporations. *See Kiobel v. Royal Dutch Petroleum Co*., 621 F.3d 111 (2d Cir. 2010). In *Sosa*, the Supreme Court stated that courts in ATS cases must determine whether customary international law "extends the scope of liability for a violation of a given norm to the perpetrator being sued." 542 U.S. at 732 n.20. Customary international law does not recognize corporate liability. That means plaintiffs' ATS claims against a corporation (Exxon) cannot go forward. Moreover, the Supreme Court in *Sosa* emphasized the need for judicial restraint, "great caution," and "vigilant doorkeeping" in ATS cases. *Id.* at 725-29. Given the Supreme Court's admonition, it would be quite odd for a U.S. court to allow a customary international law-based ATS claim against a corporation when no international tribunal has allowed a customary international law claim against a corporation.

*Third*, even if customary international law established corporate liability for torture and extrajudicial killing, we still should not allow plaintiffs' ATS claims for those violations to go forward because doing so would be incongruous with the Torture Victim Protection Act. The Supreme Court has indicated that courts should exercise judicial restraint and interpret the open-ended language of the ATS by reference to analogous congressionally enacted causes of action. *See Sosa*, 542 U.S. at 731. Plaintiffs assert that the ATS and customary international law give *aliens* a cause of action for torture and extrajudicial killing. The analogous Torture Victim Protection Act gives *U.S. citizens* a cause of action for torture and extrajudicial killing. But the TVPA does not allow corporate liability or aiding and abetting liability. In

exercising the restraint mandated by the Supreme Court in ATS cases, we must follow Congress's approach to fashioning the TVPA for U.S. citizens and similarly fashion the ATS for aliens. Under the majority opinion's contrary approach, an *alien* can sue a corporation in a U.S. court for aiding and abetting torture and extrajudicial killing, but a *U.S. citizen* cannot sue the same corporation in the same U.S. court for the exact same aiding and abetting of torture and extrajudicial killing. That makes little sense and is, to put it charitably, a strange reading of congressional intent and Supreme Court precedent.

*Fourth*, the Supreme Court has required us to interpret the open-ended language of the ATS so as to avoid conflict with the Nation's foreign policy – and therefore, to heed Executive Branch statements of interest in ATS cases. *See Sosa*, 542 U.S. at 733 n.21. Following *Sosa*, courts must dismiss ATS cases when the Executive Branch reasonably explains that the suit would harm U.S. foreign policy interests. Here, the Executive Branch has repeatedly stated that allowing these ATS claims to proceed would harm the United States' relationship with Indonesia – an assertion backed up by several pointed letters that the Government of Indonesia has submitted directly to this Court and the District Court. The Executive Branch has explained that damage to the United States' relationship with Indonesia would in turn impair American national security and foreign policy with respect to the ongoing war against al Qaeda, a war in which Indonesia is a key ally. Judge Oberdorfer heeded those concerns and, in light of them, properly dismissed plaintiffs' ATS claims.[2]

---

[2] Plaintiffs base their claims on underlying customary international law norms against torture, extrajudicial killing, and prolonged detention. From a lower court's perspective in an ATS

Exercising the caution mandated by the Supreme Court in ATS cases, I would dismiss the ATS claims for any of those four independent reasons. In my judgment, permitting these ATS claims to proceed jumps the rails of proper judicial restraint.

---

case, there may be as many as seven currently cognizable customary international law norms: what one might call the "Blackstone three" plus the "Breyer four." The original Blackstone three are offenses against ambassadors, violations of safe conducts, and piracy. *Sosa*, 542 U.S. at 715. The Breyer four – which Justice Breyer identified but the Court as a whole has not yet taken a position on – are torture, genocide, crimes against humanity, and war crimes. *Id.* at 762 (Breyer, J., concurring). Because plaintiffs assert a torture claim – which is one of the Breyer four and at this point almost certainly has become a customary international law norm cognizable in ATS cases against state actors at least – plaintiffs' suit satisfies that threshold requirement for an ATS claim. *Cf. id.* at 738 (dismissing suit because no cognizable customary international law norm alleged). For that reason, unlike in *Sosa*, we must consider the various other arguments raised by Exxon against plaintiffs' ATS claim for torture. It seems doubtful, however, that the other two norms asserted by plaintiffs – extrajudicial killing and prolonged detention, which are not among the Blackstone three or the Breyer four – would be cognizable in an ATS suit against any defendant. Because the majority opinion is remanding the ATS suit to the District Court, it will be up to that court on remand to assess whether the ATS extends to claims for extrajudicial killing and prolonged detention.

6

I

*First*, I would dismiss the ATS claims because the torts alleged here occurred in Indonesia and the ATS does not extend to conduct that occurred in foreign lands.[3]

---

[3] Somewhat surprisingly, no court of appeals has analyzed whether the ATS applies to conduct that took place in a foreign nation. In its recent opinion on ATS corporate liability, the Second Circuit expressly left this question open and suggested that it "very well could conclude that the ATS does *not* apply extraterritorially, and thus we would dismiss this and the vast majority of recent ATS suits on the ground that the violations of customary international law alleged by plaintiffs originated or took place in a foreign country." *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 143 n.44 (2d Cir. 2010) (internal quotation marks omitted); *see also id.* at 117 n.10. One Ninth Circuit judge who has addressed the issue stated that the ATS should not apply to conduct that occurred on foreign land. *See Sarei v. Rio Tinto, PLC*, 625 F.3d 561, 563-64 (9th Cir. 2010) (Kleinfeld, J., dissenting). In *Sosa*, the extraterritoriality issue was raised, but the Court did not reach it because the Court rejected the ATS claim on other grounds. Only Justice Breyer alluded to the extraterritoriality issue, and he did so only briefly. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 761-63 (2004) (Breyer, J., concurring).

It is true that some courts of appeals, without any analysis of extraterritoriality, have permitted ATS suits even though the underlying tortious conduct occurred in foreign countries. *See, e.g.*, *Hilao v. Estate of Marcos*, 25 F.3d 1467 (9th Cir. 1994); *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). We are of course not bound by decisions of other courts of appeals. Moreover, those cases contain no judicial analysis of the extraterritoriality question and thus provide no persuasive arguments for accepting the extraterritorial application of the ATS. *See Arizona Christian School Tuition Organization v. Winn*, 131 S. Ct. 1436, 1448-49 (2011) (conclusion assumed sub silentio in prior cases is not precedent). And the fact that some of those cases have been on the books for several years does not add materially to their persuasive

It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian American Oil Co. (ARAMCO)*, 499 U.S. 244, 248 (1991) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). Because Congress "ordinarily legislates with respect to domestic, not foreign matters," courts presume that statutes do not apply to conduct in foreign lands unless an "affirmative intention of the Congress clearly expressed" indicates otherwise. *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010).

The presumption against extraterritoriality "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *ARAMCO*, 499 U.S. at 248. The presumption avoids the "serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004). "Foreign conduct is generally the domain of foreign law," and "courts should assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws." *Microsoft Corp. v. AT & T*, 550 U.S. 437, 455 (2007) (internal quotation marks and alteration omitted).

The presumption against extraterritoriality is focused on the site of the conduct, not the identity of the defendant. *See, e.g.*, *Morrison*, 130 S. Ct. at 2884 (the transactions that a

---

force. *See Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1268 (2011) ("immaterial" that an incorrect doctrine "has been consistently relied upon and followed for 30 years" in the lower courts).

statute "seeks to regulate" must occur domestically) (internal quotation marks omitted). That a defendant is a U.S. citizen thus does not mitigate the force of the presumption. In *ARAMCO*, for example, the Supreme Court held that Title VII did not regulate the foreign employment practices of two Delaware corporations. 499 U.S. at 247, 259. And in *Morrison*, the Supreme Court dismissed a securities suit against both foreign and U.S. corporations for misconduct in connection with securities traded on foreign exchanges. 130 S. Ct. at 2875-76, 2888.[4]

---

[4] The majority opinion cites *Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952), and *Pasquantino v. United States*, 544 U.S. 349 (2005), in claiming that "the calculus can change where a U.S. citizen is a cause of the harm." Maj. Op. at 27-28. But the Supreme Court discussed both of those cases in *ARAMCO* and *Morrison*, and the Supreme Court's analysis does not support the majority opinion's use of those cases here. The Supreme Court determined that the presumption against extraterritoriality applied the same way in all four cases, and the defendant's citizenship did not affect the extraterritoriality analysis. *ARAMCO* and *Morrison* make crystal clear that the American identity of the defendant does not defeat the presumption against extraterritoriality. In *Steele*, moreover, the statute under consideration applied to "all commerce which may lawfully be regulated by Congress," and that "express[] state[ment]" in the statutory text rebutted the presumption against extraterritoriality regardless of the identity of the defendant. *See Morrison*, 130 S. Ct. at 2886 n.11; *ARAMCO*, 499 U.S. at 252-53. In *Pasquantino*, the conduct at issue occurred entirely within the United States, and the Supreme Court therefore did not need to give the statute *any* extraterritorial effect – again, focusing on the defendant's conduct, not his citizenship. *See Morrison*, 130 S. Ct. at 2887; *Pasquantino*, 544 U.S. at 371.

The Supreme Court has also ruled that the presumption against extraterritoriality bars a suit based on foreign conduct even when a U.S. citizen defendant took some actions in the United States related to the foreign conduct. In *ARAMCO*, for example, the Title

That canon of construction is deeply rooted. In 1824, for example, the Supreme Court instructed that "however general and comprehensive the phrases used in our municipal laws may be, they must always be restricted in construction, to places and persons, upon whom the Legislature have authority and jurisdiction." *The Apollon*, 22 U.S. 362, 370 (1824) (Story, J.); *see also Rose v. Himely*, 8 U.S. 241, 279 (1808) (Marshall, C.J.); *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) (Marshall, C.J).

The canon remains to this day an essential part of the Supreme Court's jurisprudence. The Court has invoked it repeatedly in recent years. *See, e.g.*, *Morrison*, 130 S. Ct. at 2877 (2010); *Small v. United States*, 544 U.S. 385, 388 (2005); *ARAMCO*, 499 U.S. at 248 (1991).

In applying the presumption against extraterritoriality, we "look to see whether language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *ARAMCO*, 499 U.S. at 248 (alteration in original) (internal quotation marks omitted). "When a statute gives no clear indication of an

---

VII defendant – who allegedly discriminated against an employee working in Saudi Arabia – originally hired that employee in Houston. 499 U.S. at 247. And in *Morrison*, the allegedly deceptive conduct – which affected securities transactions abroad – occurred in Florida. 130 S. Ct. at 2883-84. As the *Morrison* Court explained, "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Id.* at 2884.

extraterritorial application, it has none." *Morrison*, 130 S. Ct. at 2878.

Here, the sparse text of the ATS does not support application of the law to conduct in foreign lands. The ATS refers to conduct committed in "violation of the law of nations or a treaty of the United States." To be sure, such conduct can occur worldwide. But as the Supreme Court has explained, the mere fact that statutory language could plausibly apply to extraterritorial conduct does not suffice to overcome the presumption against extraterritoriality. Otherwise, most statutes, including most federal criminal laws, would apply extraterritorially and cover conduct occurring anywhere in the world. In *Morrison* and *ARAMCO*, the Supreme Court recognized that commonsense point and ruled that "broad jurisdictional language" and statutory references to acts occurring in "foreign commerce" did not suffice to overcome the presumption against extraterritoriality. *See Morrison*, 130 S. Ct. at 2882 (interpreting § 10(b) of the Exchange Act); *ARAMCO*, 499 U.S. at 251 (interpreting Title VII); *see also Small*, 544 U.S. at 389-91 (statutory phrase "convicted in any court" refers only to convictions in domestic courts).

Nor does the ATS's specific reference to alien plaintiffs establish that the statute applies extraterritorially. That language merely ensures that alien plaintiffs can sue under customary international law for injuries suffered *within the United States.* Similarly, in *ARAMCO*, the statute covered aliens, but the Supreme Court said the statute did not apply to extraterritorial conduct. *See* 499 U.S. at 255 (Title VII did not apply abroad although the statute protected aliens working in the United States).

The ATS's historical context likewise provides no basis for rebutting the presumption against extraterritoriality. Indeed, the ATS's background provides affirmative evidence reinforcing the conclusion that the statute does *not* apply to conduct occurring in foreign countries.

Under the Articles of Confederation, which were in effect from 1781 until the U.S. Constitution was ratified in 1788, the U.S. Government lacked authority to remedy or prevent violations of the law of nations. Two incidents during that period involving foreigners mistreated *in the United States* highlighted the problem created by this legal vacuum. In the "Marbois Affair" of 1784, the Secretary of the French Legion, a French ambassador of sorts, was assaulted on a street in Philadelphia. *See* William R. Casto, *The Federal Courts' Protective Jurisdiction Over Torts Committed in Violation of the Law of Nations*, 18 CONN. L. REV. 467, 491-92 (1986). And in 1787, a New York City constable entered the home of a Dutch ambassador and arrested one of the ambassador's servants, violating the ambassador's diplomatic privileges. *See id.* at 494. Both torts violated a customary international law norm – namely, infringements on the rights of ambassadors. Yet Congress was powerless to ensure redress for either violation of the law of nations. The impotence of the national government in turn generated conflict with foreign nations concerned that their citizens could not obtain legal redress for certain injuries suffered in the United States. *See, e.g.*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 717 n.11 (2004).

After ratification of the Constitution in 1788, the First Congress addressed this problem in 1789 by enacting the Alien Tort Statute, which was part of Section 9 of the Judiciary Act of 1789. *See id.* at 717. The statutory text allowed aliens to sue for torts committed in violation of the

law of nations or a U.S. treaty. The ATS's primary purpose was to ensure federal redress for incidents like the two described above and thereby avoid unnecessary conflicts with foreign nations. *See id.* at 715-20. The First Congress was concerned about aliens who were injured in the United States in violation of customary international law, but who had no redress in federal court. But there is no evidence that Congress was concerned about remedying aliens' injuries that occurred in foreign lands. And there is no particular reason that Congress would have been concerned about aliens injured in foreign lands. Remedies for such injuries could be provided, after all, by foreign sovereigns under their countries' laws.[5] It would be very odd to think that the Congress of 1789 wanted to create a federal tort cause of action enforceable in U.S. court for, say, a Frenchman injured in London.

The purpose and background of the ATS – avoiding conflict with foreign nations – thus reinforce the presumption against extraterritoriality. And modern ATS litigation further demonstrates the continuing vitality of the concerns that undergird the presumption. The goal of the presumption against extraterritoriality, like the goal of the ATS, is to avoid conflict with foreign nations. But recent ATS cases based on acts that occurred in foreign nations have often *engendered* conflict with other sovereign nations, rather than avoided it. The Government of Indonesia, for example, has strenuously

---

[5] To be clear, the point here is not that plaintiffs must exhaust their remedies in foreign nations' legal systems – here, Indonesia's – before bringing claims under the ATS. *Contra* Maj. Op. at 25-26. Rather, the point here is that a foreign sovereign can decide whether and how to redress an injury that occurs within its territory. And that traditional understanding of sovereignty explains why Congress in 1789 would not choose to extend this U.S. tort law to conduct occurring in foreign lands.

and repeatedly objected to this lawsuit. The Government of South Africa complained for six years that an extraterritorial ATS case litigated in the Second Circuit interfered with the operation of its post-apartheid Truth and Reconciliation Commission. *See Sosa*, 542 U.S. at 733 n.21. The Canadian government objected to an ATS suit brought against a Canadian corporation for conduct that occurred in Sudan, explaining that the suit interfered with Canada's foreign relations. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01-9882, 2005 WL 2082846, at *1-2 (S.D.N.Y. Aug. 30, 2005). The Government of Papua New Guinea objected for at least two years to an ATS suit against a mining corporation that operated on the island, complaining that the litigation had "potentially very serious social, economic, legal, political and security implications" for Papua New Guinea and would impair its relations with the United States. *See Sarei v. Rio Tinto*, 487 F.3d 1193, 1199 (9th Cir. 2007), *rev'd on unrelated grounds en banc*, 550 F.3d 822 (2008). And several other nations – including the United Kingdom, Switzerland, and Germany – have complained that the ATS improperly interferes with their rights to regulate their citizens and conduct in their own territory. *See Developments in the Law: Extraterritoriality*, 124 HARV. L. REV. 1226, 1283 (2011).[6]

This laundry list shows that something is palpably awry in the modern ATS litigation juggernaut. The problem stems in large part from extension of the ATS to conduct occurring in foreign lands. The presumption against extraterritoriality was designed, in part, to prevent such overreaching and

---

[6] That is not to say that foreign governments always have laudable motives when objecting. But that's not the relevant issue. The ATS and the presumption against extraterritoriality were designed to avoid conflict with foreign nations, and modern ATS litigation has thwarted that purpose.

thereby avoid this kind of international discord. *See ARAMCO*, 499 U.S. at 248. As its history reveals, the ATS shared the same broad purpose. Stretching the ATS to cover conduct in other countries thus has managed to flout the purposes of both the ATS itself and the longstanding presumption against extraterritoriality. Courts may – and indeed, under binding Supreme Court precedent, must – adhere to and apply the settled presumption against extraterritoriality, and thereby avoid creating this kind of unnecessary international discord.[7]

To be sure, the interaction of the ATS and the presumption against extraterritoriality does raise one analytical wrinkle, although it's not presented in this case: Does the ATS apply to conduct on the high seas – that is, conduct neither in the territory of the United States nor in the territory of a foreign country? I believe the better answer is yes, and that the presumption against extraterritoriality is overcome to that limited extent in ATS cases. The Supreme Court noted in *Sosa* that piracy was one of the three causes of action contemplated by the First Congress when it passed the ATS. 542 U.S. at 720. "[P]iracy, by the law of nations, is robbery upon the sea"; it cannot, as a definitional matter, occur on U.S. soil. *United States v. Smith*, 18 U.S. 153, 162 (1820) (Story, J.). (The other two causes of action originally available under the ATS – offenses against ambassadors and violations of safe conducts – can occur in the United States.) Because we know that Congress intended the ATS to cover piracy and because piracy occurs on the high seas, it follows

---

[7] To the extent an individual commits an offense abroad and then flees to the United States as a fugitive from the foreign nation's legal process, the traditional international relations tool to address that situation is extradition. At this point, of course, the United States has extradition treaties with most other nations of the world. *See* 18 U.S.C. §§ 3181-3196.

that Congress intended the ATS to apply to conduct on the high seas.

Applying the ATS to conduct on the high seas does not pose the risk of conflicts with foreign nations that the presumption against extraterritoriality and the ATS itself were primarily designed to avoid. The high seas are jurisdictionally unique. They are "the common highway of all nations," governed by no single sovereign. *The Apollon*, 22 U.S. at 371. As a result, the high seas may fall within the jurisdiction of the federal courts even when foreign countries and foreign territorial waters do not. *See, e.g.*, *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 355-56 (1909) ("No doubt in regions subject to no sovereign, like the high seas, or to no law that civilized countries would recognize as adequate, such countries may treat some relations between their citizens as governed by their own law, and keep, to some extent, the old notion of personal sovereignty alive. They go further, at times, and declare that they will punish anyone, subject or not, who shall do certain things, if they can catch him, as in the case of pirates on the high seas.") (internal citations omitted); *The Apollon*, 22 U.S. at 371 (distinguishing "foreign ports and territories" from "places where our jurisdiction is complete, . . . our own waters, or . . . the ocean"); Breach of Neutrality, 1 U.S. Op. Att'y Gen. 57, 58 (1795) (crimes committed in foreign country "are not within the cognizance of our courts," but "crimes committed on the high seas *are* within the jurisdiction of the district and circuit courts of the United States").

That distinction between foreign lands and the high seas makes good sense, particularly as applied to the ATS. Tortious conduct that occurs in a foreign nation's territory is regulated by the foreign sovereign. Tortious conduct on the high seas, by contrast, is regulated by no nation in particular.

*See Smith*, 18 U.S. at 162 (describing "the general practice of all nations in punishing all persons, whether natives or foreigners, who have committed [piracy] against any persons whatsoever, with whom they are in amity"). Although the United States risks offending foreign nations by regulating conduct occurring in those foreign countries, it performs something of an international public service by supplying a customary international law cause of action in federal court against illegal conduct on the high seas. *Cf. The Marianna Flora*, 24 U.S. 1, 40 (1825) (pirates "are, in truth, the common enemies of all mankind") (Story, J.). The ATS, designed to smooth and improve the United States' relations with foreign nations, thus quite sensibly may be interpreted to extend to conduct on the high seas but not to conduct in foreign countries.[8]

---

[8] The central point here is that piracy typically occurs on the high seas, not in a nation's territory. Moreover, extending a cause of action to conduct on the high seas poses no risk of conflict with foreign nations. It follows that applying the ATS to conduct on the high seas is consistent with the goals of the ATS and the presumption against extraterritoriality. The majority opinion says that persons could aid or instigate piracy from foreign land or commit piracy in foreign territorial waters. *See* Maj. Op. at 15, 17 n.7, 22 & n.10. The majority opinion reasons that the ATS thus must extend to conduct on foreign land. In my view, such a theoretical possibility is far too thin a reed to overcome the presumption against extraterritoriality and extend the ATS to conduct *on foreign land.* "Characteristically [piracy] has been regarded as an offence of the open seas," not in a nation's territory. Edwin D. Dickinson, *Is the Crime of Piracy Obsolete?*, 38 HARV. L. REV. 334, 336-37 (1925); *see, e.g.*, U.S. CONST. art. I, § 8 ("Congress shall have Power . . . To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations"); 4 WILLIAM BLACKSTONE, COMMENTARIES *72 ("The offence of piracy, by common law, consists in committing those acts of robbery and depredation upon the high seas, which, if

Early cases mentioning the ATS, though few in number, confirm that the statute applies to conduct in the United States or on the high seas, but not to conduct in foreign nations. In the decade after the ATS's passage, the two reported cases that discussed the statute dealt with conduct that occurred in the United States or on the high seas. *See Bolchos v. Darrel*, 3 F. Cas. 810 (No. 1,607) (D.S.C. 1795) (ATS provides jurisdiction when wrongful seizure occurred at U.S. port and "original cause arose at sea"); *Moxon v. The Fanny*, 17 F. Cas. 942, 948 (No. 9,895) (D. Pa. 1793) (owners of British ship sought damages for its seizure in U.S. waters by a French privateer; ATS does not apply because suit was not "for a tort only").

Attorney General Bradford's 1795 opinion about an incident in Sierra Leone also supports this distinction between (i) conduct in the United States or on the high seas and (ii) conduct in foreign lands. The Bradford opinion considered whether the United States could criminally prosecute an

---

committed upon land, would have amounted to felony there."); *Sosa*, 542 U.S. at 719 ("Consider, too, that the First Congress was attentive enough to the law of nations to recognize certain offenses expressly as criminal, including the three mentioned by Blackstone. See An Act for the Punishment of Certain Crimes Against the United States, § 8, 1 Stat. 113-114 (murder or robbery, or other capital crimes, *punishable as piracy if committed on the high seas*) . . . .") (emphasis added); *id.* at 749 (Scalia, J., concurring) ("That portion of the general common law known as the law of nations was understood to refer to the accepted practices of nations in their dealings with one another (treatment of ambassadors, immunity of foreign sovereigns from suit, etc.) and with *actors on the high seas hostile to all nations and beyond all their territorial jurisdictions (pirates)*.") (emphasis added).

individual for acts committed on the high seas and in Sierra Leone.  The opinion also mentioned civil liability under the ATS.  The opinion is best read to say that the ATS applies to conduct in the United States or on the high seas.  It does not say that the ATS extends to conduct in foreign lands. Because the opinion's meaning has been the subject of some debate in ATS cases, *compare* Maj. Op. at 19-21, *with Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 142 n.44 (2d Cir. 2010), I reproduce the relevant portion in its entirety here:

> So far, therefore, as the transactions complained of originated or took place *in a foreign country*, *they are not within the cognizance of our courts*; nor can the actors be legally prosecuted or punished for them by the United States.  But crimes committed *on the high seas are* within the jurisdiction of the district and circuit courts of the United States; and, so far as the offence was committed thereon, I am inclined to think that it may be legally prosecuted in either of those courts, in any district wherein the offenders may be found.  But some doubt rests on this point, in consequence of the terms in which the 'Act in addition to the act for the punishment of certain crimes against the United States' [the Neutrality Act of 1794] is expressed.  But there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a *civil* [ATS] suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States; and as such a suit may be maintained by evidence taken at a distance, on a commission issued for that purpose, the difficulty of obtaining redress would not be so great as

> in a criminal prosecution, where *viva voce* testimony alone can be received as legal proof.

1 U.S. Op. Att'y Gen. at 58-59 (first and second emphases added). When the Bradford opinion finally mentions the ATS, it is focused on acts "committed on the high seas," not on acts that occurred in a foreign country. The Second Circuit recently analyzed the Bradford opinion and reached the same conclusion: "Attorney General Bradford circumscribes his opinion, appearing to conclude that the Company could *not* bring suit for the actions taken by the Americans in a foreign country, but rather, could sue only for the actions taken by the Americans on the high seas." *Kiobel*, 621 F.3d at 142 n.44 (internal quotation marks omitted). To the extent an opinion of one Attorney General matters to judicial interpretation of the ATS, the Bradford opinion supports the view that the ATS applies to conduct in U.S. territory and on the high seas, but it does not support the conclusion that the ATS extends to conduct in foreign countries.

In sum, the presumption against extraterritoriality bars ATS suits based on conduct in foreign lands. The ATS contains no "indication of a congressional purpose to extend its coverage" to conduct occurring in foreign lands. *ARAMCO*, 499 U.S. at 248. And the ATS's history provides affirmative evidence supporting its limited geographic scope. The First Congress was, for good reason, primarily concerned about torts against aliens that occurred within the United States and on the high seas. Extending the ATS to conduct that occurs in foreign countries not only violates the presumption against extraterritoriality, but runs counter to the ATS's broad purpose of avoiding conflict with foreign nations. Applying the bedrock presumption against extraterritoriality would alleviate the serious discord with foreign nations that has arisen in recent years as courts have

extended the ATS to conduct occurring in foreign lands. I would dismiss plaintiffs' ATS claims – which are based on conduct that occurred in Indonesia – because the ATS does not apply to conduct that occurred within a foreign country.

II

*Second*, and in the alternative, I would dismiss plaintiffs' ATS claims because the ATS does not apply to claims against corporations. In cases such as this where no U.S. treaty is involved, claims under the ATS are defined and limited by customary international law, and customary international law does not extend liability to corporations.

The ATS allows alien plaintiffs to bring tort claims for violations of customary international law norms that are "accepted by the civilized world and defined with a specificity comparable to" the three original norms thought to be cognizable under the ATS: offenses against ambassadors, violations of safe conducts, and piracy. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004). As the Supreme Court directed: "Whatever the ultimate criteria for accepting a cause of action subject to jurisdiction" under the ATS, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms [offenses against ambassadors, violations of safe conducts, and piracy] familiar when [the ATS] was enacted." *Id.* at 732. The Court emphasized that courts must exercise "great caution" and "vigilant doorkeeping" in ATS cases. *Id.* at 728-29.

The Supreme Court has said that we look to customary international law not only for the substantive content of the tort but also for the categories of defendants who may be sued.

*Id.* at 732 n.20.  This is done "on a norm-specific basis."  *Ali Shafi v. Palestinian Authority*, No. 10-7024, slip op. at 14 (D.C. Cir. June 14, 2011); *see also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791-95 (D.C. Cir. 1984) (Edwards, J., concurring).

In particular, the Court in *Sosa* stated that customary international law determines whether only state actors may be liable for violating a customary international law norm (as was the traditional approach), or whether private actors such as corporations or private individuals also may be liable for violating a given norm.  As the Court explained, whether an ATS claim can be brought against a corporation or a private individual depends on "whether *international law* extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."  542 U.S. at 732 n.20 (emphasis added).  Later in the opinion, the Court underscored that customary international law defines who can be sued; the Court said that the plaintiff in *Sosa* needed to show that the defendant "was acting on behalf of a government" when he allegedly violated a norm, for otherwise the plaintiff "would need a *rule broader still*" to establish ATS liability.  *Id.* at 737 (emphasis added).  Like footnote 20, that later sentence in *Sosa* indicated quite clearly that customary international law answers the question of who may be sued in ATS cases.  Justice Breyer reiterated the same point in his *Sosa* concurrence: To qualify for recognition under the ATS, a norm of international law "must extend liability to the type of perpetrator (*e.g.*, a private actor) the plaintiff seeks to sue." *Id.* at 760 (Breyer, J., concurring).

The Supreme Court has thus required that we look to customary international law to determine what categories of defendants can be liable for violating a particular norm.  *See*

*Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111, 127-28 (2d Cir. 2010). As applied to this case, *Sosa* requires us to determine "whether international law extends the scope of liability" for aiding and abetting torture, extrajudicial killing, and prolonged detention "to the perpetrator being sued" – here, a corporation. *Sosa*, 542 U.S. at 732 n.20.

To support an ATS claim against a corporation, it would not be sufficient to show that customary international law prohibits torture, extrajudicial killing, and prolonged detention when committed by state actors. It likewise would not be sufficient to show that customary international law recognizes corporate liability for some violations, but not for aiding and abetting torture, extrajudicial killing, and prolonged detention. Rather, for plaintiffs to maintain their claims, customary international law must impose liability against corporations for aiding and abetting torture, extrajudicial killing, or prolonged detention.[9] It does not. In fact, customary

---

[9] Because customary international law governs this issue, foreign nations' domestic laws are not relevant here, contrary to a suggestion in the majority opinion. *See* Maj. Op. at 78-80. "[T]he fact that a legal norm is found in most or even all 'civilized nations' does not make that norm a part of customary international law." *Kiobel*, 621 F.3d at 118. "[T]hat corporate criminal liability has recently obtained greater acceptance in Europe – although interesting as a matter of *comparative law* – does not demonstrate that corporate liability has attained the status of a norm of *customary international law*." *Id.* at 141 n.43 (citing *Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980), for the proposition that customary international law consists of norms that are ''of mutual, and not merely several, concern'') (internal citations omitted). The Supreme Court itself underscored this point in *Sosa*, holding that a claim for arbitrary detention was not cognizable under the ATS even though the alleged detention was illegal under Mexican law. *Sosa*, 542 U.S. at 736-37; *see also id.* at 737 n.28 ("Sosa might well have been liable under Mexican law"). In any

international law does not impose liability against corporations at all.

Customary international law generally extends liability to states, as well as to individuals who act under color of state law or aid and abet states. For most customary international law norms, customary international law *does not* extend liability to individuals who act independently of state involvement. (Piracy is a prominent exception; customary international law imposes liability on private individuals for piracy.) Most importantly for present purposes, customary international law *does not* extend liability to corporations. As the Second Circuit accurately stated, "[t]he concept of corporate liability for violations of customary international law has not achieved universal recognition or acceptance as a norm in the relations of States with each other." *Kiobel*, 621 F.3d at 149; *see also id.* at 186 (Leval, J., concurring) ("It is true that international law, of its own force, imposes no liabilities on corporations or other private juridical entities.").

A brief review of customary international law convincingly demonstrates that, as the Second Circuit concluded, there is no corporate liability in customary international law, much less corporate liability for violations of the norms alleged here.

---

event, there is no consensus in foreign nations' legal systems that corporations can be liable for violations of the kind alleged here. *See* Report of the Special Representative of the Secretary-General on the Issue of Human Rights and Transnational Corporations and Other Business Enterprises ¶ 34, U.N. Doc. A/HRC/4/35 (Feb. 19, 2007) ("At national levels, there is enormous diversity in the scope and content of corporate legal responsibilities regarding human rights.").

Traditionally, legal rights and duties under international law applied primarily to sovereign states. *See* 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 101 (1987) (Reporters' Notes). The Nuremberg trials following World War II "for the first time made explicit and unambiguous" that "individuals are responsible" for the commission of international crimes. Robert H. Jackson, Final Report to the President Concerning the Nurnberg War Crimes Trial, *reprinted in* 20 TEMP. L.Q. 338, 342 (1946). No corporations were charged or convicted in the Nuremberg trials, however, even though many corporate executives were individually tried. *See* Jonathan A. Bush, *The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said*, 109 COLUM. L. REV. 1094, 1098 (2009). Although numerous executives of the German company I.G. Farben were charged at the U.S. military tribunal, the Tribunal stated that "the corporate defendant, Farben, is not before the bar of this Tribunal and cannot be subjected to criminal penalties in these proceedings" because "corporations act through individuals." 8 TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10 1153 (1952). Indeed, the London Charter, which established the International Military Tribunal at Nuremberg, provided jurisdiction for the tribunal to "try and punish" only "individuals or . . . members of organizations." Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis art. 6, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 280; *see also id.* art. 9-10 (Tribunal may declare that "the group or organization of which the individual was a member was a criminal organization," which designation may serve as proof in a subsequent trial of an individual "for membership therein.").

Every international tribunal since Nuremberg that has enforced customary international law has followed this path, extending liability to individuals but not to corporations. To take the most prominent examples, the International Criminal Tribunals for Rwanda and the former Yugoslavia have jurisdiction only over "natural persons." *See Kiobel*, 621 F.3d at 136.

A recent U.N. Report noted the "absence of an international accountability mechanism" for corporate conduct. Report of the Special Representative of the Secretary-General on the Issue of Human Rights and Transnational Corporations and Other Business Enterprises ¶ 21, U.N. Doc. A/HRC/4/35 (Feb. 19, 2007). The U.N. Report concluded that "States have been unwilling to adopt binding international human rights standards for corporations." *Id.* ¶ 44. As a result, "[b]efore the current round of cases in U.S. courts, no corporation had ever been charged with or convicted for an international war crime or similar offense." Bush, *Prehistory of Corporations* at 1098.

The Second Circuit recently summarized the state of the law this way:

> Looking to international law, we find a jurisprudence, first set forth in Nuremberg and repeated by every international tribunal of which we are aware, that offenses against the law of nations (*i.e.,* customary international law) for violations of human rights can be charged against States and against individual men and women but not against juridical persons such as corporations. As a result, although customary international law has sometimes extended the scope of liability for a violation of a given norm to individuals, it

has *never* extended the scope of liability to a corporation.

*Kiobel*, 621 F.3d at 120.

In short, the content of an ATS claim is governed by customary international law, and customary international law does not provide liability against corporations for torture, extrajudicial killing, or prolonged detention (or aiding and abetting thereof). Even assuming that there were hints in customary international law of corporate liability for certain customary international law violations, it surely cannot be said that corporate liability for the norms alleged in this case has been established with the specificity and widespread acceptance required by *Sosa* for ATS cases.[10]

Plaintiffs agree that customary international law does not extend liability to certain categories of defendants. Plaintiffs acknowledge, for example, that customary international law, except with respect to certain norms such as piracy, does not

---

[10] Although it does not explain the relevance of this point to its analysis or conclusion in this case, the majority opinion says in passing that the "law of nations" referred to in the ATS is distinct from customary international law. *See* Maj. Op. at 43 n.23. But courts and leading scholars equate the two terms. *See, e.g.*, Curtis A. Bradley, *State Action and Corporate Human Rights Liability*, 85 NOTRE DAME L. REV. 1823, 1824 (2010) ("For a variety of reasons, the alleged international law violation in ATS cases is almost always a violation of the 'law of nations,' also known today as 'customary international law,' rather than a violation of a treaty."); William A. Fletcher, *Congressional Power Over the Jurisdiction of Federal Courts: The Meaning of the Word "All" in Article III*, 59 DUKE L.J. 929, 944 (2010) ("The law of nations was what we today call customary international law."). The substance and relevance of footnote 23 of the majority opinion are thus somewhat unclear.

impose liability on private individuals who act independently of state involvement. And plaintiffs recognize that when customary international law does not extend liability to private individual defendants for violations of a given norm, U.S. courts cannot allow ATS suits against private individual defendants for violations of that customary international law norm.

Despite acknowledging that we should follow customary international law in determining when private parties may be liable in ATS cases for violations of a given norm, plaintiffs say we should *not* follow customary international law in determining whether one particular category of private parties – corporations – may be liable in ATS cases. Rather, plaintiffs say that, notwithstanding the clear limits of customary international law, we should feel free to fashion a broader federal common-law rule allowing liability against corporations in ATS cases.

Plaintiffs' position frankly makes little sense. Either customary international law determines which categories of defendants may be liable under the ATS, or it does not. In *Sosa*, the Supreme Court resolved that question. The Court stated that customary international law does in fact determine which categories of defendants may be liable in ATS cases on a norm-by-norm basis. *See* 542 U.S. at 732 n.20, 737. Our Court has said the same. *See Ali Shafi*, No. 10-7024, slip op. at 13-14; *Tel-Oren*, 726 F.2d at 791-95 (Edwards, J., concurring). Applying that principle here should not be complicated – other than for the inconvenient fact that it does not lead to plaintiffs' desired result with respect to corporate liability.

The approach of plaintiffs and the majority opinion produces a very odd result: A defendant who would not be

liable in an international tribunal for violation of a particular customary international law norm nonetheless may be liable in a U.S. court in an ATS suit for violation of that customary international law norm. In light of *Sosa*'s direction, I agree with the Second Circuit that such a result is simply "inconceivable." *Kiobel*, 621 F.3d at 122.

In sum, customary international law does not provide corporate liability for aiding and abetting torture, extrajudicial killing, or prolonged detention. Therefore, plaintiffs cannot maintain their ATS claims against Exxon, a corporation.

## III

*Third*, and also in the alternative, even if customary international law established corporate liability for aiding and abetting torture and extrajudicial killing, we still should not allow plaintiffs' ATS claims for those violations to go forward because doing so would be incongruous with the Torture Victim Protection Act, 28 U.S.C. § 1350 note.[11]

In 1992, Congress passed and President Bush signed the Torture Victim Protection Act. That Act supplies a civil cause of action to American citizens, as well as aliens, for torture and extrajudicial killing. Americans can sue under the TVPA, just as aliens can sue under the ATS. But the TVPA does not provide for corporate liability, and it does not provide for aiding and abetting liability. As I will explain, because the

---

[11] The majority opinion asserts that Exxon forfeited this claim. *See* Maj. Op. at 83 n.45. But Exxon devoted a page in the text of its brief to arguing that "[i]t would be wholly improper for courts to create a federal common-law cause of action under the ATS broader than the directly analogous action established by Congress," the TVPA. Exxon Br. at 31-32. I address that argument here.

TVPA does not provide for corporate liability or aiding and abetting liability in suits *by U.S. citizens*, we should interpret the ATS likewise not to provide for corporate liability or aiding and abetting liability in analogous suits *by aliens*.[12]

Why should we pay attention to the limits in the TVPA's causes of action for torture and extrajudicial killing when fashioning the contours of ATS causes of action for torture and extrajudicial killing? Recall that customary international law is notoriously vague and somewhat ill-defined. There is no book or code that tells us the content of customary international law; indeed, it is often unclear who is even making customary international law. Modern customary international law thus sometimes has a make-it-up-as-you-go-along feel to it. *See* Curtis A. Bradley & Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 HARV. L. REV. 815, 839-41 (1997) (describing the numerous sources and rapidly changing content of customary international law). Indeed, even back at the Constitutional Convention, Gouverneur Morris noted that international law principles were "often too vague and deficient to be a rule" without implementing legislation by the Congress. 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 615 (Max Farrand ed., rev. ed. 1937). That reality poses difficulty for U.S. courts trying to figure out the content of customary international law for purposes of an ATS suit. And that difficulty in turn poses a risk that courts will be left with little more than their own policy preferences when determining the scope of an ATS/customary international law claim.

---

[12] As an alternative to their aiding and abetting claim, plaintiffs have also asserted that Exxon acted under color of Indonesian law and was, in effect, a state actor. However, plaintiffs have failed to argue that Exxon acted under color of law as defined by customary international law.

All of this is good reason for judicial restraint in ATS cases. Indeed, in *Sosa*, the Supreme Court emphasized the paramount need for judicial restraint, "great caution," and "vigilant doorkeeping" in ATS cases, and the Court outlined several principles of restraint that must guide the Judiciary. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 725-33 (2004). For example, as discussed above in Part II of this opinion, the Court insisted that the Judiciary recognize only those customary international law norms that are sufficiently definite and widely accepted.

Relevant to the present discussion, the Court also emphasized that courts should "look for legislative guidance before exercising innovative authority over substantive law" in ATS cases. *Id.* at 726. The Court pointed out that Congress by direct or indirect command may scale back customary international law norms otherwise cognizable in ATS cases. *See id.* at 731 (Congress may "shut the door to the law of nations" either "explicitly, or implicitly by treaties or statutes that occupy the field"); *see also id.* at 760 (Breyer, J., concurring) ("Congress can make clear that courts should not recognize any such norm, through a direct or indirect command or by occupying the field").

What this means is that plaintiffs in ATS cases must pass through two filters with respect to the substance of their claims. First, they must show that their alleged claim against the defendant is firmly grounded in customary international law. Second, they also must show that Congress has not cast doubt on their asserted ATS claim by direct or indirect command.

In my view, *Sosa*'s emphasis on judicial restraint and on the role of Congress dictates the following interpretive

principle in ATS cases: When Congress has enacted a statute that gives U.S. citizens a cause of action for tortious conduct that is also a violation of customary international law, then the statutory limits on U.S. citizens' recovery under that statute should presumptively apply to aliens' recovery under the ATS as well. That interpretive principle avoids the bizarre result that would ensue if aliens – but not U.S. citizens – could bring suit in U.S. court for the same injuries caused by the same defendants.

Applying this *Sosa*-based interpretive principle, corporations should not be liable in ATS cases based on alleged torture or extrajudicial killing. The Torture Victim Protection Act authorizes "a civil action for recovery of damages from an *individual* who engages in torture or extrajudicial killing" and who acts "under actual or apparent authority, or color of law, of any foreign nation." Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note) (emphasis added). As this Court recently held, the TVPA's text and structure establish that corporations are *not* proper defendants in TVPA suits. *Mohamad v. Rajoub*, 634 F.3d 604, 607-08 (D.C. Cir. 2011); *see also Bowoto v. Chevron Corp.*, 621 F.3d 1116 (9th Cir. 2010). The word "individual" in the TVPA carries "its ordinary meaning," which "encompasses only natural persons and not corporations or other organizations." *Mohamad*, 634 F.3d at 607; *see also* 1 U.S.C. § 1 (Dictionary Act) (the word "person" includes "corporations, companies, associations, firms, partnerships, societies, . . . *as well as individuals*") (emphasis added).

Under the *Sosa*-based interpretive principle, plaintiffs' ATS claims for torture and extrajudicial killing are barred not just because the TVPA provides no corporate liability, but also because the TVPA provides no aiding and abetting

liability. Plaintiffs are suing Exxon under an aiding and abetting theory. But the text of the TVPA does not provide for aiding and abetting liability, and the Supreme Court has made crystal clear that there can be no civil aiding and abetting liability unless Congress expressly provides for it. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). Because liability for aiding and abetting torture and extrajudicial killing does not exist under the TVPA, courts should not allow liability for aiding and abetting torture and extrajudicial killing under the ATS.

To be clear, the TVPA does not alter or affect the contours of ATS suits based on customary international law norms other than torture and extrajudicial killing. *See Sosa*, 542 U.S. at 728. The TVPA was not intended to generally preempt or displace all ATS suits. *See id.* (TVPA's "legislative history includes the remark that [the ATS] should 'remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law'") (quoting H.R. Rep. No. 102-367, pt. 1, p. 4 (1991)). But the TVPA does reflect a specific congressional decision about when and under what circumstances U.S. citizens (and aliens) may sue for torture and extrajudicial killing. It would be odd and incongruous to disregard those limits in defining when aliens may sue for torture and extrajudicial killing under the ATS. Put simply, *Sosa* told courts in ATS cases to look to Congress for guidance, and Congress has specifically delineated what limits should attach to civil suits for torture and extrajudicial killing. Consistent with that direction in *Sosa*, we should follow the TVPA when fashioning the contours of the famously vague ATS. And it makes eminent sense to fashion the ATS so that aliens cannot recover in U.S. court for torture and extrajudicial killing in

circumstances where U.S. citizens could not recover in U.S. court for torture and extrajudicial killing.[13]

The majority opinion discounts the relevance of the TVPA to our analysis here. By doing so, however, the majority opinion produces the rather bizarre outcome that *aliens* may sue corporations in U.S. courts for aiding and abetting torture and extrajudicial killing, but *U.S. citizens* may *not* sue U.S. corporations for aiding and abetting torture and extrajudicial killing. In my view, it is implausible to think that Congress intended such a discrepancy. And it is inconsistent with *Sosa* to enshrine such a discrepancy into ATS case law. Because the TVPA does not provide corporate liability or aiding and abetting liability for torture and extrajudicial killing, the ATS likewise does not provide corporate liability or aiding and abetting liability for torture and extrajudicial killing.[14]

---

[13] The TVPA was not redundant with the ATS for at least three reasons. First, the TVPA gives a cause of action to U.S. citizens and aliens, not just to aliens. Second, the TVPA supplies a cause of action for extrajudicial killing, which is likely not a cognizable customary international law violation in ATS cases because it is not one of the Blackstone three or the Breyer four. *See supra* note 2. Third, at the time the TVPA was enacted in 1992, it was unclear whether any causes of action could be asserted under the ATS without further congressional action. *See, e.g.*, *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) (disagreement between Judges Edwards and Bork on this issue). The TVPA eliminated some uncertainty by definitively establishing causes of action for torture and extrajudicial killing.

[14] The TVPA provides a cause of action for torture and extrajudicial killing. The analysis in this section thus precludes plaintiffs' ATS claims based on those two asserted customary international law norms. Plaintiffs also claim a third alleged customary international law norm – prolonged detention. The TVPA does not speak to prolonged detention or put limits on it.

34

IV

*Fourth*, and again in the alternative, I would affirm the District Court's dismissal of plaintiffs' ATS claims because the Executive Branch has reasonably explained that adjudicating those ATS claims would harm U.S. foreign policy interests.

In *Sosa*, as noted above, the Supreme Court emphasized that lower courts must exercise judicial restraint in ATS cases. Part of that restraint, the Court said, is "a policy of case-specific deference to the political branches" that applies in cases touching on the foreign relations of the United States. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004). In "such cases," the Court instructed, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Id.*; *see also id.* at 760-61 (Breyer, J., concurring) ("courts should give 'serious weight' to the Executive Branch's view of the impact on foreign policy that permitting an ATS suit will likely have in a given case or type of case"). The Court added that courts considering ATS cases should be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* at 727.

The judicial restraint dictated by *Sosa* footnote 21 means the following: When the Executive Branch reasonably

---

But that alleged norm is not one of the Blackstone three or the Breyer four, and thus is not likely a customary international law norm cognizable in ATS cases. The prolonged detention claim thus likely fails at the threshold, as did the asserted arbitrary detention norm in *Sosa* itself. *See supra* note 2. In any event, the prolonged detention claim fails for any of the other three alternative reasons set forth in Parts I, II, and IV of this opinion.

explains that adjudication of a particular lawsuit would adversely affect U.S. foreign policy interests, the court should dismiss the lawsuit. *See id.* at 733 n.21; *cf. Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004) ("[S]hould the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy."); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000) (regarding state legislation regulating foreign commerce with Burma: "[R]epeated representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state Act stands in the way of Congress's diplomatic objectives."); *Hwang Geum Joo v. Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005) ("The Executive's judgment that adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders this case nonjusticiable under the political question doctrine.").

The theory behind *Sosa* footnote 21 is straightforward. Congress created a tort cause of action for aliens based on customary international law, a kind of international common law. Congress did so in order to benefit America's foreign relations. But if an ATS suit would harm the Nation's foreign relations – as assessed and explained by the Department of State or Department of Justice as representative of the President of the United States – then the courts have no business ignoring that statement of interest, thereby threatening the Nation's foreign relations and thwarting Congress's intent in the ATS.

Plaintiffs' case against Exxon has been pending for a decade, and the Executive Branch has repeatedly expressed its

views on the ATS claims. The Executive has reasonably and consistently stated that adjudication of plaintiffs' ATS claims would harm U.S. foreign policy interests.

In July 2002, the State Department filed a statement of interest with the District Court stating that this case would interfere with the U.S. Government's foreign policy goals. That letter explained:

> [T]he Department of State believes that adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism. It may also diminish our ability to work with the Government of Indonesia ("GOI") on a variety of important programs, including efforts to promote human rights in Indonesia.
>
> . . . .
>
> With respect to this litigation, it is the Department's considered opinion that adjudication at this time could adversely affect United States interests in two ways, recognizing that such effects cannot be determined with certainty. First, the GOI may respond to the litigation by curtailing cooperation with the United States on issues of substantial importance to the United States. Second, the litigation's potential effects on Indonesia's economy could in turn adversely affect important United States interests.

Letter from William H. Taft, IV, Legal Adviser, Department of State, to The Honorable Louis F. Oberdorfer, United States District Court for the District of Columbia 1-2 (July 29, 2002) (footnote omitted).

In 2003, the Department of Justice submitted a "Supplemental Statement of Interest" addressing some of the legal issues raised by plaintiffs' claims. That statement explained that the U.S. Government's concerns about the litigation required that the District Court dismiss the ATS claims:

> It remains the United States' position that adjudication of this case would raise foreign policy and national security concerns for the reasons articulated in the State Department's letter. Those concerns can be avoided by holding, as the United States contends, that the ATS does not create an independent right of action.

Supplemental Statement of Interest of the United States of America at 2, *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005).

In the District Court, Judge Oberdorfer paid careful attention to the Executive Branch's stated concerns and dismissed plaintiffs' ATS claims, in part to avoid "adjudicating the actions of the Indonesian government." *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 26-27 (D.D.C. 2005). Exxon then asked this Court to entertain an interlocutory appeal or grant a writ of mandamus compelling the District Court to dismiss plaintiffs' D.C. tort claims as well. This Court declined to do so. *See Doe v. Exxon Mobil Corp.*, 473 F.3d 345 (D.C. Cir. 2007). The Court's opinion focused on plaintiffs' D.C. tort claims – the only issue presented – and did not evaluate either the Executive Branch's statement of interest with respect to the ATS claims or the District Court's decision to dismiss the ATS claims.

Exxon petitioned for certiorari with respect to the D.C. tort claims, and the Government filed an amicus brief urging

the Supreme Court to deny the writ. Brief for the United States as Amicus Curiae at 8-9, *Exxon Mobil Corp. v. Doe*, 554 U.S. 909 (2008) (No. 07-81). In so doing, the Government's brief – which was signed by the Solicitor General and the Legal Adviser to the Department of State – reiterated the U.S. Government's position on the ATS claims:

- The District Court "reach[ed] the result the United States had advocated with respect to respondents' ATS claims" when it dismissed those claims. *Id.* at 8.
- "Moreover, the United States had said that its 'concerns can be avoided by holding * * * that the ATS does not create an independent right of action,' and the district court responded by granting petitioners' motion to dismiss the ATS and TVPA claims, which were premised on alleged violations of international law by the Indonesian government." *Id.* at 16 (quoting Supplemental Statement of Interest of the United States of America at 2, *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20).
- "[A]s a result of the district court's rulings narrowing the scope of respondents' suit, the case now presents neither of the particular situations discussed in *Sosa* and *Altmann*. In *Sosa*, the Court addressed the deference owed to the Executive Branch by the courts in exercising their federal-common-law-making authority under the ATS with respect to claims alleging violations of international law. Here, the district court dismissed respondents' claims under the ATS, as the United States had requested, as well as those under the TVPA." *Id.* at 17-18 (internal citation omitted).

The U.S. Government's amicus brief to the Supreme Court thus plainly stated that the Executive Branch opposed

the ATS claims and that the District Court correctly dismissed plaintiffs' ATS claims in light of the Executive Branch's concerns. That amicus brief was the Executive Branch's last statement on this lawsuit.

In sum, in 2002, 2003, and 2008, the Executive Branch reasonably explained that the court would harm U.S. foreign policy interests if it allowed plaintiffs' ATS claims to proceed. The Executive Branch has never retracted the statements. Judge Oberdorfer followed *Sosa*'s instruction to give "serious weight to the Executive Branch's view of the case's impact on foreign policy," and he dismissed the ATS claims. 542 U.S. at 733 n.21. In light of *Sosa* footnote 21, I would affirm Judge Oberdorfer's decision.

The majority opinion disagrees. In my judgment, the majority opinion does not give proper weight to the Executive Branch statements about the ATS claims. To be sure, it is possible that the Supreme Court didn't mean what it said in *Sosa* footnote 21. And it is possible that the Executive Branch no longer believes what it said in 2002, 2003, and 2008. On the current record, however, there can be little doubt under *Sosa* footnote 21 that the Executive Branch's clear and consistent statements require dismissal of the ATS claims. On remand, the District Court still can (and in my view, should) invite the Executive Branch to state or clarify its views once again. If the Executive Branch reiterates its objection to the ATS claims, then the District Court should dismiss those claims.

* * *

I respectfully dissent.